UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FOX NEWS NETWORK, LLC, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civ. No. 09cv00272 (AKH) ) |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | ) ) ) ) |
| Defendant. | ) ) ) |

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Katherine H. Wheatley (KW7931)
Associate General Counsel
Yvonne F. Mizusawa (YM5081)
Senior Counsel
Board of Governors of the Federal
  Reserve System
20th and C Streets, N.W.
Washington, D.C.  20551
Ph: (202) 452-3436
Fax: (202) 736-5615

March 27, 2009

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

BACKGROUND .............................................................................................................. 2

ARGUMENT ................................................................................................................... 6

  A.   SUMMARY OF ARGUMENT ................................................................... 6

  B.   SUMMARY JUDGMENT STANDARD IN FOIA CASES .......................... 7

  C.   THE BOARD CONDUCTED AN ADEQUATE SEARCH ......................... 8

    1)   The Applicable Legal Standard ...................................................... 8

    2)   The Board Conducted an Adequate Search in Response to the First and Second FOIA Requests ................................................................................................ 9

  D.   THE BOARD PROPERLY WITHHELD LOAN INFORMATION ON INDIVIDUAL BORROWERS UNDER EXEMPTIONS 4 AND 5 OF FOIA............. 17

    1)   The Applicable Exemption 4 Standard ...................................... 17

      (a)   Disclosure of Loan Information on Individual Borrowers is Likely to Cause Substantial Competitive Harm to Borrowers at the DW and SCLFs..................... 20

      (b)   The Loan Information on Individual Borrowers was Properly Withheld under the Third Prong of National Parks Because Disclosure Would Impair the Board's Ability to Provide Liquidity Through the DW and SCLFs, and to Promote Maximum Employment, Stable Prices, and Moderate Long-Term Interest Rates, as Rates as Required by Statute................................................................................ 26

    2)   The Board Properly Withheld Loan Information on Individual Borrowers Under FOIA Exemption 5 ................................................................................................ 34

E.       RESPONSIVE DOCUMENTS AT THE FRBNY AND FRBB ARE NOT "AGENCY RECORDS" OF THE BOARD SUBJECT TO A FOIA REQUEST TO THE BOARD ...................................................................................................................................... 37

1)     Responsive Documents at the FRBNY and FRBB were Neither Created nor Obtained by the Board and are not "Agency Records" of the Board Subject to FOIA................. 38

2)     The Structure of the Board and the Federal Reserve Banks .......................................... 41

3)     Responsive Documents at the FRBNY and FRBB do not Fall Within the Narrow Category of Reserve Bank Documents that are Board Records by Regulation............. 44

CONCLUSION.................................................................................................................................... 52

# TABLE OF AUTHORITIES

## CASES

9 to 5 Org. for Women Office Workers v. Board of Governors,
  721 F.2d 1 (1st Cir. 1983). ................................................................ 26, 33

ACLU v. U.S. Dep't of Defense,
  389 F. Supp. 2d 547 (S.D.N.Y. 2005) ................................................ 7, 8

Africa Fund v. Mosbacher,
  1993 U.S. Dist. LEXIS 7044 (S.D.N.Y. 1993)....................................... 27

American Airlines, Inc. v. National Mediation Board,
  588 F.2d 863 (2d Cir. 1978) ................................................................. 18

Amnesty International USA v. CIA,
  2008 U.S. Dist LEXIS 47882 (S.D.N.Y., June 19, 2008) ............... 9, 13, 16

Auer v. Robbins,
  519 U. S. 452 (1997) ............................................................................ 45

Bowles v. Seminole Rock & Sand Co.,
  325 U. S. 410 (1945) ............................................................................ 45

Bruh v. Bessemer Venture Partners III L.P.,
  464 F.3d 202 (2d Cir. 2006), cert. denied, 549 U.S. 1209 (2007)........... 45

Carney v. U.S. Dep't of Justice,
  19 F.3d 807 (2d Cir.), cert. denied, 513 U.S. 823 (1994)................ 7, 8, 17

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986). ............................................................................. 7

Ciba-Geigy Corp. v. Matthews,
  428 F. Supp. 523 (S.D.N.Y. 1977) ........................................................ 40

Clarke v. U.S. Dep't of Treasury,
  1986 U.S. Dist. LEXIS 29989 (E.D. Pa. Jan. 28, 1986)............... 28, 29, 33

Comstock Int'l (U.S.A.), Inc. v. Export-Import Bank,
  464 F. Supp. 804 (D.D.C. 1979)....................................................... 27, 28

Continental Stock Transfer & Trust Co. v. SEC,
  566 F.2d 373 (2d Cir. 1977) (per curiam) ............................................ 19

Critical Mass Energy Project v. NRC,
    975 F.2d 871 (D.C. Cir. 1992) (en banc), cert. denied, 507 U.S. 984 (1993). ........................ 26

Fasano v. Federal Reserve Bank of New York,
    457 F.3d 274 (3rd Cir. 2006), cert. denied, 549 U.S. 1115 (2007)..................................... 42, 43

Federal Reserve Bank of Boston v. Comm'r of Corporations,
    499 F.2d 60 (1st Cir. 1974). ................................................................................................. 42

Federal Reserve Bank of St. Louis v. Metrocentre Improv. Dist.,
    657 F.2d 183 (8th Cir. 1981), aff'd, 455 U.S. 995 (1982)........................................................ 42

Ferguson v. FBI,
    83 F.3d 41 (2d Cir. 1996) ........................................................................................................ 8

First Agricultural Nat'l Bank v. State Tax Comm'n,
    392 U.S. 339 (1968) ............................................................................................................... 42

FOMC v. Merrill,
    443 U.S. 340 (1979) ....................................................................................................... passim

Forsham v. Harris,
    445 U.S. 169 (1980) ............................................................................................................... 40

FTC v. Grolier, Inc.,
    462 U.S. 19 (1983) ................................................................................................................. 34

Garcia v. U.S. Dep't of Justice,
    181 F. Supp. 2d 356 (S.D.N.Y. 2002). ..................................................................................... 9

Government Land Bank v. GSA,
    671 F.2d 663 (1st Cir. 1982) ................................................................................................... 36

Grand Central Partnership v. Cuomo,
    166 F.3d 473 (2d Cir. 1999) ........................................................................................ 7, 13, 39

Gulf & Western Industries, Inc. v. United States,
    615 F.2d 527 (D.C. Cir. 1980)............................................................................................... 18

Hack v. Dep't of Energy,
    538 F. Supp. 1098 (D.D.C. 1982)........................................................................................... 36

iv

Halpern v. FBI,
    181 F.3d 279 (2d Cir. 1999) ........................................................................ 7

Inner City Press v. Board of Governors,
    380 F. Supp. 2d 211 (S.D.N.Y. 2005), aff'd in part, remanded in part on other gnds,
    463 F.3d 239 (2d Cir. 2006) ........................................................................ 20

Inner City Press/Community on the Move v. Board of Governors,
    1998 U.S. Dist. LEXIS 15333 (S.D.N.Y., Sept. 30, 1998), aff'd, 182 F.3d 900 ............... 8, 16

Inner City Press/Community on the Move v. Board of Governors,
    463 F.3d 239 (2d Cir. 2006) ........................................................................ 17, 19

Jones v. FBI,
    41 F.3d 238 (6th Cir. 1994) ........................................................................ 14

Jones-Edwards v. NSA,
    196 Fed. Appx. 36 (2d Cir. 2006) .................................................................. 7, 9, 17

Judicial Watch, Inc. v. Export-Import Bank,
    108 F. Supp. 2d 19 (D.D.C. 2000) .................................................................. 28, 30

Kissinger v. Reporter's Committee for Freedom of the Press,
    445 U.S. 136 (1980). ................................................................................ 38, 40

Lion Raisins, Inc. v. USDA,
    354 F.3d 1072 (9th Cir. 2004) ...................................................................... 20

Maynard v. CIA,
    986 F.2d 547 (1st Cir. 1993). ...................................................................... 16

Melcher v. FOMC,
    644 F. Supp. 510 (D.D.C. 1986), aff'd in part, vacated in part, 836 F.2d 561 (D.C. 1987),
    cert. denied, 486 U.S. 1042 (1988). ................................................................ 41, 44

Merrill v. FOMC,
    516 F. Supp. 1028 (D.D.C. 1981) .................................................................... 36

Nadler v. FDIC,
    899 F. Supp. 158 (S.D.N.Y. 1995), aff'd on other gnds, 92 F.3d 93 (2d Cir. 1996) ............... 27

Nadler v. FDIC,
    92 F.3d 93 (2d Cir. 1996) ........................................................................... 18

National Parks & Conservation Ass'n v. Kleppe,
  547 F.2d 673 (D.C. Cir. 1976) ................................................................. 19

National Parks Conservation Ass'n v. Morton,
  498 F.2d 765 (D.C. Cir. 1974) ........................................................... passim

NLRB v. Robbins Tire & Rubber Co.,
  437 U.S. 214 (1978) ........................................................................... 40

NLRB v. Sears, Roebuck & Co.,
  421 U.S. 132 (1975) ........................................................................... 34

Oglesby v. U.S. Dep't of the Army,
  920 F.2d 57 (D.C. Cir. 1990) ............................................................... 8

OSHA Data/CIH, Inc. v. U.S. Dep't of Labor,
  220 F.3d 153 (3rd Cir. 2000) ............................................................. 18

Public Citizen Health Research Group v. FDA,
  704 F.2d 1280 (D.C. Cir. 1983) ........................................................ 20

Raichle v. Federal Reserve Bank of New York,
  34 F.2d 910 (2d Cir. 1929) ................................................................ 51

Safecard Services, Inc. v. SEC,
  926 F.2d 1197 (D.C. Cir. 1991) ........................................................ 8, 9

Scott v. Federal Reserve Bank of Kansas City,
  406 F.3d 532 (8th Cir. 2005), cert. denied, 546 U.S. 1216 (2006) ...................... 42, 44

Truitt v. U.S. Dep't of State,
  897 F.2d 540 (D.C. Cir. 1990 .......................................................... 9, 16

U.S. Dep't of Justice v. Tax Analysts,
  492 U.S. 136 (1989) ........................................................................ 7, 39

U.S. v. Weber Aircraft Corp.,
  465 U.S. 792 (1984) ........................................................................... 34

United Technologies Corp. v. FAA,
  102 F.3d 688 (2d Cir. 1996), cert. denied, 521 U.S. 1103 (1997) ........................ 19

Utah v. U.S. Dep't of the Interior,
  256 F.3d 967 (10th Cir. 2001) ........................................................... 20

vi

Vaughn v. Rosen,
    484 F.2d 820 (D.C. Cir. 1973) ................................................................. 2

Wilbur v. CIA,
    355 F.3d 675 (D.C. Cir. 2004) ................................................................ 14

Wood v. FBI,
    432 F.3d 78 (2d Cir. 2005) .................................................................... 8

**STATUTES**

5 U.S.C. § 551(2) ........................................................................................ 18

5 U.S.C. § 552 .............................................................................................. 1

5 U.S.C. § 552(a)(4)(B). ........................................................................ 7, 38

5 U.S.C. § 552(b)(4)). ................................................................................ 18

5 U.S.C. § 552(b)(5). .................................................................................. 34

12 U.S.C. § 33 ............................................................................................. 48

12 U.S.C. § 225a ......................................................................................... 29

12 U.S.C. § 248(j) ....................................................................................... 41

12 U.S.C. § 241 ........................................................................................... 41

12 U.S.C. § 248(k) ................................................................................. 43, 46

12 U.S.C. § 263 ........................................................................................... 42

12 U.S.C. § 263(a) ...................................................................................... 42

12 U.S.C. § 263(b) ...................................................................................... 51

12 U.S.C. §§ 282, 341 ................................................................................. 43

12 U.S.C. § 301 ........................................................................... 43, 45, 46, 48

12 U.S.C. § 302 ........................................................................................... 43

12 U.S.C. § 341 (Fifth) ............................................................................... 44

12 U.S.C. §§ 341-361 .................................................................................. 43

12 U.S.C. § 343 .................................................................................................... passim

12 U.S.C. § 347b ................................................................................................. 46, 48

12 U.S.C. § 347b(a). ............................................................................................ 46, 48

12 U.S.C. § 347c. ...................................................................................................... 48

12 U.S.C. § 348a. ...................................................................................................... 51

12 U.S.C. § 353 ......................................................................................................... 51

12 U.S.C. § 354 ......................................................................................................... 51

12 U.S.C. § 355 ......................................................................................................... 51

12 U.S.C. § 356 ......................................................................................................... 51

## OTHER AUTHORITIES

18 Fed. Res. Bull. 518-20 (August 1932) ................................................................. 50

H.R. Rep. No. 69, 63rd Cong., 1st Sess. 18 (1913) .............................................. 43, 49

75 Cong. Rec. 15040-41 and 14981 (July 11, 1932) ............................................... 50

Pub. Law 72-302, § 210 of Title 2, 47 Stat. 709 (July 21, 1932) ............................ 49

The Federal Reserve System Purposes and Functions (Ninth Edition, June 2005) ............... passim

## RULES

Fed. R Civ. P. 26(c)(7). ............................................................................................ 35

Fed. R. Civ. P. 56 ....................................................................................................... 1

Fed. R. Civ. P. 56(c) .................................................................................................... 7

## REGULATIONS

12 C.F.R. § 201 ......................................................................................................... 48

12 C.F.R. § 201.4(d), ................................................................................................ 51

12 C.F.R. § 261.2(i)(1)(i) ................................................................... passim

12 C.F.R. § 261.12-17 ........................................................................... 42

12 C.F.R. § 265.11 ................................................................................ 43

12 C.F.R. § 265.11(a)-(g) ..................................................................... 46

12 C.F.R. § 270.4 .................................................................................. 51

12 C.F.R. Part 271 ................................................................................ 42

12 C.F.R. § 271.5 .................................................................................. 36

12 C.F.R. § 271.5 (1979). ..................................................................... 35

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| ABCP | Asset-backed Commercial Paper |
| AMLF | Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility |
| CPFF | Commercial Paper Funding Facility |
| DW | Discount Window |
| FOMC | Federal Open Market Committee |
| FRA | Federal Reserve Act |
| FRBB | Federal Reserve Bank of Boston |
| FRBNY | Federal Reserve Bank of New York |
| MA | Division of Monetary Affairs |
| OMO | Open Market Operations |
| P & F | "The Federal Reserve System: Purposes & Functions" |
| PDCF | Primary Dealer Credit Facility |
| RBOPS | Division of Reserve Bank Operations and Payment Systems |
| SCLF | Special Credit and Liquidity Facilities |
| SLP | SOMA Securities Lending Facility |
| SOMA | System Open Market Account |
| SPV | Special Purpose Vehicle |
| TAF | Term Auction Facility |
| TOP | Term Securities Lending Facility Options Program |
| TSLF | Term Securities Lending Facility |

x

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FOX NEWS NETWORK, LLC, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civ. No. 09 CV 00272 (AKH) ) |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | ) ) ) ) |
| Defendant. | ) ) |

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Defendant, the Board of Governors of the Federal Reserve System ("Board"),

respectfully moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure in this Freedom of Information Act case, 5 U.S.C. § 552, on the grounds that no

records have been improperly withheld from the plaintiff, Fox News Network, LLC, and the

defendant is entitled to judgment as a matter of law.  In support of its motion, the Board submits

declarations from: Alison M. Thro, Senior Counsel in the Board's Legal Division; Brian F.

