UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
FOX NEWS NETWORK LLC,                :
                                     :
                      Plaintiff,     :   Case No. 09 CV 00272 (JKH)
                                     :
     -against-                       :
                                     :
BOARD OF GOVERNORS OF THE            :
FEDERAL RESERVE SYSTEM,              :
                                     :
                      Defendant.     :
------------------------------------------------------x

## DECLARATION OF LORIE K. LOGAN

**Lorie K. Logan**, being duly sworn, says:

1. I am a Vice President in the Market Operations and Markets Analysis Function of the Markets Group at the Federal Reserve Bank of New York (the "New York Fed" or the "Bank"). I submit this declaration in support of the motion for summary judgment by the Board of Governors of the Federal Reserve System (the "Board of Governors") in the above-referenced matter. I have personal knowledge of the matters set forth herein.

2. I have worked in the Markets Group at the New York Fed since 2000. I am currently the Director of Treasury Markets and am responsible for Treasury Auctions, Treasury Markets Policy Staff, System Open Market Account ("SOMA") Operations, the SOMA Securities Lending Program, Federal Open Market Committee ("FOMC") Policy Analysis and Implementation, Market Surveillance, the Term Securities Lending Facility (the "TLSF"), and the TSLF Options Program ("TOP"). Prior to becoming the Director of Treasury Markets, I was a Staff Coordinator in the Markets Group and prior to that, I was a Trader/Analyst in the Markets Group.

3. I received a Bachelor of Arts degree from Davidson College in 1995 and a Masters in Public Administration from the School of International and Public Affairs at Columbia University in 1999.

4. I have been informed that the Board of Governors received two requests pursuant to the Freedom of Information Act ("FOIA") seeking documents relating to, among other things, the SOMA Securities Lending Program, the TSLF and the TOP. As one of the officers at the New York Fed responsible for the oversight of these programs, I am familiar with how they operate, how they are managed and what records are kept at the New York Fed. The Board of Governors has asked me to make this declaration to provide an overview of the SOMA Securities Lending Program, the TSLF and the TOP, and the effect that public disclosure of the confidential information called for by the FOIA requests would have on the markets and the Bank's ability to fulfill its statutory functions and its policy mandate and mission.

**Securities Lending Program**

5. The SOMA Securities Lending Program is an overnight lending program designed to provide a secondary and temporary source of securities to the Treasury financing market to promote the smooth clearing of Treasury securities. The program offers specific Treasury securities against general Treasury securities as a means of adding liquidity to markets for financing short positions, in particular Treasury securities. Adding liquidity to financing markets related to short positioning in the Treasury cash market enhances hedging and market making activity in cash markets and improves their liquidity and function. Better functioning and higher liquidity in the Treasury cash market benefits the taxpayer because investors are generally willing to pay more at auction for more liquid securities. The New York Fed has been running this program since April 1969.

6.      The Securities Lending Program is a competitive, multiple price auction facility that awards overnight loans of securities from the SOMA portfolio to primary dealers. To prevent securities lending from affecting overnight bank reserves, loans are collateralized with Treasury bills, notes, bonds and inflation-indexed securities rather than cash. Dealer participation is entirely voluntary and the New York Fed does not evaluate dealer performance based on participation in securities lending operations. Borrowers are required to deliver collateral in exchange for borrowed securities on the loan date, and to return borrowed securities in exchange for the re-delivery of collateral at maturity.

7.      Each day, the Securities Lending Program auctions the theoretical amount available in the SOMA portfolio, which is currently 90 percent of each Treasury security owned by SOMA with a maturity greater than thirteen days. If less than 90 percent of holdings in a particular issue are in the SOMA account at the time of auction, then the entire amount is made available at auction.

8.      Loans are awarded based on competitive bidding in a multiple price auction for each security. Auctions are held each day at noon and primary dealers that have elected to participate in the program may submit two bids per issue on as many issues as they choose after the auction has been announced. However, loan awards are constrained by several dealer limits. Currently, primary dealers may have a maximum of 25 percent of the theoretical amount available to borrow per issue with a maximum of $750 million par, and $5 billion total par in outstanding loans at any one time. In the case where SOMA owns a much larger amount of an issue, dealer borrowing per issue is capped at $750 million.

