UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
FOX NEWS NETWORK LLC,              :
                                   :
                    Plaintiff,     :    Case No. 09 CV 00272 (AKH)
                                   :
       -against-                   :
                                   :
BOARD OF GOVERNORS OF THE          :
FEDERAL RESERVE SYSTEM,            :
                                   :
                    Defendant.     :
------------------------------------------------------x

## DECLARATION OF CHRISTOPHER R. BURKE

**Christopher R. Burke**, being duly sworn, says:

   1.   I am a Vice President in the Markets Group at the Federal Reserve Bank of New York (the "New York Fed" or the "Bank"). I submit this declaration in support of the motion for summary judgment submitted by the Board of Governors of the Federal Reserve System (the "Board of Governors") in the above-referenced matter. I have personal knowledge of the matters set forth herein.

   2.   I have worked in the Markets Group at the New York Fed since December 1998. I am currently the Director of Domestic Money Markets and Reserves Management and am responsible for overseeing the operations of the Domestic Money Market staff and the Monetary Projections staff. Prior to this, I ran the Domestic Money Market staff and prior to that I was a project manager in the Markets Group.

   3.   I received a Bachelor of Arts degree from Colgate University in 1989, a Masters in Business Administration from Columbia Business School in 1996, and am a graduate of the Stonier ABA Graduate School of Banking at Georgetown University.

4. I have been informed that the Board of Governors has received two requests pursuant to the Freedom of Information Act ("FOIA") seeking documents relating to, among other things, Open Market Operations ("OMOs") and Single Tranche OMOs. As one of the officers at the New York Fed responsible for the oversight of OMOs and Single Tranche OMOs, I am familiar with how they operate, how they are managed and what records are kept at the New York Fed. The Board of Governors has asked me to make this declaration to provide an overview of OMOs and Single Tranche OMOs, and the effect that public disclosure of the confidential information called for by the FOIA Requests would have on the markets and the Bank's ability to fulfill its statutory functions and its policy mandate and mission.

**Open Market Operations**

5. OMOs are a key tool used by the Federal Reserve System to reach its monetary policy objectives, which include adjusting the supply of reserve balances to keep the federal funds rate near the target federal funds rate established by the FOMC, and improving the functioning of markets generally. By buying and selling government securities, OMOs can adjust the level of reserve balances in the banking system and thereby offset or support permanent, seasonal or cyclical shifts in the supply of reserve balances. OMOs enable the Federal Reserve System to influence short-term interest rates and achieve other monetary policy objectives, such as improving the functioning of markets generally.

6. Through this adjustment to the supply of reserve balances, the Federal Reserve System influences the federal funds rate, which is the interest rate that depository institutions pay when they borrow unsecured reserve balances from each other. Depository institutions may borrow reserves in the federal funds market in order to meet reserve requirements set by the Federal Reserve System. They may also borrow funds to ensure adequate balances in their

accounts at their Reserve Bank to cover checks and electronic payments that their Reserve Bank processes on their behalf. Changes in the federal funds rate often have a strong impact on other short-term rates.

7. The Federal Open Market Committee (the "FOMC"), the Federal Reserve System's monetary policy-making body, has designated responsibility for implementing U.S. monetary policy to the Manager of the System Open Market Account (the "SOMA") at the New York Fed. The New York Fed thus executes OMOs on behalf of the entire Federal Reserve System.

8. After each policy meeting, which occur every six to eight weeks, the FOMC issues a Directive to the SOMA Manager outlining the approach to monetary policy that the FOMC considers appropriate for the time period between its meetings. The Directive contains the rate at which the FOMC would like federal funds to trade over the inter-meeting period, also known as the policy rate or target rate.

9. The New York Fed conducts OMOs with primary dealers (dealers in government securities who have an established trading relationship with the Bank) in the collateralized lending market, also known as the repo market.[1] Primary dealers are required to participate in OMOs and Treasury auctions as a condition of maintaining their status as primary dealers. The Bank is able to affect the supply of reserve balances in the banking system through this structure because the primary dealers have accounts at clearing banks, which are depository institutions. Thus, when the Bank sends and receives funds from the dealer's account at its clearing bank, it is able to add reserves to, or drain reserves from, the banking system.

---

[1] Repos, also called repurchase agreements, are a form of collateralized loan where the Bank lends money to primary dealers, and the primary dealers give the Bank high-quality securities as general collateral against the loan. Reverse repos are the opposite of repos, where the Bank borrows money from the primary dealers versus collateral from the SOMA.