Madigan, Director of the Board's Division of Monetary Affairs ("MA"); Susan E. McLaughlin,

Senior Vice President, Markets Group at the Federal Reserve Bank of New York ("FRBNY");

Lorie K. Logan, Vice President, Market Operations and Markets Analysis Function at the

FRBNY; Christopher R. Burke, Vice President, Markets Group at the FRBNY; Anne F. Baum,

1

Senior Vice President, Markets Group at the FRBNY; and Jacqueline P. Palladino, Vice President, Supervision, Regulation, and Credit Department at the Federal Reserve Bank of Boston ("FRBB"), along with a Statement of Material Facts Not in Dispute.[1]

As shown in this memorandum and attachments, the Board is entitled to summary judgment on plaintiff's Complaint because the documents plaintiff seeks are exempt from disclosure under FOIA. Other responsive documents that may be housed at the FRBNY and FRBB are not agency records of the Board subject to a FOIA request to the Board. For the withheld documents, which total approximately 6186 pages, defendant filed two indices on February 19, 2009 pursuant to Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973) (the "Vaughn Indices"), has filed a Supplemental Vaughn Index, and files supporting declarations with this motion identifying the legal basis for withholding. Because the withheld documents are exempt under FOIA in their entirety, plaintiff's request for injunctive relief, requiring the Board to produce the exempt records, should be denied.

## BACKGROUND

This action involves two FOIA requests filed by the plaintiff. The first, filed November 10, 2008 by Fox Business News Vice President Bruce Becker (the "First FOIA Request"), sought "the names of institutions receiving Federal Reserve lending" from twelve programs listed in the Request and "any other Federal Reserve lending facility not mentioned above" as well as "an accounting of the collateral provided by these institutions in exchange for the lending." Declaration of Alison M. Thro, executed March 26, 2009 ("Thro Decl."), ¶ 4 and

---

[1] A glossary of acronyms used in this brief is provided at p. x for the convenience of the Court.

Exh. A.  The First FOIA Request covered the time period August 8, 2007 through November 17, 2008.  Id. at ¶ 5.

The second request, filed November 18, 2008 by Fox Business News Executive Vice President Kevin Magee (the "Second FOIA Request"), sought substantially the same information over a shorter time period.  For the months of September and October 2008, the Second FOIA Request sought "records sufficient to identify all institutions that have participated in" the programs listed in the First FOIA Request, and "(i) records sufficient to identify all collateral pledged by each such institution; and (ii) records sufficient to show the amount borrowed or advanced to the institution" as well as "records sufficient to identify all of the collateral held by the Fed at the close of business on November 14, 2008."  Thro Decl., ¶ 6 and Exh. C.

The Discount Window ("DW"), one focus of the plaintiff's FOIA Requests, is the basic lending program through which the twelve Federal Reserve Banks lend funds on a short-term basis to eligible depository institutions in their respective districts.  Declaration of Brian F. Madigan, executed March 23, 2009 ("Madigan Decl."), ¶ 6.  All DW loans are secured by collateral acceptable to the lending Reserve Bank.  Extensive information about DW lending can be found on the DW website at www.frbdiscountwindow.org.

The DW is a permanent program of the Federal Reserve Banks.  In response to the current financial crisis, the Board has authorized the Federal Reserve Banks to initiate a number of additional, temporary special credit and liquidity facilities ("SCLFs") to relieve severe liquidity strains in the market, reduce risks to financial stability, and strengthen the effectiveness of monetary policy in addressing risks to the outlook for growth and inflation.  Several of these temporary, emergency facilities are the focus of the plaintiff's FOIA requests.  They are: (1) the

3

Term Auction Facility ("TAF"), a form of DW lending that provides longer than overnight funding to eligible depository institutions through an auction mechanism, Madigan Decl., ¶ 9; (2) the Primary Dealer Credit Facility ("PDCF"), a facility under which the FRBNY makes overnight funds available to its primary dealers,[2] id., ¶ 11; (3) the Term Securities Lending Facility ("TSLF"), a lending facility permitting primary dealers to obtain a 28-day loan of Treasury securities from the FRBNY by pledging certain other kinds of securities, id.; ¶ 12; (4) the Term Securities Lending Facility Options Program ("TOP"), which offers primary dealers options on TSLF loans for short periods to relieve collateral market pressures, id.; (5) the Asset Backed Commercial Paper ("ABCP") Money Market Mutual Fund Liquidity Facility ("AMLF"), which assists money market mutual funds in meeting demands for redemptions by lending to depository institutions to purchase ABCP from these funds, id.; ¶ 10; and (6) the Commercial Paper Funding Facility ("CPFF"), which provides liquidity to U.S. issuers of commercial paper through a special purpose vehicle ("SPV"). Id.; ¶ 13. OMOs, also identified in plaintiff's FOIA Requests, are the purchase and sale of eligible securities as the Federal Reserve System's ("System's") principal tool for implementing monetary policy. Id., ¶ 14. The System Open Market Account ("SOMA") Securities Lending Program ("SLP") is a permanent program designed to facilitate OMOs, and not an SCLF. Id., ¶ 15. While extensive information about these facilities can be found on the Board's public website,[3] neither the Board nor the Federal

---

[2] Primary dealers are designated banks and securities broker dealers with whom the FRBNY trades U.S. government and other securities as trading counterparties in open market operations ("OMOs"). Madigan Decl., ¶ 11. The names of the primary dealers are publicly available. See http://www.ny.frb.org/markets/pridealers_current.html.

[3] See http://www.federalreserve.gov/monetarypolicy/bst.htm and http://www.federalreserve.gov/monetarypolicy/bst_supportspecific.htm.

Reserve Banks have made public the transaction-level information sought by the plaintiffs, for the reasons discussed more fully <u>infra</u>.

As detailed in the attached Thro Decl., in response to the First and Second FOIA Requests, and similar FOIA requests earlier in 2008, Board staff searched its divisions most likely to have responsive information, and made appropriate inquiries.  Board staff determined that it had approximately 6186 full pages of records containing some limited information (borrower names and loan amounts for the DW and SCLFs, but virtually no collateral information and no transaction-level information regarding OMOs or the SLP) responsive to the First and Second FOIA Requests,.  Thro Decl., ¶¶ 14, 28-29 and Exh. I (hereinafter, "Supplemental <u>Vaughn</u> Index) and <u>Vaughn</u> Indices.  Board staff reviewed these records and determined that they were exempt under FOIA exemptions 4 and 5, and contained no reasonably segregable non-exempt information.  Thro Decl., ¶¶ 22, 28-29; <u>Vaughn</u> Indices and Supplemental <u>Vaughn</u> Index.

As discussed more fully below, Board staff determined that responsive transaction-level information regarding collateral pledged for loans under the DW, TAF, TSLF, PDCF, TOP, CPFF and AMLF, and transaction-level information regarding OMOs and SLP, was in the possession and control of the FRBNY and FRBB.  Thro Decl. ¶ 31.  The FRBNY, along with the other eleven Federal Reserve Banks, has statutory authority to conduct DW and TAF operations. Madigan Decl., ¶¶ 6; 9; Declaration of Susan E. McLaughlin, executed March 26, 2009 ("McLaughlin Decl."), ¶ 5.  The FRBNY also has statutory authority and Board authorization to administer the PDCF, TSLF, TOP and CPFF.  Madigan Decl., ¶ 11-13, 16; McLaughlin Decl., ¶¶ 11, 16; Declaration of Lorie K. Logan, executed March 27, 2009 ("Logan Decl."), ¶ 27;

Declaration of Anne F. Baum, executed March 27, 2009 ("Baum Decl.") ¶ 13.  The FRBNY also conducts OMOs and administers SLP under statutory authority and directives issued by the Federal Open Market Committee ("FOMC").  Madigan Decl., ¶¶ 14, 16; Logan Decl., ¶ 11; Declaration of Christopher R. Burke, executed March 27, 2009 ("Burke Decl."), ¶¶ 7, 17. The FRBB has statutory authority and Board authorization to administer the AMLF.  Declaration of Jacqueline P. Palladino, executed March 23, 2009 ("Palladino Decl."), ¶ 5.  As set forth at pp. 16-17 and 37-52 below, after careful review and discussions with Board, FRBNY and FRBB staff, Board staff properly determined that responsive FRBNY and FRBB documents were not "agency records" of the Board subject to FOIA requests directed to the Board, and would in any case be exempt from disclosure.

By letters dated January 6 and January 16, 2009, the Secretary of the Board informed the plaintiff of its decision to deny the First and Second FOIA Requests, and directed the plaintiff to publicly available information regarding the DW, SCLFs and OMOs.  Thro Decl., ¶¶ 24-25 and Exhs. G and H.

On January 12, 2009, plaintiff filed its Complaint seeking injunctive relief and judgment that it was entitled to records sought in the First and Second FOIA Requests.

## ARGUMENT

### A.   SUMMARY OF ARGUMENT

As the <u>Vaughn</u> Indices, Supplemental <u>Vaughn</u> Index and attached declarations show, the Board conducted an adequate search in response to the First and Second FOIA Requests.  The Board properly withheld approximately 6186 full pages of documents under FOIA exemptions 4 and 5.  FRBNY and FRBB documents responsive to the First and Second FOIA Requests are not

"agency records" of the Board subject to a FOIA request to the Board.  Because the Board did not "(1) 'improperly' (2) 'withh[o]ld' (3) 'agency records,'" there is no remedy available for the plaintiff under FOIA and the Court should enter summary judgment in favor of the Board. Grand Central Partnership v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999) (quoting U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989)).

## B.    SUMMARY JUDGMENT STANDARD IN FOIA CASES

Summary judgment is generally granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  "'Summary judgment is the procedural vehicle by which most FOIA actions are resolved.'"  ACLU v. U.S. Dep't of Defense, 389 F. Supp. 2d 547, 551 (S.D.N.Y. 2005) (Hellerstein, J.) (quoting Jones-Edwards v. NSA, 352 F. Supp. 2d 420, 423 (S.D.N.Y. 2005)).  The agency has the burden of proof on all material issues related to the merits of any claimed FOIA exemptions.  5 U.S.C. § 552(a)(4)(B).  The Court exercises de novo review over FOIA matters.  Id; Halpern v. FBI, 181 F.3d 279, 287-88 (2d Cir. 1999).  On a motion for summary judgment in a FOIA case, "the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir.), cert. denied, 513 U.S. 823 (1994); accord, ACLU, supra, 389 F. Supp. 2d at 551.

An agency's burden "although high, is not impractical."  ACLU, supra, 389 F. Supp. 2d at 552.  "It suffices if the agency shows, by 'affidavits or declarations supplying facts,' that the agency has conducted a 'thorough search' for responsive documents, and has given reasonably detailed explanations why any withheld documents fall within an exemption.'"  ACLU, supra,

389 F. Supp. 2d at 552 (quoting <u>Carney</u>, <u>supra</u>, 19 F. 3d at 812).  FOIA "affidavits submitted by

any agency are 'accorded a presumption of good faith.'"  <u>Carney</u>, <u>supra</u>, 19 F.3d at 812 (quoting

<u>Safecard Services, Inc.</u> v. <u>SEC</u>, 926 F.2d 1197, 1200 (D.C. Cir. 1991)); <u>accord</u> <u>ACLU</u>, <u>supra</u>,

389 F. Supp. 2d at 553.  If the agency's submissions are adequate, discovery relating to the

agency's search and the claimed exemptions is generally unnecessary.  <u>Wood</u> v. <u>FBI</u>, 432 F.3d

78, 85 (2d Cir. 2005).