9.  The total amount lent and weighted-average award rate[1] for each issue are released in a timely manner after the auction is complete.  Summary information is also posted on the New York Fed's web site following the auction each day at: http://www.newyorkfed.org/markets/seclend/sec_lendop.cfm.  Information regarding transactions by specific dealers is not provided.

10. The terms and conditions of the Securities Lending Program can be found on the Bank's website at: http://www.newyorkfed.org/markets/sec_terms.html.

11. The Board of Governors has oversight responsibility for the Securities Lending Program as part of its general oversight responsibilities for all Reserve Bank operations, but the Board of Governors is not involved in the daily operations of the program, which are handled exclusively by the New York Fed.

12. The New York Fed maintains all collateral and pricing information for each winning bidder on a daily basis.  The information is highly confidential and access to the records is on a need-to-know and limited basis.  To the best of my knowledge, during the time period covered by the FOIA request, the Bank has provided select members and staff of the Board of Governors with limited information relating to the Securities Lending Program.

**The Term Securities Lending Facility**

13. On March 11, 2008, the Board of Governors authorized the Reserve Bank to create the TSLF as a term lending facility for primary dealers to promote liquidity in Treasury and other collateral markets.  Prior to the TSLF, the repo market[2] showed signs of significant

---

[1]  The "Weighted Average Rate" represents the average fee rate that dealers paid in order to borrow the specified issues, weighted by the dollar amount of the awards.

[2]  In a repo transaction, the borrower of cash agrees to immediately sell a security to a lender and simultaneously agrees to buy the same security back from the lender at a fixed price at a fixed later date.  The repo rate is the interest rate equivalent of the price difference between

illiquidity as market participants became unwilling to provide term funding against even high-quality collateral. The TSLF was established to address this illiquidity in the term funding for collateralized financing markets and foster the functioning of financial markets more generally. The TSLF was created as a temporary emergency measure and is currently set to expire on October 30, 2009.

14.     The TSLF is a competitive, single price auction facility that auctions loans of Treasury securities in exchange for other securities. It allows primary dealers to offer relatively illiquid securities as collateral in exchange for a loan of Treasury securities. Specifically, the TSLF auctions a fixed amount of general collateral Treasury securities from the SOMA in exchange for eligible collateral as determined by the New York Fed. Eligible collateral includes any collateral eligible for repurchase agreements arranged by the Open Market Trading Desk (collectively referred to as "Schedule 1 Collateral"). In addition to Schedule 1 Collateral, the TSLF separately auctions general collateral Treasury securities in exchange for a second schedule of eligible collateral which consists of Schedule 1 Collateral plus all investment-grade debt securities (collectively referred to as "Schedule 2 Collateral").

15.     The New York Fed currently auctions a set amount of Treasury general collateral weekly for Schedule 2 operations and bi-weekly for Schedule 1 operations. The term of a TSLF loan is generally 28 days. The New York Fed announces TSLF auctions one business day before the auction. The announcement generally includes the par value of Treasury securities being offered, the schedule of eligible collateral to be pledged, the minimum bid rate, the auction start

---

the purchase and repurchase prices. So while a repo is technically a purchase and resale wrapped into a single agreement, its economic function is similar to a collateralized loan where money is borrowed at a fixed rate for a fixed term. In general repo transactions, the repo rate reflects the price of money for the term; in specific or "special" repo transactions the repo rate reflects the price of borrowing the collateral for a fixed term.

and close times, settlement date and loan maturity date, and the specific breakdown of general Treasury collateral being allocated in the auction.

16. The resulting rate on the collateral loan is set through a competitive auction process, and limits are imposed on the share of the auction allocated to each winning bidder in order to ensure that the lending is distributed across multiple institutions. Dealers are allowed to submit two propositions in each term general collateral auction but each bid and each dealer's overall auction award may not exceed 20 percent of the offering amount. Dealers are allowed to bid for a minimum of $10 million in par value and in increments of $10 million in par value to the maximum allowed per dealer according to program limits.