10.   The Bank conducts two types of OMOs: temporary OMOs and outright purchase or sale operations ("outright OMOs"). Outright OMOs are used to either accommodate the longer-term factors driving the expansion of the Federal Reserve System's balance sheet, or to implement other monetary policy objectives. They are conducted through the SOMA portfolio by the buying and selling of OMO-eligible securities[2] outright in the open market. Purchases add and sales drain reserves available to the banking system.

11.   Temporary OMOs are typically used to address reserve needs that are deemed to be transitory in nature, or to achieve other monetary policy objectives. These operations are conducted through the Bank's long-term and short-term repo programs and involve repurchase agreements and reverse repurchase agreements that are designed to temporarily add or drain reserves available to the banking system. The long-term and short-term repo books have traditionally been used to make temporary adjustments to offset seasonal movements in factors (long-term repo book)[3] and to fine-tune the level of banking reserves needed on a particular day (short-term repo book).[4]

12.   For temporary OMOs, the Bank announces states the auction close time, repo type (repo or reverse repo) and term of the operation, but does not specify its size. The size of the operation is announced later, after the operation is completed. The operations are either for the Bank to lend cash against OMO-eligible collateral from primary dealers (repo) or to borrow funds from primary dealers versus collateral from the SOMA portfolio (reverse repo). The

---

[2] OMO-eligible collateral, as defined in the Federal Reserve Act and the FOMC Authorization to the SOMA Manager, include U.S. Treasury securities, direct agency debt, and agency pass-throughs, also called agency MBS.
[3] Long-term repos have a maturity of 14 days or longer, and were traditionally conducted less frequently than short-term repos.
[4] Short-term repos consist of repos with shorter-than-14-day maturities (dominated by overnight repos) and used to be conducted daily.

dealers' propositions are evaluated on a competitive best-price basis. Both repo and reverse repo are multi-price auctions, meaning each winning bid is awarded at its bid rate. Overall auction results are simultaneously sent to the primary dealers, posted on the Bank's external website, and sent to wire services. The results include the deal date, the delivery date, the settlement date, the maturity date, the type and term of operation, the collateral type, the amount submitted and accepted, and the stop-out rate, weighted average rate, and the high and low bids for each collateral tranche. Trades generated by the auction include many different transactions with different primary dealers for different amounts at different rates, and the details of individual transactions are not disclosed. Historical data for past temporary OMOs can be found at the Bank's website at: http://www.newyorkfed.org/markets/omo/dmm/temp.cfm.

13.     For outright OMOs, auctions for security purchases or sales into or out of the SOMA portfolio are typically arranged later in the morning and follow a procedure similar to the temporary repo operation. The New York Fed announces the maturity range for securities the Bank is looking to purchase, as well as a list of any securities to be excluded in this maturity range. Dealers bid on securities, and the Bank compares the relative richness of propositions across securities, accepting the best relative rates from the propositions submitted. Auction results are similarly posted on the Bank's website, which include the operation date, operation type, release and close times, settlement date, total par amount accepted and submitted, and a specific security description with the corresponding par amount accepted for that security. Historical data for past outright OMOs can be found at the Bank's website at: http://www.newyorkfed.org/markets/pomo/display/index.cfm.

14.     More information regarding OMOs conducted by the New York Fed can be found at the New York Fed's public website at: http://www.newyorkfed.org/markets/openmarket.html.

5

It should be noted that as of September 2008, the increase in the use of the various Federal Reserve lending facilities has caused an increase in reserve balances. As a result, there has been no need for the New York Fed to regularly conduct short-term OMOs since September 2008. Single Tranche Repos, discussed below, were eliminated in January 2009, with the final repo maturing in February 2009.

15. Repo OMOs are settled via triparty arrangements, which means that the triparty agent banks are used to settle them. The triparty agent banks (Bank of New York or JPMorgan Chase), manage the cash and collateral for the two parties involved in the repo. They are responsible for ensuring that the collateral is eligible collateral as prescribed by the cash investor, ensuring that there is sufficient collateral to cover the cash being lent; pricing the collateral through acceptable pricing services; and applying the appropriate margin as established by the Bank. Legally, the lender, borrower, and triparty bank are all party to the triparty repo agreements.

16. The triparty agent banks provide the New York Fed with data and information relating to these operations, which include: detailed and specific information for each security pledged by each dealer (such as CUSIP numbers), market price, margin value, and par amount. The Bank stores the data it receives from the clearing banks in an electronic database maintained at the New York Fed.