        Once the agency has "made a reasonable response, the burden on a FOIA plaintiff is

high." <u>ACLU</u>, <u>supra</u>, 389 F. Supp. 2d at 553.  "In order to justify discovery once the agency has

satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency

sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence

that an exemption claimed by the agency should not apply or summary judgment is otherwise

inappropriate." <u>Id</u>. (citing <u>Carney</u>, <u>supra</u>, 19 F.3d at 812).  The plaintiff "cannot rely upon 'mere

speculation' that responsive documents have not been produced."  <u>Inner City Press/Community</u>

<u>on the Move</u> v. <u>Board of Governors</u>, 1998 U.S. Dist. LEXIS 15333 at *9 (S.D.N.Y.,  Sept. 30,

1998), <u>aff'd</u>, 182 F.3d 900 (2d Cir. 1999) (quoting <u>Carney</u>, <u>supra</u>, 19 F.3d at 812).  If the plaintiff

fails to make the required showing, summary judgment should be awarded in favor of the

agency.  <u>Ferguson</u> v. <u>FBI</u>, 83 F.3d 41, 43 (2d Cir. 1996); <u>Carney</u>, <u>supra</u>, 19 F.3d at 812.

## C.    THE BOARD CONDUCTED AN ADEQUATE SEARCH

### 1)    The Applicable Legal Standard

        In responding to a FOIA request, an agency is under a duty to conduct a reasonable

search for responsive records.  <u>Oglesby</u> v. <u>U.S. Dep't of the Army</u>, 920 F.2d 57, 68 (D.C. Cir.

1990).  If an agency demonstrates that it has conducted a reasonable search, "it has fulfilled its

obligations under FOIA and is entitled to summary judgment on this issue." <u>Garcia</u> v. <u>U.S. Dep't of Justice</u>, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002).

"A search will be considered adequate if it was 'reasonably calculated to uncover all relevant documents.'" <u>Amnesty International USA</u> v. <u>CIA</u>, 2008 U.S. Dist LEXIS 47882 at *26 (S.D.N.Y., June 19, 2008) (quoting <u>Truitt</u> v. <u>U.S. Dep't of State</u>, 897 F.2d 540, 542 (D.C. Cir. 1990)). An agency "is not expected to take extraordinary measures to find the requested records, but only to conduct a search "reasonably designed to identify and locate responsive documents." <u>Garcia</u>, <u>supra</u>, 181 F. Supp. 2d at 368. An agency has no obligation to search for documents that are outside of its possession, custody or control. <u>Jones-Edwards</u> v. <u>NSA</u>, 196 Fed. Appx. 36, 38 (2d Cir. 2006) (unpublished). The adequacy of the search is "dependent upon the circumstances of the case." <u>Truitt</u>, <u>supra</u>, 897 F.2d at 542. "Speculation that other documents exist, without more, 'does not undermine the finding that the agency conducted a reasonable search.'" <u>Garcia</u>, <u>supra</u>, 181 F. Supp. 2d at 366 (quoting <u>Safecard Servs.</u>, <u>supra</u>, 926 F.2d at 1201).

### 2) The Board Conducted an Adequate Search in Response to the First and Second FOIA Requests

Here, as set forth in the attached Declaration of Alison M. Thro, the Board attorney responsible for supervising the search, the Board conducted an adequate search for records responsive to the First and Second FOIA Requests. <u>See</u> <u>Garcia</u>, <u>supra</u>, 181 F. Supp. 2d at 368 ("[a]n affidavit from an agency employee responsible for supervising a FOIA search is all that is needed"). Ms. Thro, who has been responsible for supervising the processing of FOIA requests at the Board for five years, and Board staff members acting at her direction, conducted searches in response to approximately 19 FOIA requests the Board starting receiving in or around April 2008 for information regarding the names of borrowers, loan amounts, and collateral pledged for

the Federal Reserve Banks' extensions of credit at the DW and SCLFs (the "Facilities Requests"). Thro Decl., ¶ 8. Because of the substantial overlap between these Facilities Requests and the First and Second FOIA Requests, Ms. Thro drew upon information she had previously gathered in responding to the plaintiff's Requests. Thro Decl., ¶ 9.

In connection with earlier Facilities Requests, Ms. Thro contacted employees in the Board's two divisions most likely to have responsive documents. Thro Decl., ¶¶ 10, 11, 20, 22. In particular, Ms. Thro contacted seven staff members in the Board's division of Monetary Affairs ("MA") who she concluded were most likely to have responsive information, or to know where it would be located, including the division director, deputy director, senior associate director and deputy associate director. Thro Decl., ¶ 11. Ms. Thro reasonably concluded that MA would be one of two divisions most likely to have responsive information because of its role in compiling data and analysis relating to the DW, SCLFs, and OMOs, and its role in supporting the Board and the FOMC in the conduct of domestic monetary policy. Id. She provided these individuals with copies of the earlier Facilities Requests, discussed them, and asked if they, or anyone on their staffs (or the Board, to their knowledge), had responsive information. Thro Decl., ¶ 12.

In addition to MA staff, Ms. Thro contacted six staff members in the Board's division of Reserve Bank Operations and Payment Systems ("RBOPS"), which oversees administration of the DW and SCLFs by the Federal Reserve Banks. Thro Decl., ¶ 20. Because of this role, Ms. Thro concluded that RBOPS was the other division at the Board likely to have responsive information. Id. She interviewed six RBOPS staff members, showed them copies of earlier Facilities Requests and, as she had done with MA, compiled responsive information. Id.

10

As a result of these discussions with MA and RBOPS staff, Ms. Thro had been compiling information on the Legal Division servers that she believed contained documents responsive to the First and Second FOIA Requests. Thro Decl., ¶¶ 9, 12. Upon receiving the First and Second FOIA Requests, Ms. Thro reviewed this information and identified approximately 6008 pages of responsive information. This responsive information is described at Thro Decl., ¶¶ 15-19, 22 and on the Vaughn Indices. After locating this responsive information, Ms. Thro reviewed her findings, and the First and Second FOIA Requests, with three members of MA staff and three members of RBOPS staff, and reconfirmed orally with them that there were no additional documents in MA or RBOPS (or elsewhere in the Board to their knowledge) responsive to the First and Second FOIA Requests. Thro Decl., ¶¶ 12, 20.

As a result of her discussions with MA and RBOPS staff members, Ms. Thro learned that because the Board itself does not administer the DW or SCLFs (those facilities are administered by the Federal Reserve Banks), and does not conduct OMOs (those operations are conducted on behalf of the System by the FRBNY), MA and RBOPS had some information regarding the names of some borrowers and loan amounts at the DW and SCLFs, as described below and on the Vaughn Indices, but virtually no information relating to specific items of collateral pledged by specific borrowers for specific loans, and no information relating to counterparties in routine OMO transactions or specific OMOs conducted by specific institutions on specific dates, or information regarding specific transactions under the SLP. Thro Decl., ¶¶ 14, 20-21; Madigan Decl. ¶¶ 17-18. Ms. Thro learned that the majority of information in MA and RBOPS consisted of high level, aggregate data and statistics compiled for use by the Board, FOMC and Board staff in formulating monetary policy and for Reserve Bank oversight purposes. Thro Decl., ¶¶ 14, 20.

11

Ms. Thro determined that one MA staff member received daily data feeds from the Federal Reserve Banks relating to the DW and SCLFs that were used to generate three separate types of reports: a daily Primary, Secondary and Other Credit Extensions Outstanding by Remaining Term report (the "Remaining Term Report"); a daily report of Primary Credit DW loans originating the previous day (the "Originations Report"); and a daily report of institutions borrowing under the SCLFs (the "Emergency Credit Report") (collectively, the "Reports").  Thro Decl., ¶¶ 15-17 and Vaughn Indices.  These Reports had been distributed to some staff members in MA and RBOPS and select staff at the FRBNY.  Vaughn Indices.  Ms. Thro determined that, for the period August 8, 2007 through November 17, 2008, these Reports contained information responsive to the First and Second FOIA Requests, in particular, the names of some borrowers at the DW and SCLFs, individual loan amounts, and the specific credit facility utilized.  Thro Decl., ¶¶ 15-17; Vaughn Indices; Madigan Decl., ¶ 18.  Although  information on two of the Reports, the Remaining Term Report and the Emergency Credit Report, was carried forward from day to day, and was therefore redundant, Ms. Thro determined that the Board had approximately 5912 pages of responsive Reports, which were withheld in full under exemptions 4 and 5.  Thro Decl., ¶¶ 15, 17 and Vaughn Indices.

In addition to the Reports, Ms. Thro obtained approximately 94 pages of e-mails from an MA staff member which contained the names of some DW or SCLF borrowers and individual loan amounts, along with non-responsive information, as well as draft collateral monitoring procedures ("Draft Procedures") which contained approximately 1-2 pages of responsive information (the names of a few borrowers at the DW and TAF, the value of collateral they pledged, and the value of additional collateral required for specific loans), along with non-

responsive information.  Thro Decl. ¶¶ 17-18 and Vaughn Indices.  These documents brought the total pages withheld as of the filing of the Vaughn Indices to approximately 6008.  Thro Decl. ¶ 22 and Vaughn Indices.

With the limited exception of the Draft Procedures described above, Ms. Thro determined that neither MA nor RBOPS had information regarding specific items of collateral pledged by specific borrowers for specific borrowings.  Thro Decl., ¶¶ 13-14.  Ms. Thro confirmed with MA staff that it did not have responsive information on counterparties in routine OMOs, including single tranche OMOs, or SLP, or information on which primary dealers participate in specific OMOs (and in what volume) on any given day, and that no other division at the Board was likely to have responsive information relating to OMOs.  Thro Decl., ¶ 14, 21; see Madigan Decl., ¶ 18.

Ms. Thro confirmed through her discussions with MA and RBOPS staff that no other divisions at the Board were likely to have information responsive to the Facilities Requests, or the First and Second FOIA Requests, as these are the two divisions responsible for overseeing the Federal Reserve Banks' administration of the DW and SCLFs, advising the Board and FOMC on OMOs, and preparing data and analysis relating to those facilities.  Thro Decl., ¶ 22.  As a result, Ms. Thro reasonably opted not to search other divisions.  Cuomo, supra, 166 F.3d at 489 (agency acted reasonably by searching offices most likely to contain responsive documents); Amnesty International, supra, 2008 U.S. Dist. LEXIS 47882 at *34 (upholding agency decision not to search offices unlikely to possess responsive records because "FOIA does not demand a search that would be futile").

In connection with preparing her declaration, Ms. Thro learned that two Board members and one MA staff member had received e-mails from the FRBNY attaching a weekly report

containing, among other things, the names of primary dealers utilizing FRBNY liquidity

facilities and general collateral information, as well as e-mails attaching a second weekly report

containing names of institutions participating in FRBNY liquidity facilities and information from

which approximate loan amounts could be derived.  Thro Decl., ¶ 26.  Ms. Thro followed up

with each of the three individuals who received these reports and determined: that none of them

had retained copies (paper or electronic) of the e-mails or reports for the relevant time period;

that it had been their practice since they started receiving the e-mails and reports to delete or

destroy them shortly after receiving them; and they had not forwarded or provided copies to

other Board or Board staff members.  Id.  As a result of these discussions, Ms. Thro reasonably

determined that there were no remaining copies of the reports or e-mails for the relevant time,

that the records had been destroyed prior to receipt of the First and Second FOIA Requests, and

that these reports and e-mails were not "agency records" subject to FOIA.  Id.; see Wilbur v.

CIA, 355 F.3d 675, 678 (D.C. Cir. 2004) (per curiam) ("the fact that responsive documents once

existed does not mean that they remain in the [agency's] custody today or that the [agency] had a

duty under FOIA to retain the records"); Jones v. FBI, 41 F.3d 238, 249 (6th Cir. 1994) (no

remedy for documents destroyed before a FOIA request is received).

   In a similar manner, Ms. Thro learned that a very few members of the Board and Board

staff had received weekly e-mails regarding the CPFF beginning in or around November 6, 2008.

Thro Decl, ¶ 27.  Ms. Thro contacted these Board and Board staff members and determined that

only one e-mail fell within the relevant time period.  Id.  She reviewed that e-mail and

determined that it did not contain responsive information.  Id.  The e-mail had an attachment;

however, the individuals who received it had never opened or otherwise used or reviewed the

attachment, and had not forwarded the e-mail to anyone else at the Board. <u>Id</u>. Ms. Thro

reasonably determined that the attachment was not an "agency record" subject to FOIA. <u>Id</u>.

Finally, Ms. Thro learned in connection with preparing her declaration that one Board

officer, who was detailed to work on Facilities issues and serves as the Board's liaison for

Chairman Bernanke to the President's Working Group, received e-mails from the FRBNY

attaching a Daily PDCF Collateral Report which might contain information responsive to the

First and Second FOIA Requests. Thro Decl., ¶ 28. Ms. Thro contacted this officer and

determined that he had been receiving these e-mailed Reports since March 2008, but had

retained only 47 for the relevant time period (mostly from September and October 2008). <u>Id</u>.

The Board officer had archived the majority of these e-mails without opening the e-mail or

attachment, suggesting that they were not agency records. <u>Id</u>. Because neither Ms. Thro nor the

officer could determine which had been opened and which had not, Ms. Thro elected to treat

them as agency records, reviewed the Reports and e-mails, and determined that the majority of

information was non-responsive. <u>Id</u>. However, 47 pages of the Reports and 41 pages of

transmittal e-mails (totaling approximately 88 pages) contained some limited information

regarding the names of some primary dealers receiving loans at the PDCF, amounts of overnight

borrowing, and total borrowings by all primary dealers on specific dates responsive to the First

and Second FOIA Requests. <u>Id</u>.

Ms. Thro also determined that this Board officer had separately received approximately

163 pages of e-mails from the FRBNY, which had been archived in a similar manner and

contained similar responsive information on 90 of the pages, and that most information in the e-

mails was non-responsive. <u>Id</u>. Ms. Thro elected to treat these e-mails as agency records. <u>Id</u>.