17. The New York Fed reviews and accepts bids at the highest rate through successively lower rates. All accepted bids are awarded at the same fee rate, which is the lowest rate at which any bid was accepted. On auction date, the New York Fed determines the total lending fee, in dollars, which is charged to each winning bidder and owed at the end of the loan. Dealers' clearing bank accounts are charged for the fees due on the maturity date.

18. The terms and conditions of the TSLF can be found on the Bank's website at: http://www.newyorkfed.org/markets/tslf_terms.html. Aggregate results of each auction, including the stop-out rate, total propositions submitted and accepted, as well as the bid-to-cover ratio are posted on the New York Fed's website at: http://www.newyorkfed.org/markets/tslf/termseclending.cfm.

19. Procedurally, the actual transfer of securities is done via the clearing banks. A dealer receiving an award at auction is required to pledge auction-eligible collateral from its clearing bank custodial account and all transfers of securities are made through the borrower's clearing bank account. After each auction, on the loan settlement date, the New York Fed

transfers to the clearing banks a basket of general collateral Treasury securities totaling the par amount awarded at auction with instructions to the clearing banks to accept collateral with a market value, adjusted for margin, equal to the value of pledged Treasury securities. Once the clearing banks receive the eligible securities from the winning bidders, the clearing banks then transfer to the New York Fed's account at the clearing bank an equivalent value of eligible collateral, adjusted for margin, from the winning bidders' clearing bank accounts. Margin requirements are determined by the New York Fed. The haircut schedule is provided directly to the primary dealers and the clearing banks. It is the clearing bank's responsibility to adjust for margin and value the collateral, and to check that the collateral is acceptable and meets the Bank's eligibility requirements. The clearing banks have price sources they utilize to value the collateral. For example, if the margin is 2 percent, they will require that the value of the collateral pledged to the Bank be 2 percent greater than the value of the Bank's general collateral Treasury securities. The prices for the general collateral Treasury securities and pledged collateral are determined by the clearing banks.

20. Each morning thereafter, the borrower's collateral is returned to the borrower and the general collateral Treasury securities are returned to the New York Fed's account. At the end of the day, the Treasury securities go back to the borrower against the receipt of the borrower's collateral. Collateral is valued daily by the clearing bank and adjustments to collateral levels are required to maintain the designated margin amounts. Upon maturity of the loan, the clearing bank transfers general collateral Treasury securities from the New York Fed's account at the clearing bank to the New York Fed.

21. The Bank does not specify which specific securities must be posted by the primary dealers as collateral for the loan. If the primary dealer should pledge a different kind of

collateral than the day before, the margin requirement would change to match that asset's margin. What is most important to the New York Fed is that each day, the securities that are posted are eligible securities and are adjusted to maintain the adequate margin.

22. By lending Treasury securities, the TSLF has increased the supply of liquid securities, which has improved conditions in the Treasury general collateral markets (in which the Bank conducts its open market operations). It has also allowed primary dealers to fund more illiquid assets such as Schedule 2 eligible securities, alleviating their own funding pressures. Additionally, it has provided primary dealers with a more certain source of funding and an increased confidence in primary dealers as counterparties.

**TSLF Options Program**

23. On July 30, 2008, the Board of Governors authorized the Federal Reserve Bank of New York to auction options for primary dealers to borrow Treasury securities from the TSLF. The TOP was intended to enhance the effectiveness of the TSLF by offering additional liquidity over periods of heightened collateral market pressures, such as quarter-end dates. It was designed to offer such options for exercise in advance of such periods typically characterized by elevated stress in financial markets and the term of the loan typically spans that short period of traditional collateral market dislocation. Like the TSLF, the TOP was created as a temporary emergency measure and is currently set to expire on October 30, 2009.

24. The TOP offers options to draw upon loans of U.S. Treasury securities from the SOMA portfolio in accordance with terms and conditions similar to the TSLF. Under the options program, up to $50 billion of draws on the TSLF using options may be outstanding at any time. Draws on the TSLF through exercise of these options may be collateralized by the full

range of TSLF Schedule 2 collateral. If the options are exercised, the borrower receives a loan of Treasury general collateral at a fixed rate against a pledge of TSLF-eligible collateral.