17. OMOs are a function handled uniquely by the New York Fed as designated by the FOMC. The Board of Governors has oversight authority over OMOs as part of its general oversight responsibilities for all Reserve Bank operations, but it is not involved in the routine operations of OMOs. Those operations are handled by and conducted at the New York Fed.

Except as discussed herein, data and documents relating to OMOs are maintained by and at the New York Fed. Information relating to OMOs is highly confidential and is not made available to anyone outside of the New York Fed and, even within the Bank, access to the records is on a need-to-know and limited basis. The Board of Governors does not have access to the electronic database maintained at the Bank. To the best of my knowledge, the Bank does, however, provide select members and staff of the Board of Governors with limited information regarding OMOs.

**Single Tranche Repos**

18.  On March 7, 2008, the Board of Governors announced that the New York Fed would initiate a series of term repo transactions for a single tranche of designated collateral. The announcement can be found at:

http://www.federalreserve.gov/newsevents/press/monetary/20080307a.htm. This facility was created to give the primary dealers and their customers a way to finance collateral that they otherwise might not be able to finance in the market. Single Tranche Repos are OMOs, though their purpose is unlike conventional OMO repos, whose objective is to provide reserve balances as part of a program to affect federal funds rates.

19.  Single Tranche Repos are conducted as 28-day term repos in which primary dealers may elect to deliver as collateral any of the types of eligible securities. A typical repo has three collateral tranches that define the type of collateral that a primary dealer will pledge to borrow funds against, one for each type of OMO-eligible collateral: U.S. Treasuries; direct agency obligations plus U.S. Treasuries; and agency MBS plus direct agency obligations plus U.S. Treasuries. Rates as part of bids submitted at auction are typically higher for the riskier collateral, and the Bank uses market rates to benchmark the dealer bids between tranches. In a

Single Tranche Repo, the all-inclusive third tranche is used, meaning the dealer can pledge any acceptable collateral, and there will be no bench-marking of rates across collateral tranches.

20. Single Tranche OMOs are triparty repos conducted in the same multi-price auction format as conventional OMOs as described above. The Bank receives the same type of information from the clearing bank that it receives with respect to transactions conducted through conventional OMOs.

21. Like all OMOs, Single Tranche Repos are handled uniquely by the New York Fed as designated by the FOMC. The Board of Governors has oversight authority over Single Tranche Repos as part of its general oversight responsibilities for all Reserve Bank operations, but is not involved in the routine operations of Single Tranche Repos. Those operations are handled by and conducted at the New York Fed.

22. Data and documents relating to Single Tranche Repos are maintained by and at the New York Fed. The information is highly confidential and is treated in the same manner as the information described in Paragraph 17 above.

23. Results of Single Tranche Repos are posted on the New York Fed's external web site on the same page as other OMOs: http://www.newyorkfed.org/markets/omo/dmm/temp.cfm. These results do not identify the counterparties or specific collateral actually pledged.

**Disclosure of Information**

24. I have been informed that the Board of Governors has received two requests pursuant to the Freedom of Information Act seeking various documents relating to, among other things, the names of institutions that have received funds through OMOs, including Single Tranche Repos, the amounts borrowed by each named institution, and the collateral pledged by

each institution for the time period of August 8, 2007 through November 17, 2008, as well as the collateral held by the New York Fed at the close of business on November 14, 2008.

25.     The information being requested is highly sensitive and confidential commercial information. It is not market practice to disclose this information. There is an implicit understanding based on this market practice that information relating to OMOs and Single Tranche OMOs will not be disclosed by any of the parties involved in the transaction and that all parties will keep confidential specific information relating to the loan, including the identity of the counterparty, the amount of the loan, the rate of the loan, and the specific collateral pledged.

26.     This understanding of confidentiality is very important to primary dealers interacting with the Fed through OMOs, which face competition in the market for securities brokerage services from other primary dealers and domestic and international securities broker dealers. A primary dealer would suffer a competitive disadvantage if its name, rate, amounts or the relevant collateral it posted were disclosed to the public, as these transactions would provide information to competitors regarding the rates at which it can receive financing, as well as the composition of the primary dealer's portfolio. If the Bank were to disclose or be compelled to disclose the information being sought in the FOIA request, it would severely hamper the primary dealer's ability to compete in the market because it would reveal information about the primary dealer's trading strategies and the size of its book, giving others an opportunity to trade against the primary dealer. It may also provide a basis for identifying the relationship between (a) publicly observable behavioral patterns of the primary dealer and (b) the (unobservable) composition of the dealer's portfolio that would be valuable for inferring the composition of the dealer's portfolio at a later date. This could reduce the primary dealer's willingness to participate in these operations in the future.