15

Ms. Thro determined that responsive portions of these newly uncovered Reports and e-mails were to an extent cumulative of the Reports described, supra, p. 12., were exempt for the same reasons, and prepared a Supplemental Vaughn Index describing the additional withheld information which was filed with her declaration. Id. and Exh. I. The Board's "forthright disclosure" of these additional withheld documents "suggests good faith on the part of the agency" in conducting its search. Maynard v. CIA, 986 F.2d 547, 565 (1st Cir. 1993).

Because Ms. Thro reviewed information she had gathered in response to prior, similar FOIA requests and found approximately 6008 pages of responsive information; contacted Board staff members in the two divisions most likely to have responsive information and confirmed that there were no additional responsive documents; and had follow-up discussions with three additional Board and Board staff members, and a Board officer, that uncovered an additional 178 pages of responsive (but exempt) information (for a total of 6186 pages withheld), her search was "'reasonably calculated to uncover all relevant documents,'" and was adequate for FOIA purposes. See Amnesty International, supra, 2008 U.S. Dist. LEXIS 47882 at *26 (quoting Truitt, supra, 897 F.2d at 542); Inner City Press, supra, 1998 U.S. Dist. LEXIS 15333 at *9 ("[m]easured by any standard, FRB's search for responsive documents," which included extensive personal investigation by Board attorney responsible for supervising processing of FOIA requests, was "thorough and adequate").

Through her discussions with MA and RBOPS staff, and in reviewing the earlier Facilities Requests, Ms. Thro learned that additional responsive documents were likely in the possession of the FRBNY, which (along with the eleven other Reserve Banks) administers the DW and TAF, and which is solely responsible for operating the TSLF, TOP, PDCF, and CPFF,

and which conducts OMOs and administers the SLP.  Thro Decl., ¶¶ 31-32; McLaughlin Decl.,

¶¶ 5, 11, 16; Logan Decl., ¶¶ 11, 27; Burke Decl., ¶¶ 7, 17; Baum Decl, ¶ 12.  Likewise, Ms.

Thro learned that responsive documents relating to the AMLF were likely in the hands of the

FRBB, which administers that facility.  Thro Decl., ¶ 31; Palladino Decl., ¶ 5.

    As described more fully, infra, pp. 37-52, Ms. Thro reasonably concluded, with the

concurrence of her supervisors, that responsive documents at the FRBNY and FRBB were not

Board records subject to FOIA under the Board's regulations, 12 C.F.R. § 261.2(i)(1)(i), and that

no Board staff member had obtained, reviewed or relied upon these documents in performing

any Board function.  Thro Decl., ¶¶ 30-32.  The Board's decision not to include the FRBNY and

FRBB documents in the scope of its search was reasonable as an agency has no FOIA obligation

to search records outside of its possession or control.  Jones-Edwards, supra, 196 Fed. Appx. at

38 ("[a]n agency is not obligated to conduct a search of records outside its possession or

control").

    Ms. Thro's declaration, which is "reasonably detailed and reveal[s] that each of the

[agency's] subdivisions undertook a diligent search for [responsive] documents," Carney, supra,

19 F.3d at 813, demonstrates that the Board conducted an adequate search in response to the First

and Second FOIA Requests, and the Board is entitled to summary judgment on the issue.

**D.    THE BOARD PROPERLY WITHHELD LOAN INFORMATION ON
    INDIVIDUAL BORROWERS UNDER EXEMPTIONS 4 AND 5 OF FOIA**

    **1)    The Applicable Exemption 4 Standard**

    Exemption 4 is satisfied if a tripartite test is met: "(1) [t]he information [for which

exemption is sought] must be a 'trade secret' or 'commercial or financial' in character...; (2) …

must be 'obtained from a person,' ... and (3) … must be 'privileged or confidential.'"  Inner City

Press/Community on the Move v. Board of Governors, 463 F.3d 239, 244 (2d Cir. 2006)

(quoting Nadler v. FDIC, 92 F.3d 93, 95 (2d Cir. 1996) (quoting 5 U.S.C. § 552(b)(4)).

Here, there is no doubt that the information withheld in response to the First and Second

FOIA Requests is "commercial or financial" in nature.  The "withheld information" includes:

(i) names of financial institutions or primary dealers borrowing at the DW or SCLFs;

(ii) individual loan amounts; (iii) dates for specific loans; (iv) the specific facility utilized; (v) the

type of institution (e.g., large commercial bank, small commercial bank); (vi) the originating

Federal Reserve district; and (vii) very limited information about the value of collateral pledged

for a few DW and TAF loans (on the Draft Procedures).  Thro Decl., ¶¶ 15-19, 28-29; Vaughn

Indices; and Supplemental Vaughn Index.  This information is both "commercial" and

"financial" for purposes of exemption 4.  See American Airlines, Inc. v. National Mediation

Board, 588 F.2d 863, 870 (2d Cir. 1978) (broadly defining commercial in exemption 4 to mean

"pertaining or relating to or dealing with commerce").

The second prong of the tripartite test also is easily satisfied.  Board staff obtained the

withheld information, and data used to prepare the three types of Reports listed on the Vaughn

Indices,[4] from the Federal Reserve Banks, which in turn obtained and derived that information

from records of transactions with institutions borrowing at the DW or SCLFs.  Thro Decl., ¶¶ 14-

18, 27-28; Vaughn Indices; and Supplemental Vaughn Index.  The Federal Reserve Banks

(which are corporations as discussed, infra, pp. 43-44) and the borrowers are "person[s]" within

the meaning of FOIA exemption 4.  5 U.S.C. § 551(2) (defining "person" to include "an

---

[4] Data and reports prepared by an agency using confidential information obtained from "a
person" outside of the agency are "obtained from a person" for exemption 4 purposes.  OSHA
Data/CIH, Inc. v. U.S. Dep't of Labor, 220 F.3d 153, 162 n. 23 (3rd Cir. 2000); Gulf & Western
Industries, Inc. v. United States, 615 F.2d 527, 529-30 (D.C. Cir. 1980).

individual, partnership, corporation, association, or public or private organization other than an agency").

Accordingly, the issue for the Court is whether the information on individual borrowers is "privileged or confidential" under the third prong of the tripartite test.

In determining whether a particular document is "privileged or confidential," the Second Circuit uses a two-part test originally formulated by the D.C. Circuit in <u>National Parks Conservation Ass'n</u> v. <u>Morton</u>, 498 F.2d 765 (D.C. Cir. 1974) ("<u>National Parks</u>"). <u>Inner City Press</u>, <u>supra</u>, 463 F.3d at 244; <u>see</u> <u>United Technologies Corp.</u> v. <u>FAA</u>, 102 F.3d 688, 692 (2d Cir. 1996), <u>cert</u>. <u>denied</u>, 521 U.S. 1103 (1997). Under the <u>National Parks</u> test:

> information is confidential for the purposes of Exemption 4 if its disclosure would have the effect either: '(1) of impairing the government's ability to obtain information - necessary information - in the future; or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'

<u>Inner City Press</u>, <u>supra</u>, 463 F.3d at 244 (quoting <u>Continental Stock Transfer & Trust Co.</u> v. <u>SEC</u>, 566 F.2d 373, 375 (2d Cir. 1977) (per curiam)).

If either prong of the alternative <u>National Parks</u> test is satisfied, the information is "privileged or confidential," within the meaning of exemption 4. As set forth below, public disclosure of the withheld information is likely to cause substantial harm to the competitive position of persons from whom the information was obtained -- namely, borrowers at the DW or SCLFs. Thus, the Board properly withheld the documents under the second prong of the <u>National Parks</u> test. In addition, cases following <u>National Parks</u> have identified a so-called "third prong" test that looks to effectiveness of government operations to authorize withholding. As discussed, <u>infra</u>, pp. 26-33, the documents were also properly withheld under this prong.

19

### (a) Disclosure of Loan Information on Individual Borrowers is Likely to Cause Substantial Competitive Harm to Borrowers at the DW or SCLFs

Here, the second prong of National Parks is satisfied as disclosure of the withheld information likely would cause substantial competitive harm to borrowers at the DW or SCLFs. To meet the second prong of the National Parks test, it is not necessary to show actual competitive harm. Rather, "[a]ctual competition and the likelihood of substantial competitive injury is all that need be shown." Gulf & Western, supra, 615 F.2d at 530 (citing National Parks & Conservation Ass'n v. Kleppe, 547 F.2d 673, 679 (D.C. Cir. 1976) ("National Parks II")). The court "'need not conduct a sophisticated economic analysis of the likely effects of disclosure.'" Utah v. U.S. Dep't of the Interior, 256 F.3d 967, 970 (10th Cir. 2001) (quoting Public Citizen Health Research Group v. FDA, 704 F.2d 1280, 1291 (D.C. Cir. 1983)); accord Inner City Press v. Board of Governors, 380 F. Supp. 2d 211, 219 (S.D.N.Y. 2005), aff'd in part, remanded in part on other gnds, 463 F.3d 239 (2d Cir. 2006). Rather, "evidence demonstrating the existence of potential economic harm is sufficient." Id.

As set forth in the attached Madigan Decl., ¶ 22; McLaughlin Decl., ¶ 21; and Palladino Decl., ¶ 17, borrowers at the DW, TAF and AMLF face competition in the market for retail and commercial banking services from other domestic and international institutions.[5] Primary

---

[5] Because of the Board's unique role in overseeing Reserve Bank lending facilities and stabilizing the financial markets, the FRBNY's unique role in administering the DW and SCLFs and serving as a lender of last resort to financial institutions, and the FRBB's unique role in administering the AMLF, the Board's, FRBNY's, and FRBB's declarations attesting to the harm to borrowers through disclosure of details regarding their borrowing is sufficient to show the likelihood of competitive harm for exemption 4 purposes. Lion Raisins, Inc. v. USDA, 354 F.3d 1072, 1079 (9th Cir. 2004) ("[c]ourts can rely solely on government affidavits so long as the affiants are knowledgeable about the information sought and the affidavits are detailed enough to allow the court to make an independent assessment of the government's claims").

dealers[6] eligible to borrow at the PDCF, TSLF, TOP and other facilities face actual competition in the market for securities brokerage services from other primary dealers and domestic and international securities broker dealers. McLaughlin Decl., ¶ 26; Logan Decl., ¶ 34. Issuers of commercial paper purchased by the CPFF face actual competition in the market for retail goods from other U.S. and foreign issuers of commercial paper. Baum Decl., ¶ 16. These institutions are likely to suffer substantial competitive harm if information that they borrowed at the DW or SCLFs, or information regarding the size or term of loans made in specific Federal Reserve districts, is publicly disclosed.

These competitive harms arise from several sources. First, borrowers are likely to suffer harm if financial analysts, customers or competitors of the financial institutions perceive the institutions' borrowing at the DW or SCLFs as a sign that the institution is experiencing liquidity strains or capital shortfalls. This "stigma" from borrowing at the DW stems from the fact that the DW serves as a back-up source of liquidity for depository institutions that may not have access to ordinary, market sources of funding on a short-term basis. Madigan Decl., ¶ 23; McLaughlin Decl., ¶ 20. Institutions may experience short-term liquidity shortfalls for a number of reasons, some of which do not indicate financial instability. For example, a depository institution may be at the DW to obtain late-day funds as the result of routine developments such as an unexpectedly large loan request from a customer, or a runoff in liabilities as a major depositor makes payments to third parties. Madigan Decl., ¶ 23. A borrower might also experience a late-day shortage of funds because of operational problems that impeded funds

---

[6] Defined, supra, p. 4, n. 2.

receipts or clerical errors that understated its funding position for the day.  McLaughlin Decl.,

¶ 21.

However, because the Reserve Banks are the "lenders of last resort," the fact that an

institution is borrowing at the DW can fuel market speculation and rumors that the entity's

liquidity strains stem from a financial problem at the institution that is not known by the public at

large.  Madigan Decl., ¶ 23; McLaughlin Decl., ¶¶ 5, 20-21; Palladino Decl, ¶¶ 16-17.

As a result of this "stigma," which also applies to borrowers at the TAF, PDCF, TSLF,

TOP, AMLF and other SCLFs, money market mutual funds and sellers of ABCP participating in

AMLF, and issuers of securities purchased by the CPFF, Madigan Decl., ¶ 26; McLaughlin

Decl., ¶¶ 20, 26; Logan Decl., ¶¶ 33-37; Palladino Decl., ¶¶ 16-20; Baum Decl., ¶¶ 16-17, there

is an understanding among the Reserve Banks, borrowers at the DW, SCLFs, and clearing banks

that hold collateral on behalf of the FRBNY, that information regarding their borrowing --

including the names of borrowers, information regarding collateral pledged for specific loans, the

terms, rates or documentation for specific loans, the valuation of specific loans vis-à-vis the

collateral pledged (the "haircut"), or other information that could lead to the identification of

borrowers -- will not be disclosed publicly by the FRBNY, the FRBB, or their agents.

McLaughlin Decl., ¶ 19; Logan Decl, ¶ 32; Palladino Decl., ¶ 15; Baum Decl., ¶ 15.  Indeed, the

System's DW website relating to AMLF states that "[t]here will not be any public disclosure of

the individual borrowers participating in this program or the amounts of individual advances

made to the borrowers."  Palladino Decl., ¶ 15; see

http://www.frbdiscountwindow.org/mmmf.cfm#f21.  The FRBNY's agreements with asset

managers and custodial agents involved in the CPFF contain confidentiality provisions.  Baum

Decl., ¶ 15.  Likewise, the Board, to the extent that it has this information, does not publicly

disclose it.  Madigan Decl., ¶ 21.  Indeed, concern about the "stigma" associated with DW

borrowing is so acute that the Federal Reserve Banks not only keep confidential the fact of an

institution's borrowing, but even an institution's *eligibility* to obtain primary or secondary DW

credit.[7]  Madigan Decl., ¶ 28.  This is so because primary credit, offered at a lower interest rate

and on less stringent terms than secondary credit, is only available to institutions in generally

sound financial condition.  Id.  The fact that a depository institution is not eligible for primary

credit therefore reveals non-public information regarding its financial condition that could lead to

the competitive harms described herein.  Id.  In fact, neither the Board nor the Reserve Banks

routinely share information regarding an institution's DW borrowing with other regulators.[8]  Id.