25. Similar to the TSLF, options are sold to primary dealers based on competitive bidding, subject to a minimum bid requirement and dealer award limits. Multiple TOP auctions may be held for each option-related TSLF loan. The terms and conditions for the TOP are similar to the TSLF as described above except that on the TOP expiration day, option holders will have the opportunity to exercise and draw upon the underlying TSLF loan in whole or in part or allow the option to expire without any claim or exercise.

26. Like the TSLF, both the total amount of options purchased and the award rate are released in a timely manner after the TOP auction is complete. The aggregate results including the stop-out award rate, total propositions submitted and accepted, and the bid-to-cover ratio are posted on the New York Fed's website, at: http://www.newyorkfed.org/markets/top/topseclending.cfm. On expiration date, the total amount of options exercised is also released in a timely manner on the same webpage.

**Oversight Role of the Board of Governors in TSLF and TOP**

27. Although the TSLF and TOP were authorized by the Board of Governors, the Board of Governors does not have a role in the daily operations of the TSLF or the TOP. The Board of Governors approved the basic parameters of the program and the Board of Governors has oversight responsibility for the TSLF and the TOP as part of its general oversight responsibilities for all Reserve Bank operations. But the Board of Governors is not involved in the daily operations of the TSLF or the TOP; those operations are handled by and conducted at the New York Fed.

28.   The clearing banks provide the New York Fed with collateral and pricing information for each winning bidder on a daily basis.

29.   The Bank stores the data it receives from the clearing banks in an electronic database maintained at the New York Fed. This information is highly confidential and not made publicly available. To the best of my knowledge, during the time period covered by the FOIA requests, the Bank has provided select members and staff of the Board of Governors with limited information regarding the TSLF and TOP.

30.   Aggregate information on the TOP and TSLF lending is published each Thursday in the Board of Governors' H.4.1 Statistical Release, which is available on the Board of Governors' website. The release shows the total amount of TSLF and TOP loans outstanding as of the close of business on the prior Wednesday and the average daily amounts for each week.

**Disclosure of Information**

31.   I have been informed that the Board of Governors has received two requests pursuant to the Freedom of Information Act seeking various documents relating to, among other things, the names of institutions that have received lending through the Securities Lending Program, the TSLF and the TOP, the amount borrowed by these institutions, and an accounting of the collateral provided by those institutions for the time period of August 8, 2007 through November 17, 2008, as well as the collateral held by the New York Fed at the close of business on November 14, 2008.

32.   The information being requested is highly sensitive and confidential commercial information. It is not market practice to disclose such detailed information. There is an implicit understanding based on this market practice that information relating to borrowing through the Securities Lending Program, the TSLF or the TOP will not be disclosed by any of the parties

involved in the loan and that all parties will keep confidential specific information relating to the loan, including the identity of the borrower, the amount of the loan, and/or the collateral pledged.

33.     Both TSLF and TOP programs were designed as auction facilities to avoid the negative consequence of "stigma" being associated with their use, as auction participation is always undertaken with an expectation of confidentiality. To lose this confidentiality retroactively would damage future participation in these programs as well as other government sponsored auctions.

34.     This understanding of confidentiality is very important to primary dealers borrowing from these programs, which face competition in the market for securities brokerage services from other primary dealers and domestic and international securities broker dealers. A primary dealer would suffer competitive and reputational harm if its name and the relevant collateral it posted were disclosed to the public. Indeed, the Bank would also suffer reputational harm for violating market practice if it disclosed this information.

35.     A primary dealer that borrows from the Securities Lending Program would suffer a competitive disadvantage if its name and the relevant collateral it posted were disclosed to the public. Anonymity is crucial to primary dealers. If the Bank were to disclose or be compelled to disclose the information being sought in the FOIA request, it would severely hamper a primary dealer's ability to compete in the marketplace because it would reveal the proprietary trading information of the primary dealer as well as the primary dealer's trading strategies and the size and nature of its book. Such disclosure could also inhibit future market making activities and reduce Treasury market liquidity, which in turn would harm the taxpayer because it would reduce the liquidity premium investors are willing to pay at Treasury auctions.