27. The purpose of OMOs is to implement monetary policy objectives, which include adjusting the supply of reserve balances to keep the federal funds rate near the target federal funds rate established by the FOMC, and improving the functioning of markets generally. If a primary dealer became unwilling to participate in OMOs for fear of public disclosure, then the Bank's ability to adjust the supply of reserve balances would be undermined and the effectiveness of one of the key tools of the Federal Reserve System to implement monetary policy would be diminished. If this policy tool were thus fettered, the New York Fed would have difficulty meeting its mandate to keep the federal funds rate at the target rate and promoting orderly and well-functioning markets.

28. Since the primary dealer network is also used by the New York Fed in its role as fiscal agent for the U.S. Treasury, anything that has a negative impact on the dealers will necessarily have a negative impact on the U.S. Treasury. If the dealer network were to become dislocated, it could be disruptive to the smooth distribution of new Treasury debt. At a minimum, it would significantly affect the trading of U.S. Treasury debt instruments.

29. Margins or "haircuts" are understood to be a confidential term of any bilateral trade. If margins or haircuts for OMOs were disclosed, and the haircuts were different from those prevailing in the market, this could be disruptive, as it could be misinterpreted by market participants that the New York Fed has inside information about the quality of the assets pledged, or about the credit-worthiness of the primary dealer, that the market does not.

30. Similarly, if the name of a primary dealer that participated in a Single Tranche Repo were to be made public, there is a real concern that market participants would draw adverse conclusions about the primary dealer's creditworthiness and viability based on conjecture and speculation. The mere fact that a primary dealer is participating in the Single Tranche Repo

could lead market participants to inaccurately speculate that the primary dealer was having difficulty finding term funding against its collateral in the open market and that the dealer itself must therefore be in financial trouble, when in fact, the primary dealer might be participating in the Single Tranche Repo for other reasons, such as being able to win cheaper financing through that auction or expanding its balance sheet to accommodate a customer's need for financing. These rumors would likely cause substantial competitive harm to the primary dealer because, among other things, customers could withdraw their assets, market sources of funding could dry up, and the institution's stock price could fall. Any of these events would put the primary dealer in a weakened position vis-à-vis its competitors. Fear of disclosure of confidential information could cause primary dealers to avoid participating in any operation with the Bank, and would undermine the Bank's ability to achieve its policy mandate and mission.

31.   In addition to the likelihood of substantial competitive harm to the primary dealers participating in OMOs, if details regarding specific securities posted as collateral for Single Tranche Repos were publicly disclosed, there would also be a likelihood of substantial competitive harm to the institutions whose assets had been pledged as collateral (the "issuers"). This would occur because public disclosure of the specific securities being pledged for Single Tranche Repos would fuel speculation regarding the soundness of the issuers, leading the market to question an issuer's financial condition based on the volume of a particular security that was pledged, the value placed on the specific security, and the fact that the borrower was unable to readily pledge the issuer's security in private financial markets. While the speculation about an issuer might have no basis in fact, the rumors alone could place this institution in a weakened condition vis-à-vis its competitors, particularly in these times of elevated market stress.

32. Public disclosure of the aggregate amount of specific securities pledged would also result in a likelihood of substantial competitive harm to borrowers pledging large blocks of particular issues.  Market participants could draw adverse conclusions about these borrowers if they learned that large blocks of particular issues were in dealer hands, rather than in the hands of long-term, buy-and-hold investors.

33. Finally, public disclosure of details regarding the specific collateral pledged for OMOs, and the New York Fed's valuation of the collateral, would be disruptive to markets.  If the market viewed the value that the New York Fed's clearing bank had assigned to a certain security as an "official" price, and ascribed to this valuation the New York Fed's approval and acceptance of this price, this valuation could be perceived as a benchmark for market pricing.  The New York Fed, and not the market, could become the price setter, which is not desirable in that it undermines the market mechanism.  Once again, this would weaken the Bank's ability to fulfill its mission in that disclosure that disrupts markets undermines our mission to promote market stability.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, New York, on this 27th day of March 2009.

_____
Christopher R. Burke