A depository institution's, primary dealer's, or issuer of commercial paper's competitive

position can be severely harmed if the market becomes aware that it obtained funds at the DW or

an SCLF.[9]  McLaughlin Decl., ¶¶ 21-22, 26; Madigan Decl., ¶¶ 22, 26; Logan Decl., ¶¶ 34-37;

Palladino Decl., ¶¶ 17-18; Baum Decl., ¶ 16.  A rumor that a depository institution is

experiencing liquidity strains could rapidly lead to a loss of public confidence in the institution, a

---

[7] The DW normally comprises three programs: primary credit for depository institutions in
generally sound financial condition; somewhat more expensive secondary credit for institutions
that do not qualify for primary credit; and seasonal credit, designed to address temporary swings
in loans and deposits, mostly at smaller institutions.  Madigan Decl., ¶¶ 6, 28.

[8] Regulators may, however, obtain information about an institution's borrowing history when
investigating potential supervisory problems.  Madigan Decl., ¶ 28.

[9] In the case of the CPFF, the likelihood of substantial competitive harm applies to the issuers
who sell commercial paper to the SPV, and not the SPV, whose name is publicly known.  Baum
Decl., ¶¶ 15-16.  For the AMLF, not only the depository institutions borrowing from that facility,
but also money market mutual funds whose ABCP is posted as collateral, and sellers of that
ABCP, face the likelihood of substantial competitive harm if the borrowing is disclosed.
Palladino Decl., ¶¶ 7, 19-20.

sudden outflow of deposits (a "run"), a loss of confidence by market analysts, a drop in the institution's stock price, a withdrawal of market sources of funding, an acceleration of existing loans to the institution or the refusal to provide new loans, and, in extreme cases, closure of the institution.  Madigan Decl., ¶ 22; McLaughlin Decl., ¶ 22; Palladino Decl., ¶ 18.  Any of these events is likely to put the institution in a weakened position vis-à-vis its competitors, likely resulting in substantial competitive harm to its position in the market for retail or commercial banking or securities brokerage services.  Id.  These concerns apply equally to primary dealers, who are likely to suffer similar reputational or competitive harm for the same reasons if details regarding their borrowing are disclosed.  McLaughlin Decl., ¶ 26; Logan Decl., ¶¶ 34-35, 37; Madigan Decl., ¶ 26.  The likelihood of competitive harm intensifies during periods of financial distress, such as the current one, when market participants show heightened concern that banks or dealers could be in weakened financial condition.  Madigan Decl., ¶ 24.

The harm resulting from disclosure of an institution's DW or SCLF borrowing is not simply a theoretical possibility, but has been demonstrated in real world events.  For example, rumors that Citibank might be borrowing at the DW in the early 1990s reportedly sparked runs at some of its offices in Asia.  Madigan Decl., ¶ 27.

Even the release of the dollar amounts of individual loans, without the borrowers' name, could contribute to financial institutions' reluctance to utilize Reserve Bank liquidity facilities. Madigan Decl., ¶ 29.  If the amounts borrowed are large, and the Federal Reserve Bank originating the loan is identified, market participants may speculate that the borrower must be one of the few large banks in that district.  Id.  For very large loans, speculation may center around one of a handful of institutions in the in the country eligible to take out such a large loan.

Id. This speculation would discourage large banks from utilizing the Federal Reserve's facilities and potentially force large banks publicly to state that they are not borrowing at the DW or SCLFs. Id. Speculation about the identity of borrowers poses similar problems to actual identification of borrowers, and a greater number of institutions could adversely be affected. Id.

In addition to likely competitive harm resulting from a loss of public confidence, a depository institution or primary dealer needing access to short-term liquidity, but fearing a market and customer backlash, may avoid turning to the DW or SCLFs at virtually any cost. Madigan Decl., ¶¶ 24-26. These institutions' unwillingness to access Reserve Bank funding facilities could result in the institution's failure to meet short-term funding needs, which could quickly lead to its demise. Madigan Decl., ¶ 25. Even if the institution managed to meet its funding needs, it would be at a disadvantage vis-à-vis its competitors because it could be forced to pay very high rates to borrow and might be limited in its ability to issue longer-term debt. Id. Potential customers would tend to direct their business to other firms that were thought to be in better financial condition, resulting in substantial competitive harm to the institution that failed to borrow. Id. Thus, depository institutions' and primary dealers' unwillingness to access the Reserve Bank funding facilities for fear of public disclosure is likely to result in substantial competitive harm by leaving the institution in a weakened financial condition and making it a less viable competitor in the market for commercial and retail banking services. Id.

Because of the likelihood of substantial competitive harm, the Board properly withheld information described in the Vaughn Indices and Supplemental Vaughn Index under the second prong of National Parks, and is entitled to summary judgment on the issue.

**(b) The Loan Information on Individual Borrowers was Properly Withheld under the Third Prong of <u>National Parks</u> Because Disclosure Would Impair the Board's Ability to Provide Liquidity Through the DW and SCLFs, and to Promote Maximum Employment, Stable Prices, and Moderate Long-Term Interest Rates, as Required by Statute**

In addition to the likelihood of substantial competitive harm, the Board properly withheld information described in the <u>Vaughn</u> Indices and Supplemental <u>Vaughn</u> Index under the so-called "third prong" of <u>National Parks</u>, which asks whether "public disclosure of the requested commercial or financial information will harm an identifiable private or governmental interest which Congress sought to protect by enacting exemption 4 of the FOIA." <u>9 to 5 Org. for Women Office Workers</u> v. <u>Board of Governors</u>, 721 F.2d 1, 10 (1st Cir. 1983).  In enunciating this third prong of exemption 4, the First Circuit noted "the 'various exemptions included in the [FOIA] serve two interests – that of the government in efficient operation and that of persons supplying certain kinds of information in maintaining its secrecy.'"[10] <u>Id</u>. (quoting <u>National Parks</u>, <u>supra</u>, 498 F.2d at 767).  The D.C. Circuit has upheld the First Circuit's view, finding "the two interests identified in the National Parks test are not exclusive" and "exemption [4] also protects a governmental interest in administrative efficiency and effectiveness." <u>Critical Mass Energy Project</u> v. <u>NRC</u>, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc), <u>cert</u>. <u>denied</u>, 507 U.S. 984 (1993).

A number of courts, including courts in the Southern District of New York, have adopted this so-called program effectiveness analysis to uphold agencies' withholding of information where disclosure would impair the agency's ability to carry out its governmental mandate.  For

---

[10] The First Circuit also relied on footnote 17 in <u>National Parks</u>, in which the D.C. Circuit cited FOIA's legislative history to suggest that "the problems of compliance and program effectiveness [are] governmental interests possibly served by this exemption." <u>National Parks</u>, <u>supra</u>, 498 F.2d at 770 n.17; <u>9 to 5</u>, <u>supra</u>, 721 F.2d at 9.

example, in <u>Nadler</u> v. <u>FDIC</u>, 899 F. Supp. 158, 161-63 (S.D.N.Y. 1995), <u>aff'd</u> <u>on</u> <u>other</u> <u>gnds</u>, 92 F.3d 93 (2d Cir. 1996),[11] the district court upheld the FDIC's non-disclosure of a joint venture agreement the agency obtained when it took over a failed bank, finding that disclosure could "hurt the venture's prospects for financial success," which would "reduce returns to the FDIC," and "interfere significantly with the FDIC's receivership program, which aims to maximize profits on the assets acquired from failed banks." <u>Id</u>. at 162. The <u>Nadler</u> court noted that, to invoke the program effectiveness prong, agencies "must identify specific dangers that disclosure will pose to the fulfillment of their statutory responsibilities … [a]nd the burden of persuasion rests, as always, on the agency." <u>Id</u>. Likewise, in <u>Africa Fund</u> v. <u>Mosbacher</u>, 1993 U.S. Dist. LEXIS 7044 at *21 (S.D.N.Y. 1993), a court in the Southern District of New York upheld the Department of Commerce's withholding of documents relating to export license applications based on the agency's unrebutted evidence that disclosure "would interfere with the export control system."

A number of district courts have upheld the non-disclosure of information pertaining to loan agreements, the purchase of Treasury bonds, or similar financial transactions with the government, where disclosure would hamper the effectiveness of the government's efforts to stabilize the economy or promote economic growth. For example, in <u>Comstock Int'l (U.S.A.), Inc.</u> v. <u>Export-Import Bank</u>, 464 F. Supp. 804, 808 (D.D.C. 1979), relied upon by the district court in <u>Nadler</u>, <u>supra</u>, 899 F. Supp. at 161-62, the court found that there was no risk of impairing the Eximbank's access to information in loan agreements, because, as the lender, it was a party to the agreements. Nevertheless, the court found documents relating to the loans

---

[11] The Second Circuit affirmed on the basis of competitive harm to the FDIC (as receiver for a failed bank), and did not reach the "program effectiveness" exemption. 92 F.3d at 96.

exempt under the third prong of <u>National Parks</u> because "disclosure would significantly impair [the agency's] ability to promote United States exports," could cause potential loan applicants to "seek financing outside the United States because of their unwillingness to subject themselves to the possible risk of disclosure," and would "discourage commercial bank participation with Eximbank on joint loan agreements, thus impairing Eximbank's ability to control overall financing of transactions." <u>Comstock</u>, <u>supra</u>, 464 F. Supp. at 808. <u>See also</u> <u>Judicial Watch, Inc.</u> v. <u>Export-Import Bank</u>, 108 F. Supp. 2d 19, 30 (D.D.C. 2000) (upholding Eximbank's withholding of information regarding applications for export insurance where disclosure "would impair its ability to fulfill its statutory purpose, which is to foster domestic economic growth by supporting United States export transactions that are too risky for private capital financing").

In <u>Clarke</u> v. <u>U.S. Dep't of Treasury</u>, 1986 U.S. Dist. LEXIS 29989 (E.D. Pa. Jan. 28, 1986), the court found that the U.S. Treasury properly withheld the names and addresses of institutional owners of Flower Bonds (a form of U.S. Treasury bond), including the dollar amount, coupon, and maturity date for each owner, under the third prong. The agency argued that release of the information would "violate the purchasers' expectations of confidentiality and harm the Treasury Department's ability to issue bonds in the future." <u>Id</u>. at *2. The court agreed, relying on the uncontroverted affidavit of a Treasury official stating that "releasing the requested information would harm the national interest because investors would be less likely to purchase government bonds in the future if they knew the details of their purchases would be subject to public disclosure." <u>Id</u>. at *5. The court cited the official's statements that "trading and investment strategies in the Treasury market … depend on this confidentiality … [and] [a]ny

market participant with access to data concerning the positions of other participants would have a significant competitive advantage."  Id. at *7.

Here, disclosure of the withheld information would impair the Board's ability -- through Federal Reserve Bank funding facilities -- to address strains in financial markets and to effectively pursue its statutory objectives.  See Madigan Decl, ¶¶ 19, 31-35; McLaughlin Decl. ¶¶ 24, 27; Logan Decl, ¶¶ 40, 42; Palladino Decl., ¶¶ 21-22; Baum Decl., ¶ 17.  In particular, public disclosure of the withheld information would impair: (i) the Board's ability to carry out its statutory responsibility "to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates" specified in section 2A of the Federal Reserve Act, as amended (the "FRA"), 12 U.S.C. § 225a; (ii) its ability effectively to utilize its authority under section 13(3) of the FRA to permit lending by the Reserve Banks to individuals, partnerships or corporations to address "unusual and exigent circumstances" in the domestic economy; and (iii) its ability under section 10B and related sections of the FRA to utilize DW, TAF and AMLF lending by the Reserve Banks as a safety valve in relieving liquidity strains for individual depository institutions and the banking system, and to complement open market operations in achieving the target federal funds rate.

First, the Board and the FOMC use monetary policy to carry out their statutory mandate under section 2A of the Federal Reserve Act "to promote effectively the goals of maximum employment, stable prices and moderate long term interest rates."  Madigan Decl., ¶ 32. Monetary policy is the process by which a government, generally through a central bank, affects the level of interest rates and the supply of money in pursuit of policy goals.  Id.  In the U.S., the FRBNY's open market desk conducts open market operations by buying and selling government

29

securities to adjust the aggregate supply of reserve balances so as to achieve a target rate in the federal funds market (the market for unsecured overnight and term loans in which depository institutions and certain other participants trade deposit balances at the Federal Reserve). Id.; see also Burke Decl., ¶¶ 5-9, 27. DW lending complements OMOs by making Federal Reserve balances available to depository institutions when the aggregate supply of reserve balances in the market falls short of demand. Madigan Decl., ¶ 32. When the demand for reserve balances is high relative to the supply of such balances from other institutions, the federal funds rate tends to move higher and depository institutions then tend to borrow at the DW to obtain needed reserves, thereby reducing upward pressure on the federal funds rate. Id.