36.     The purpose of the Securities Lending Program is to provide a secondary and temporary source of securities to the Treasury specific issue financing market to promote the smooth clearing of Treasury Securities and foster the functioning of financial markets more generally. If primary dealers were unwilling to participate in the Securities Lending Program for fear of public disclosure, then the Bank's ability to promote the smooth clearing of Treasury securities would be undermined.

37.     Similarly, if the name of a primary dealer that borrowed from the TSLF or the TOP were to be made public, there is a real concern that market participants would draw adverse conclusions about the primary dealer based on conjecture and speculation. These rumors would likely cause substantial competitive harm to primary dealers borrowing at the TSLF or the TOP because the mere fact that a primary dealer is coming to the TSLF or the TOP would lead market participants to inaccurately speculate that the primary dealer was having difficulty finding term funding against its collateral in the open market and that the dealer itself must therefore be in financial trouble.

38.     There would also be serious competitive harm to releasing individual bids for TSLF and TOP, as it would provide the market with information about the perceived health of a dealer. For example, if at auction, four primary dealers were each to bid for $5 billion at 25 basis points and another primary dealer, Dealer X, bid for $5.9 billion at 100 basis points, the fact that Dealer X bid at 100 basis points is not relevant to the results of the auction, as Dealer X would be awarded the same stop-out rate of 25 basis points. If the Bank were to disclose the fact that Dealer X submitted a bid at 100 basis points, the market would view that as a sign of extreme weakness, and counterparties would likely pull away, perhaps pushing the firm out of business.

39. Also, if "haircuts" for TSLF and TOP loans were disclosed, and the haircuts were different from those prevailing in the market, this could be destabilizing, as it could be incorrectly interpreted by market participants that the New York Fed has adverse information about the types of assets pledged that the market does not.

40. The purpose of the TSLF and the TOP is to give primary dealers a back-up source of liquidity when the repo market shows signs of illiquidity and market participants are unwilling to provide term funding against even high-quality collateral. The facility provides a better balance in collateralized funding markets between the supply of and demand for Treasury securities and other eligible collateral, and leads to a reduction in forced deleveraging and associated downward asset price spirals. If primary dealers were unwilling to use the facility for fear of public disclosure and associated stigma, then these market stability goals would be undermined.

41. In addition to the likelihood of substantial competitive harm to the primary dealers coming to the TSLF or the TOP, if details regarding specific securities posted as collateral were publicly disclosed there would also be a likelihood of substantial competitive harm to the institutions whose assets had been pledged as collateral (the "issuers"). This would occur because public disclosure of the specific securities being pledged for the TSLF or TOP loans would fuel speculation regarding the soundness of the issuers. The market would question the financial condition of the issuers based on the volume of a particular security that was pledged, the value placed on the specific security and the fact that the borrower was unable to readily pledge the issuer's security in private financial markets. While the speculation about an issuer might have no basis in fact, the rumors alone could place this institution in a weakened condition vis-à-vis its competitors, particularly in these times of market stress.

42.     Public disclosure of details regarding which institutions are availing themselves of the TSLF or the TOP would also cause substantial harm to the New York Fed because disclosure would undermine the Bank's ability to achieve its policy mandate and mission. If the names of these institutions were to become public, the stigma that has traditionally been associated with borrowing from the lender of last resort would return. That, in turn, would cause financial institutions to avoid using these liquidity tools – even when needed – to alleviate market pressures, thus rendering our policy tools ineffective. Without these policy tools, the New York Fed would no longer be able to meet its mandate to promote orderly and well-functioning markets.

43.     Finally, public disclosure of details regarding the specific collateral pledged for TSLF or TOP loans, and the New York Fed's valuation of the collateral, would be disruptive to markets. If the market viewed the value that the New York Fed's clearing bank had assigned to a certain security as an "official" price, and ascribed to this valuation the New York Fed's approval and acceptance of this price, this valuation could be perceived as a benchmark for market pricing. The New York Fed, and not the market, could then become the price setter, which is not desirable in that it undermines the market pricing mechanism. Once again, this would weaken the Bank's ability to fulfill its mission in that disclosure that disrupts markets undermines our mission to promote market stability.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York, on this 27th day of March, 2009.

*Lorie K. Logan*
Lorie K. Logan