If institutions are unwilling to access the DW for fear of public disclosure, this "safety valve" role of the DW will be impaired and the Board's and FOMC's task under section 2A of achieving a desired level of short-term interest rates through OMOs would be greatly complicated. Id. The inability to achieve a desired level of short-term interest rates, in turn, adds to uncertainty in financial markets and makes it more difficult for the Board to achieve its statutory objectives under section 2A of maximum employment, stable prices and moderate long term interest rates. Id. Likewise, as described in the McLaughlin Decl, ¶ 25, and the Logan Decl., ¶ 43, public disclosure of details regarding specific collateral pledged at the DW and SCLFs, and the FRBNY's valuation of the collateral, could cause the FRBNY to become a price setter in the market, thereby undermining the market mechanism and undermining the Reserve Bank's mission to promote market stability. As in Judicial Watch, supra, 108 F. Supp. at 30, where the court found loan agreements exempt under the third prong because disclosure would "impair [Eximbank's] ability to fulfill its statutory purpose, which is to foster domestic economic

30

growth by supporting United States export transactions that that are too risky for private capital financing," withheld information relating to DW lending is exempt because disclosure would impair the Board's ability to use the DW as in instrument of monetary policy to achieve a desired level of short-term interest rates and fulfill its statutory objectives under section 2A of the FRA.

Second, section 13(3) of the FRA, 12 U.S.C. § 343, allows the Board "to authorize any Federal reserve bank" to extend credit to "individual[s], partnership[s], or corporations" in "unusual and exigent circumstances," upon the affirmative vote of five members of the Board, if, in the judgment of the Reserve Bank, the individual, partnership or corporation "is unable to secure adequate credit accommodations from other banking institutions." Id. In these times of unprecedented stress in the U.S. financial markets, the Board has used its authority under section 13(3) to create back-up sources of liquidity, including the PDCF, TSLF, TOP, AMLF and CPFF, to ease tight credit conditions and support a resumption of sustainable economic growth. Madigan Decl., ¶ 8. The PDCF provides primary dealers with access to FRBNY funding during this period of liquidity strain, providing a back-up source of liquidity if market sources are unavailable and facilitating the continued functioning of the financial markets and supporting credit availability and overall economic activity. Madigan Decl., ¶ 11; McLaughlin Decl., ¶¶ 11, 27. Likewise, the TSLF and TOP promote liquidity in the financing markets for Treasury securities and other collateral and foster the functioning of financial markets more generally, support asset prices, and support economic activity. Madigan Decl., ¶ 12; Logan Decl., ¶¶ 13, 23, 40. The AMLF, authorized under sections 13(3) and 10B, provides needed liquidity to money market mutual funds and assists them in meeting unprecedented demands for redemption through loans to depository institutions to purchase certain assets from such funds. Madigan

31

Decl., ¶ 10; Palladino Decl., ¶ 5.  The CPFF enhances liquidity in the commercial paper market by allowing an SPV established by the FRBNY to purchase eligible commercial paper directly from U.S. issuers.  Madigan Decl., ¶ 13; Baum Decl., ¶ 5.  If primary dealers, issuers, or depository institutions are unwilling to access these facilities for fear that non-public information regarding the fact that they borrowed or details regarding their loans will be disclosed, the utility of these facilities in providing liquidity to individual institutions and the capital markets will be undermined.  McLaughlin Decl., ¶ 27; Madigan Decl., ¶ 33; Logan Decl., ¶ 40; Palladino Decl., ¶ 21; Baum Decl., ¶¶ 16-17.  As a result, the Board's ability under section 13(3) to address "unusual and exigent circumstances" in the financial markets by authorizing the Reserve Banks to lend to individuals, partnerships or corporations will be impaired.  Madigan Decl., ¶ 33.

Finally, as discussed, infra, pp. 47-49, the Board has statutory authority under section 10B and related sections of the FRA to oversee the Federal Reserve Banks' lending at the DW, TAF, and AMLF, and the Reserve Banks have statutory authority to lend under those provisions. The DW functions as a safety valve in relieving pressures in the interbank funds market, and alleviating liquidity strains in individual depository institutions and the banking system as a whole.  McLaughlin Decl., ¶ 5; Madigan Decl., ¶ 34.  The DW helps to ensure the basic stability of the payment system by supplying liquidity during times of systemic stress.  McLaughlin Decl., ¶ 5.  In the Reserve Banks' role as "lender of last resort," id., the DW serve as an emergency, back-up source of liquidity for institutions that may not have access to ordinary, market sources of funding.  Madigan Decl., ¶ 34.  Similarly, since 2007, the TAF has complemented the DW's role as a safety valve by providing term funding to depository institutions eligible for primary DW credit through an auction mechanism.  Madigan Decl., ¶¶ 7,

9, 34-35.  The AMLF, established in September 2008, has played an important role in alleviating liquidity strains in depository institutions, money market funds, and the banking system, and in facilitating redemptions at money market mutual funds.  Madigan Decl., ¶¶ 7, 34; Palladino Decl., ¶¶ 5-7.  A reluctance of institutions to borrow at the DW, TAF or AMLF because of confidentiality concerns would impair the Board's and Federal Reserve Banks' statutory function under section 10B and related provisions of the FRA to act as a "lender of last resort," and to utilize DW, TAF and AMLF lending as a safety valve providing liquidity to individual depository institutions and to the banking system as a whole.  Madigan Decl., ¶¶ 34-35; McLaughlin Decl., ¶ 24; Palladino Decl., ¶¶ 21-22.

As in <u>Clarke</u>, <u>supra</u>, 1986 U.S. Dist. LEXIS 29989 at * 5, where the court found that disclosure of confidential information provided by purchasers of government bonds would "harm the national interest because investors would be less likely to purchase government bonds in the future if they knew the details of their purchases would be subject to public disclosure," disclosure of the names of borrowers at the DW and SCLFs, loan amounts and dates, and other withheld information would make depository institutions,  primary dealers, and issuers less likely to access these facilities, thereby impairing the Board's and Reserve Banks' ability to provide liquidity to individual institutions and to support the financial markets generally.  Accordingly, the Board has met its burden of showing that "disclosure of the requested commercial or financial information will harm an identifiable private or governmental interest which the Congress sought to protect by enacting exemption 4," <u>9 to 5</u>, <u>supra</u>, 721 F.2d at 10, and is entitled to summary judgment under the third prong of <u>National Parks</u>.

2)    **The Board Properly Withheld Loan Information on Individual Borrowers Under FOIA Exemption 5**

Exemption 5 of FOIA protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has construed this language "to exempt those documents, and only those documents that are normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975). The coverage of exemption 5 is broad, encompassing both statutory privileges and privileges commonly recognized by case law, and is not limited to those privileges explicitly mentioned in FOIA's legislative history. U.S. v. Weber Aircraft Corp., 465 U.S. 792, 800 (1984); see FTC v. Grolier, Inc., 462 U.S. 19, 26-27 (1983).

Here, there can be little doubt that the withheld information constitutes "inter-agency or intra-agency memorandums or letters," under 5 U.S.C. § 552(b)(5). The Reports were prepared by Board staff using data supplied by the Federal Reserve Banks and distributed to Board staff (with copies to the FRBNY) for use in formulating monetary policy and for Reserve Bank supervision purposes. Madigan Decl., ¶ 18; Thro Decl., ¶¶ 15-17 and Vaughn Indices; see Merrill, supra, 443 U.S. at 352-53. The Draft Procedures and e-mails were transmitted between Board and Reserve Bank staff.[12] Thro Decl, ¶¶ 18-19 and Vaughn Indices. The daily PDCF Collateral Reports, transmittal e-mails and additional e-mails were transmitted by the FRBNY to a Board officer. Thro Decl., ¶ 28 and Supplemental Vaughn Index. Likewise, the withheld

---

[12] See FOMC v. Merrill, 443 U.S. 340, 352 (1979) (finding that Domestic Policy Directives ("directives"), which are "essentially the FOMC's written instructions to the Account Manager" at the FRBNY are "'inter-agency or intra-agency memorandums or letters.'") (quoting FOIA).

information is surely confidential, Madigan Decl., ¶ 21; Thro Decl., ¶¶ 15-17, 28; <u>Vaughn</u>

Indices and Supplemental <u>Vaughn</u> Index, and is commercial in nature, as it relates to loans by the

Reserve Banks to financial institutions and primary dealers.  <u>Merrill</u>, <u>supra</u>, 443 U.S. at 361

(finding information "commercial in nature because it relates to the buying and selling of

securities on the open market").

     As such, this information is exempt under exemption 5 which includes a privilege

analogous to the qualified privilege for confidential commercial information available in civil

discovery under Fed. R Civ. P. 26(c)(7).[13]  <u>Merrill</u>, <u>supra</u>, 443 U.S. at 359.  <u>Merrill</u> involved the

FOMC's current Domestic Policy Directives ("directives"), which summarize the economic and

monetary background of the FOMC's monthly meeting and set forth the monetary policy to be

followed in the month ahead.  At the time of the <u>Merrill</u> decision, the FOMC delayed public

release of the directives until supplanted by another directive.  <u>See</u> 12 C.F.R. § 271.5 (1979).

     The FOMC argued that premature release would make it difficult to implement gradual

changes in monetary policy, because it would enable market participants to adjust their holdings

of government securities in anticipation of purchases or sales by the government, making it more

difficult for the agency gradually to change interest rates, and would give large investors, who

could quickly process information in the directives, an unfair advantage over their smaller

competitors.  443 U.S. at 348-49.  The Supreme Court held the directives protected under the

qualified privilege for confidential commercial information.  443 U.S. at 363.  The Court found

"the sensitivity of the commercial secrets involved, and the harm that would be inflicted upon the

---

[13] Rule 26(c)(7) provides that, "for good cause shown," a district court may order "that a trade
secret or other confidential research, development, or commercial information not be disclosed,
or be disclosed only in a designated way."

government by premature disclosure, should serve as a relevant criteria in determining the applicability of the Exemption 5 privilege." Id. at 363. It concluded, "if the Domestic Policy Directives contain sensitive information not otherwise available, and if immediate release of the Directives would significantly harm the Government's monetary functions or commercial interests, then a slight delay in publication of the Directives such as that authorized by 12 C.F.R. § 271.5 would be permitted under Exemption 5." Id. at 363. On remand, the District Court found that immediate release of the directives would harm the government's monetary and commercial interests, and that the directives were exempt under exemption 5. Merrill v. FOMC, 516 F. Supp. 1028, 1030-31 (D.D.C. 1981).

Subsequent cases have concluded that exemption 5 "protects the government when it enters the marketplace as an ordinary buyer or seller." Government Land Bank v. GSA, 671 F.2d 663, 665 (1st Cir. 1982) (appraisal report for real property listed for sale by GSA protected under exemption 5 until the property was sold); see also Hack v. Dep't of Energy, 538 F. Supp. 1098, 1104 (D.D.C. 1982) (DOE conceptual design reports exempt from disclosure under FOIA exemption 5 because premature release would jeopardize selection process for architectural engineering contracts).

As in Merrill, the withheld information at issue here "contain[s] sensitive information not otherwise available, and … immediate release … would significantly harm the Government's monetary functions or commercial interests." 443 U.S. at 363. As set forth, supra, pp. 29-31, in addition to providing liquidity to individual institutions, the Board uses the DW as an instrument

36

of monetary policy to complement OMOs in achieving the target federal funds rate.[14]  If

withheld information relating to the DW is publicly disclosed, and institutions are unwilling to

access the DW, the DW's utility as an instrument of monetary policy would be reduced,

Madigan Decl., ¶ 32, thereby harming the government's "monetary functions" within the

meaning of Merrill.  As in Merrill, where premature release of the FOMC's directives would

have made it difficult for the FOMC to implement gradual changes in monetary policy, 443 U.S.

at 348, release of withheld information relating to the DW would make it more difficult for the

Board to use the DW as a lever of monetary policy.  Madigan Decl., ¶ 32.  That information is

therefore exempt under exemption 5.[15]

## E.    RESPONSIVE DOCUMENTS AT THE FRBNY AND FRBB ARE NOT "AGENCY RECORDS" OF THE BOARD SUBJECT TO A FOIA REQUEST TO THE BOARD

Finally, as is apparent from the declarations, the Board has a limited number of records

responsive to First and Second FOIA Requests because the transaction-level documents plaintiff

is seeking are more likely at the FRBNY which, along with the 11 other Federal Reserve Banks,

administers the DW and TAF, and which alone is responsible for operating the TSLF, TOP,

---

[14] Although commercial transactions at the DW are carried out by the Reserve Banks, not the Board, the Supreme Court recognized in Merrill that the FOMC (like the Board) can act in the commercial markets only through the Reserve Banks, and that the resulting Governmental interest is protected under exemption 5.

[15] Although the Board has no virtually no responsive collateral specific information regarding securities pledged as collateral for the DW or SCLFs with the exception of the Draft Procedures, Thro Decl., ¶¶ 14, 21, public release of such collateral-specific information "would significantly harm the Government's monetary functions or commercial interests" as set forth in the Madigan Decl., ¶ 30.  Merrill, 443 U.S. at 363.  Thus, to the extent that this information is in the possession of the Reserve Banks, the information could be exempt under FOIA exemption 5 even if the Reserve Bank documents were deemed to be "agency records" under FOIA.

PDCF, SLP and CPFF.  Likewise, transaction-level AMLF documents are more likely at the

FRBB, which administers that facility.  The Board -- a government agency -- oversees the

Reserve Banks' lending activities, but is not itself a bank, does not make loans, and does not

maintain or use transaction-level loan documentation in the performance of its agency functions.

Likewise, while the FOMC oversees OMOs, only the Reserve Banks are authorized to buy and

sell securities on the open market.  The FRBNY conducts OMOs on behalf of the System, and

the Board does not maintain transaction-level documentation on specific OMOs on specific

dates.  Because, as set forth below, responsive FRBNY and FRBB documents are not "agency

records" of the Board subject to a FOIA request to the Board,[16] the Board did not "improperly

withhold" these documents, and the court lacks subject matter jurisdiction to order the Board to

provide these documents to the plaintiff.

### 1) Responsive Documents at the FRBNY and FRBB were Neither Created nor Obtained by the Board and are not "Agency Records" of the Board Subject to FOIA

FOIA provides jurisdiction to the U.S. District courts to "enjoin the agency from

withholding agency records and to order the production of any agency records improperly

withheld …."  5 U.S.C. § 552(a)(4)(B).  Federal jurisdiction under FOIA "is dependent upon a

showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'"  Kissinger v.

---

[16]  As set forth in the Thro Decl., ¶ 32, it is the position of the Board, the FRBNY, and the FRBB
that, even if these documents are "agency records" of the Board, they are nevertheless exempt
under FOIA exemptions 4 and 5.  Because the documents have at all times been in the possession
of the FRBNY and FRBB, the Board is unable to prepare a Vaughn Index for these documents,
and has only included declarations and argument supporting the application of exemptions 4 and
5 to these documents to the extent that this information is available.  Should the Court conclude
that these documents are subject to FOIA, the Board requests that the FRBNY and FRBB be
given an opportunity to intervene and assert their interest, and the Board reserves its right, if
necessary, to submit additional evidence and argument regarding the application of exemptions 4
and 5 to responsive FRBNY and FRBB documents.

<u>Reporter's Committee for Freedom of the Press</u>, 445 U.S. 136, 150 (1980).  Only when each of these components has been met may a district court "'force an agency to comply with the FOIA's disclosure requirements.'"  <u>Cuomo</u>, <u>supra</u>, 166 F.3d at 478 (quoting <u>Tax Analysts</u>, <u>supra</u>, 492 U.S. at 142).

The Supreme Court has articulated a basic two-part test for determining what constitutes "agency records" under FOIA.  <u>Tax Analysts</u>, <u>supra</u>, 492 U.S. at 144-45.  "Agency records" are records that are: (1) either *created* or *obtained* by an agency, *and* (2) under agency control at the time of the FOIA request.  <u>Id</u>. (emphasis supplied).  Both parts of the test must be met for documents to be agency records.  <u>Cuomo</u>, <u>supra</u>, 166 F.3d at 479.  Here, because the Board did not "create or obtain" the FRBNY or FRBB records, the first part of the test is not met and the Court need not even exam the issue of "control."  Because the FRBNY and FRBB documents are not "agency records" of the Board, and the FRBNY and FRBB are not named as defendants in this lawsuit, the Court lacks subject matter jurisdiction to order their production.

As set forth in the McLaughlin, Logan, and Baum Decls., the FRBNY obtains and generates collateral and loan documentation through its transactions with borrowers, clearing banks, and, for the CPFF, its asset manager and custodial administrator.  McLaughlin Decl., ¶ 17; Logan Decl, ¶¶ 12, 28-29; Baum Decl., ¶ 13.  The FRBB obtains and generates similar documentation in the course of transactions with participants at the AMLF.  Palladino Decl., ¶ 13.  The FRBNY obtains and generates documentation regarding specific OMOs on specific dates in the course of OMOs with primary dealers and clearing banks.  Burke Decl., ¶¶ 17, 22.  These documents are maintained by the FRBNY and FRBB, are highly confidential, and are not made available to anyone outside of the FRBNY or FRBB and their agents.  McLaughlin Decl.,

¶¶ 17, 19; Logan Decl., ¶¶ 29, 32; Baum Decl., ¶ 15; Burke Decl., ¶¶ 17, 22; Palladino Decl., ¶¶
13, 15.  With the exception of the withheld information, Board staff has not obtained, reviewed
or relied upon responsive FRBNY or FRBB records in the performance of any Board function.
Thro Decl., ¶ 31.

      "Congress contemplated that an agency must first either create or obtain a record as a
prerequisite to its becoming an 'agency record' within the meaning of the FOIA."  Forsham v.
Harris, 445 U.S. 169, 182 (1980).  FOIA reaches only "'records and material in the possession of
federal agencies ….'"  Kissinger, supra, 445 U.S. at 151 (quoting NLRB v. Robbins Tire &
Rubber Co., 437 U.S. 214, 221 (1978)).  Here, because responsive FRBNY or FRBB documents
were not created or obtained by the Board, and no Board staff member has used or relied upon
those documents in the performance of agency functions, they are not agency records of the
Board subject to a FOIA request to the Board.

      Whether or not the Board *could* have requested or obtain copies of responsive FRBNY or
FRBB documents has no bearing on this lawsuit.  The Supreme Court in Forsham, supra, held
that an agency's mere *right of access* to documents does not transform documents into "agency
records" if the right is unexercised.  445 U.S. at 185-86.  Rather, "the FOIA applies to records
which have been in fact obtained, and not to records which merely could have been obtained."
Id. at 186.

      Similarly, in Ciba-Geigy Corp. v. Mathews, 428 F. Supp. 523, 531 (S.D.N.Y. 1977), a
district court in the Southern District of New York found "[j]ust as the government cannot be
compelled to obtain possession of documents not under its control or furnish an opinion when
none is written, … it should not be compelled to acquire data it neither referred to directly nor

relied upon in making decisions." Ciba-Geigy, supra, 428 F. Supp. at 531. Thus, responsive FRBNY or FRBB documents, which were never obtained or relied upon by the Board, are not agency records of the Board subject to a FOIA request to the Board, and the Court lacks subject matter jurisdiction to order their production.

**2) The Structure of the Board and the Federal Reserve Banks**

Moreover, although the Complaint collectively refers to the Board and the Federal Reserve Banks as the "Federal Reserve," Complaint, ¶¶ 10-16, it is plain from the FRA and relevant case law that the Board and the Federal Reserve Banks are separate entities which work hand in hand as components of our nation's central banking system, but nevertheless maintain separate records.

The System includes several components which combine public and private elements. See Melcher v. FOMC, 644 F. Supp. 510, 517-18 (D.D.C. 1986), aff'd in part, vacated in part, 836 F.2d 561 (D.C. 1987), cert. denied, 486 U.S. 1042 (1988). The defendant Board, to which plaintiff's FOIA Requests were directed, is a government agency in Washington, D.C. composed of seven members appointed by the president and confirmed by the Senate. 12 U.S.C. § 241; see generally Board of Governors of the Federal Reserve System, The Federal Reserve System Purposes and Functions (Ninth Edition, June 2005) ("P & F") at 4.[17] The Board supervises and regulates the operations of the Federal Reserve Banks, exercises broad responsibility over the nation's payments system, promulgates and administers regulations, and plays a major role in the supervision and regulation of the U.S. banking system. 12 U.S.C. § 248(j); P & F at 4-5. The

_____

[17] The Board's P & F publication has been relied upon by a number of courts, including the Supreme Court in Merrill, supra, 443 U.S. at 343 n.2, to explain System operations. It is available at http://www.federalreserve.gov/pf/pdf/pf_complete.pdf.

Board is subject to FOIA and promulgates its own regulations regarding FOIA compliance.  12

C.F.R. §§ 261.12-.17.

Similarly, the FOMC, which oversees System OMOs, maintains its own records and is a

separate government agency for FOIA purposes, even though it shares offices with the Board,

receives support from some Board staff members, and includes members of the Board and

Reserve Bank presidents.  See Merrill, supra, 443 U.S. at 352; 12 U.S.C. § 263; Madigan Decl.,

¶ 1.  The FOMC publishes its own regulations regarding FOIA compliance.  See 12 C.F.R. Part

271.

In contrast, the twelve regional Federal Reserve Banks and their branches are the

operational arm of the nation's central banking system.  P & F at 3.  The Federal Reserve Banks

were created by Congress in 1913 as the "'monetary and fiscal agents of the United States.'"

Fasano v. Federal Reserve Bank of New York, 457 F.3d 274, 277 (3rd Cir. 2006), cert. denied,

549 U.S. 1115 (2007) (quoting First Agricultural Nat'l Bank v. State Tax Comm'n, 392 U.S.

339, 356 (1968) (Marshall, J., dissenting)).  The Reserve Banks carry out a variety of System

functions including operating a nationwide payments system, distributing currency and coin,

supervising and regulating member banks and bank holding companies (under delegated

authority from the Board), and serving as banker for the U.S. Treasury.  P & F at 6; see also

Scott v. Federal Reserve Bank of Kansas City, 406 F.3d 532, 536 (8th Cir. 2005), cert. denied,

546 U.S. 1216 (2006); Federal Reserve Bank of St. Louis v. Metrocentre Improv. Dist., 657 F.2d

183, 185-86 (8th Cir. 1981), aff'd, 455 U.S. 995 (1982); Federal Reserve Bank of Boston v.

Comm'r of Corporations, 499 F.2d 60, 62-63 (1st Cir. 1974).  Besides carrying out System

functions, each Reserve Bank acts as a depository for banks within its district, a lender to eligible

42

institutions through the DW and, more recently, the TAF, and a clearing agent for checks, and fulfills other responsibilities for banks within the district.  P & F at 6.

Congress chartered the Reserve Banks for a public purpose, and they combine public and private elements.  The Board has broad oversight responsibility for the operations and activities of the Federal Reserve Banks, 12 U.S.C. § 248(j), and has delegated some of its statutory authority to the Reserve Banks, see 12 C.F.R. § 265.11.  However, the Reserve Banks also operate under independent grants of authority from Congress.  Subchapter IX of the FRA, 12 U.S.C. §§ 341-361, enumerates the powers and duties of the Federal Reserve Banks, which include the power to sue and be sued in their own names, the power to make contracts, to appoint officers, hire and fire employees, and to prescribe bylaws through their boards of directors. 12 U.S.C. § 341.

Each Federal Reserve Bank is a separate corporation which issues stock that is held by depository institutions within a particular Federal Reserve district.[18]  12 U.S.C. §§ 282, 341; Fasano, supra, 457 F.3d at 277.  Each Reserve Bank has its own 9-member Board of directors, six of whom are elected by member banks within the district, and three appointed by the Board. 12 U.S.C. §§ 301, 302.  The Reserve Bank boards "perform the duties usually appertaining to the

---

[18] The corporate structure of the twelve Federal Reserve Banks was an integral part of Congress's plan to create a unified central banking system which is responsive to the needs of banks in each district.  As stated in the 1913 House Currency and Banking Committee Report accompanying the FRA, each Reserve Bank is "individually organized and individually controlled, each holding the fluid funds of the region in which it is organized and each ordinarily dependent upon no other part of the county for assistance."  H.R. Rep. No. 69, 63rd Cong., 1st Sess. 18 (1913) ("1913 House Report").  The House Report went on to state that the "only factor of centralization which has been provided in the committee's plan is found in the Federal reserve board, which is to be a strictly Government organization created for the purpose of inspecting existing banking institutions and of regulating relations between Federal reserve banks and between them and the Government itself."  Id . at 18.

office of directors of banking associations ...."  12 U.S.C. § 301.  Presidents or first vice

presidents of five of the Federal Reserve Banks serve as FOMC members, 12 U.S.C. § 263(a),

but are not "officers of the United States" for purposes of the appointments clause of the

Constitution.  Melcher, supra, 644 F. Supp. at 519.  Reserve Bank employees are not civil

servants, but are at-will employees of each Reserve Bank.  12 U.S.C. § 341 (Fifth); Scott, supra,

406 F.3d at 536.  Because the Reserve Banks are private corporations serving a public purpose,

they have no rulemaking authority, Scott, supra, 406 F.3d at 536, and no published regulations

regarding FOIA.  System rulemaking authority is vested in the Board, which may not delegate

this function.  12 U.S.C. § 248(k).  No statute designates the Federal Reserve Banks as federal

agencies.  Scott, supra, 406 F.3d at 537.  Federal Reserve Banks receive no appropriated funds

from Congress, but rather are capitalized by required contributions from member banks.  Scott,

supra, 406 F.3d at 537.

Because the Board, the FOMC, and the twelve Federal Reserve Banks are each separate

entities, each entity maintains separate records that are not interchangeable for FOIA or other

purposes.  With a very narrow exception defined by Board regulation, and discussed below,

records at the Federal Reserve Banks are not Board records subject to a FOIA request to the

Board.

### 3) Responsive Documents at the FRBNY and FRBB do not Fall Within the Narrow Category of Reserve Bank Documents that are Board Records by Regulation

By regulation, a very narrow category of documents located at the Federal Reserve Banks

are "Board records" subject to FOIA.   The Board's Rules Regarding Availability of Information

provide that Board records include:

44

all information coming into the possession and under the control of the Board, any Board member, any Federal Reserve Bank, or any officer, employee, or agent of the Board or of any Federal Reserve Bank, *in the performance of functions for or on behalf of the Board* that constitute part of the Board's official files;

12 C.F.R. § 261.2(i)(1)(i) (emphasis supplied).

Under this definition, for a document at a Reserve Bank to be a "record of the Board" subject to FOIA, it must relate to a Board function performed by a Reserve Bank acting under delegated authority from the Board.[19]

Here, responsive FRBNY and FRBB records relating to credit extensions under the DW and SCLFs are not Board records because the extension of credit is a fundamental part of the business of banking, and a commercial activity in which the Reserve Banks are authorized to engage, but the Board is not. Because the Reserve Banks are statutorily authorized to extend credit to depository institutions, and to individuals, partnerships or corporations in unusual and exigent circumstances, upon prior Board authorization, and are not operating under delegated authority, Reserve Bank records obtained or created in the course of these activities are not Board records under 12 C.F.R. § 261.2(i)(1)(i). Although the Board issues regulations and orders governing these extensions of credit and, in the case of the SCLFs, authorized these activities by a special Board action, this exercise of *supervisory* authority does not change these ordinary commercial banking transactions into an agency function. Likewise, the FRBNY's purchases and sales of securities in the course of OMOs is a commercial activity the Reserve

---

[19] The Board's interpretation of its own regulation is entitled to "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Bruh v. Bessemer Venture Partners III L.P., 464 F.3d 202, 207 (2d Cir. 2006), cert. denied, 549 U.S. 1209 (2007) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14 (1945)). The fact that an agency's interpretation of its own regulation is set forth in a legal brief does not reduce the deference owed it when the brief reflects the agency's "fair and considered judgment on the matter in question." Auer v. Robbins, 519 U.S. 452, 462 (1997).

Banks are authorized to engage in, but the Board is not, and not a Board-delegated function. Thus, responsive records at the Reserve Banks relating to the DW, SCLFs, and OMOs are not records of the Board subject to a FOIA request to the Board under the Board's regulations.

DW lending was established by the FRA in 1913. The FRA vests lending authority in the Federal Reserve Banks, and the power to supervise lending in the Board. Section 10B of the FRA provides "[a]ny Federal Reserve bank, under rules and regulations prescribed by the Board of Governors of the Federal Reserve System, may make advances to any member bank on its time or demand notes having maturities of not more than four months and which are secured to the satisfaction of such Federal Reserve Bank."[20] 12 U.S.C. § 347b(a). It is apparent from the plain language of section 10B, and related provisions, that Congress has given the Federal Reserve Banks independent statutory authority to lend at the DW, *and* to determine the sufficiency of collateral pledged for DW loans, subject to rules and regulations issued by the Board, and that the Board did not "delegate" this authority to the Reserve Banks.[21]

---

[20] Likewise, section 13(2) of the FRA provides "[u]pon the indorsement of any of its member banks … any Federal reserve bank may discount notes, drafts, and bills of exchange arising out of actual commercial transactions… ." 12 U.S.C. § 343. Section 4 of the FRA provides that the boards of directors of the Federal Reserve Banks "may, subject to the provisions of law and the orders of the Board of Governors of the Federal Reserve System, extend to each member bank such discounts, advancements and accommodations as may be safely and reasonably made …." 12 U.S.C. § 301.

[21] The FRA authorizes the Board "to delegate, by published order or rule and subject to [the Administrative Procedure Act] any of its functions other than those relating to rulemaking or pertaining principally to monetary and credit policies, to one or more ... Federal Reserve banks." 12 U.S.C. § 248(k). Because the Board itself lacks statutory authority to lend, or to purchase and sell securities on the open market, see, infra, pp. 51-52, it could not "delegate" this authority to the Reserve Banks. There is no delegation of lending authority, or authority to purchase and sell securities, in the Board's Rules Regarding Delegation of Authority or elsewhere. 12 C.F.R. §§ 265.11(a)-(g).

Documentation required to be executed by depository institutions borrowing at the DW also makes plain that the Reserve Banks, and not the Board, are the lenders and that the Reserve Banks determine the sufficiency of collateral.  The Authorizing Resolution for Borrowers provides that the institution is "borrow[ing] money from a Federal Reserve Bank on the terms and security that such Federal Reserve Bank requires" and is "grant[ing], assign[ing], pledge[ing], and transfer[ing] to any Federal Reserve Bank" a security interest in the collateral, and appoints the Federal Reserve Bank as the borrowers' attorney-in-fact for purposes of "endors[ing], assign[ing], transfer[ing] and sell[ing], … collateral pledged to such Federal Reserve Bank."[22]  Operating Circular 8, which governs a the pledge of collateral to a Federal Reserve Bank to secure DW or other borrowing, states that collateral is "[p]ledged to this Reserve Bank or another Federal Reserve Bank to secure repayment of an advance made to the Pledgor or to secure repayment of any other indebtedness (including intraday or overnight overdrafts and any penalties and fees thereon) of the Pledgor to a Federal Reserve Bank" and that "the Reserve Bank holds collateral as custodian."[23]

The Board could not delegate lending authority to the Reserve Banks because, as a government agency, it does not have authority to take deposits or extend credit.  Under the structure established by Congress, the Board promulgates rules and regulations with respect to

---

[22] This and other documentation required from institutions borrowing at the DW is available on the DW website at http://www.frbdiscountwindow.org/required.cfm?hdrID=19&dtlID=42#auth.

[23] Operating Circular No. 8 is available at http://www.frbservices.org/files/regulations/pdf/operating_circular_8.pdf

DW lending, authorizes new lending facilities, such as the TAF and AMLF,[24] within the parameters set by Congress, reviews DW interest rate determinations made by the boards of directors of each Reserve Bank, and takes similar supervisory actions, but does not participate in the day-to-day business of lending.[25]  12 U.S.C. §§ 301, 343, 347b and 347c.  The Board's Regulation A, 12 C.F.R. Part 201, defines the parameters of the Reserve Banks' authority to lend at the DW.

The legislative history of the FRA makes plain that Congress intended the Board to play only a supervisory role in lending, while the Reserve Banks carried on the day-to-day business of banking.  Congress believed that the routine operations of banking required a detailed knowledge of local credit conditions that only the Reserve Banks would have.  The 1913 House Report provides:

> The limitation of business which is proposed in the sections governing rediscounts, and the maintenance of all operations upon a footing of relatively short time will keep the assets of the proposed institutions [reserve banks] in a strictly fluid and available condition, and will insure the presence of the means of accommodation when banks apply for loans to enable them to extend to their

---

[24] The Board authorized the Reserve Banks to extend credit at the TAF under section 10B of the FRA, the same statute that permits DW lending. The Board's press release can be found at http://www.federalreserve.gov/newsevents/press/monetary/20071212a.htm.  The AMLF was established under sections 10B and 13(3).  Madigan Decl., ¶ 10.  The Board's press release is at http://www.federalreserve.gov/newsevents/press/monetary/20080919a.htm.

[25] The Board's authority to supervise DW lending by the Reserve Banks is found in the FRA, which provides that the Board may "prescribe regulations further defining within the limitations of this chapter the conditions under which discounts, advancements, and the accommodations may be extended to member banks," 12 U.S.C. § 301, "determine or define the character of the paper thus eligible for discount, within the meaning of this chapter," 12 U.S.C. § 33, prescribe "rules and regulations" pertaining to Reserve Bank advances to members banks on time or demand notes with short maturities, 12 U.S.C. § 347b(a), and issue "limitations, restrictions and regulations" with regard to Reserve Bank advances to individuals, partnerships or corporations secured by U.S. government obligations.  12 U.S.C. § 347c.

> clients larger degrees of assistance in business. It is proposed that the Government shall retain a sufficient power over the reserve banks to enable it to exercise a directing authority when necessary to do so, *but that it shall in no way attempt to carry on through its own mechanism the routine operations of banking which require detailed knowledge of local and individual credit and which determine the actual use of the funds of the community in any given instance.* In other words, the reserve-bank plan retains to the Government power over the exercise of the broader banking functions, while it leaves to individuals and privately owned institutions the actual direction of routine.

1913 House Report (cited, supra, p. 43, n. 18) at 18-19 (emphasis supplied). Accordingly, Reserve Bank records relating to DW, TAF or AMLF lending are proprietary commercial records of the Reserve Bank, and not records obtained "in the performance of functions for or on behalf of the Board," 12 C.F.R. § 261.2(i)(1)(i), subject to FOIA Request to the Board.

Similarly, responsive FRBNY and FRBB documents relating to the PDCF,[26] TSLF,[27] TOP, AMLF, CPFF,[28] and other SCLFs were not obtained "in the performance of functions for or on behalf of the Board." Id. The Board authorized the FRBNY and FRBB to extend credit under those facilities pursuant to its authority under section 13(3) of the FRA. 12 U.S.C. § 343. Section 13(3), added to the FRA in 1932 at the height of the Great Depression,[29] allows the

---

[26] The Board's press release announcing the PDCF can be found at http://www.federalreserve.gov/newsevents/press/monetary/20080316a.htm.

[27] The Board's press release announcing the TSLF can be found at http://www.federalreserve.gov/newsevents/press/monetary/20080311a.htm. TOP is a variation of TSLF and is conducted under the same authority. A description of TOP can be found on the FRBNY's website at http://www.ny.frb.org/markets/top_terms.html.

[28] The Board's press release announcing the CPFF can be found at http://www.federalreserve.gov/newsevents/press/monetary/20081007c.htm.

[29] Because section 13(3) was introduced and enacted in just 5 days, there is almost no legislative history. Pub. Law 72-302, § 210 of Title 2, 47 Stat. 709 (July 21, 1932). Section 13(3) was introduced as an amendment to the Emergency Relief and Construction Act of 1932 on the same day President Hoover vetoed legislation which would have given broad lending powers to the

Board "to authorize any Federal Reserve bank" in "unusual and exigent circumstances" to extend credit to "individual[s], partnership[s], or corporation[s] … secured to the satisfaction of the Federal Reserve bank," upon the affirmative vote of five members of the Board, if, in the judgment of the Reserve Bank, the individual, partnership or corporation "is unable to secure adequate credit accommodations from other banking institutions."  Id.  Reserve Banks' lending to these non-bank entities is "subject to such limitations, restrictions, and regulations as the Board of Governors of the Federal Reserve System may prescribe."  Id.

The fact that the Board authorized the FRBNY to extend credit to non-bank entities under the SCLFs does not transform these commercial lending transactions into agency functions.  As is plain from the language of section 13(3), the SCLFs are an exercise of the Reserve Banks' statutory authority "to discount [lend] for any individual, partnership, or corporation," upon prior authorization of five Board members and under "limitations, restrictions, and regulations" prescribed by the Board.  12 U.S.C. § 343.  As with DW lending under section 10B, section 13(3) gives the Reserve Banks statutory authority to determine the sufficiency of collateral pledged for loans authorized under that section, subject to limitations, restrictions and regulations prescribed by the Board.  Id.  The conditioning of the Reserve Banks' lending authority in unusual and exigent circumstances does not transform this commercial banking activity into a delegated agency function.  Rather, the conditions imposed by section 13(3) and Regulation A,

---

Reconstruction Finance Corporation.  75 Cong. Rec. 15040-41 (vetoing bill) and 14981 (introducing amendment) (July 11, 1932).  On July 26, 1932, five days after enactment of section 13(3), the Board issued a circular to all twelve Federal Reserve Banks authorizing them to "discount eligible notes, drafts, and bills of exchange for individuals, partnerships and corporations," that is, lend to non-depository institutions for the ensuing six months pursuant to the authority granted by section 13(3).  See "Discounts for Individuals, Partnerships and Corporations," 18 Fed. Res. Bull. 518-20 (August 1932).

12 C.F.R. § 201.4(d), serve to protect and preserve the safety and soundness of the Reserve Banks.

Finally, the FRBNY conducts OMOs pursuant to an independent statutory grant of authority to the Federal Reserve Banks to purchase and sell in the open market, under rules and regulations prescribed by the Board and regulations and directives issued by the FOMC, and not under Board-delegated authority.  Section 12A of the FRA, enacted in 1933, provides "[n]o Federal Reserve bank shall engage or decline to engage in open-market operations under sections 348a and 353 to 359 of this title except in accordance with the direction of and regulations adopted by the [FOMC]."  12 U.S.C. § 263(b).  Section 14 of the FRA provides "[a]ny Federal reserve bank may, under rules and regulations prescribed by the [Board], purchase and sell in the open market … cable transfers and bankers' acceptances and bills of exchange of the kinds and with maturities by this chapter made eligible for rediscount …."[30]  12 U.S.C. § 353.  A very early Second Circuit decision interpreting section 14 held that "purchases and sales [by the FRBNY] in the open market are specifically authorized by the [Federal Reserve] act."  Raichle v. Federal Reserve Bank of New York, 34 F.2d 910, 914 (2d Cir. 1929).  The FOMC has issued regulations governing OMOs by the Federal Reserve Banks.  12 C.F.R. § 270.4.  The FRBNY is the Reserve Bank selected by the FOMC to conduct OMOs using SOMA.  Burke Decl., ¶ 7.  As the Board itself does not have statutory authority to buy and sell in the open market, that authority is vested in the Federal Reserve Banks, records generated by the FRBNY in the course

---

[30] Related provisions of the FRA give the Federal Reserve Banks the power to deal in gold coins and bullion, 12 U.S.C. § 354; to buy and sell U.S., State and municipal bonds, notes, and U.S. agency obligations, 12 U.S.C. § 355; to purchase and sell commercial paper from member banks, 12 U.S.C. § 356, and to conduct transactions with foreign banks under "special supervision" from the Board.  12 U.S.C. § 348a.

of OMOs are not "records of the Board" under 12 C.F.R. § 261.2(i)(1)(i) subject to a FOIA request to the Board.

Because records at the FRBNY and FRBB responsive to the First and Second FOIA Requests  were obtained in the course of the FRBNY's and FRBB's statutory authority to lend under section 13(3), with prior Board authorization; the FRBNY's statutory authority under section 14 to buy and sell securities in the open markets; and the FRBNY's and FRBB's statutory authority to lend at the DW, under regulations and orders prescribed by the Board, and not "in the performance of functions for or on behalf of the Board," 12 C.F.R. § 261.2(i)(1)(i), those documents are not records of the Board subject to a FOIA request to the Board, and the Court lacks subject matter jurisdiction to order their production.

## CONCLUSION

For the foregoing reasons, the Board's motion for summary judgment should be granted and the Complaint should be dismissed.

Dated: March 27, 2009

/s/Yvonne F. Mizusawa
Katherine H. Wheatley (KW7931)
Associate General Counsel
Yvonne F. Mizusawa (YM5081)
Senior Counsel
Board of Governors of the Federal
  Reserve System
20th and C Streets, N.W.
Washington, D.C.  20551
Ph: (202) 452-3436
Fax: (202) 736-5615