UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| FOX NEWS NETWORK, LLC | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Civ. No. 09-cv-00272 (AKH) |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | ) ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF BRIAN F. MADIGAN

I, Brian F. Madigan, hereby affirm the following as my testimony in the above-captioned case:

1.    I have been employed as an economist with the Board of Governors of the Federal Reserve System ("Board") from 1983 to the present. I am currently the Director of the Board's Division of Monetary Affairs ("MA"). MA supports the Board and the Federal Open Market Committee ("FOMC") in the conduct of domestic monetary policy by providing information and analysis pertaining to open market operations, discount window administration, and reserve requirements, among other things.

2.    Before becoming director of MA in 2007, I was Deputy Director, Associate Director, and Assistant Director in MA. In these positions, I was responsible for overseeing and conducting analysis of various monetary policy issues. From 1989 to 1990, while an Assistant Director in MA, I was detailed to the Council of Economic Advisors as a Senior

1

Economist. In this capacity, I was responsible for analysis of issues related to monetary

policy and macroeconomics. Prior to my employment in MA, I was Section Chief,

Senior Economist, and Economist in the Division of Research and Statistics.

3. Prior to rejoining the Board in 1983, I was employed at the Federal National Mortgage

Association (Fannie Mae) as an economist. My responsibilities included analysis of

monetary policy and financial markets. Prior to joining Fannie Mae in 1982, I was

employed in the Division of Research and Statistics of the Board of Governors of the

Federal Reserve System, responsible for analysis of the government securities market and

other financial markets and for preparing estimates and analysis of the money supply. I

originally joined the Federal Reserve Board in 1979. I received a Ph.D. in Economics

from Pennsylvania State University in 1981 and an M.A. in Mathematics from George

Mason University in 2003. I received an A.B. in Economics from St. Joseph's College in

1975. I have published in the area of monetary policy, including an article entitled

"Proposed Revisions to the Federal Reserve's Discount Window Programs," co-authored

with William R. Nelson, published in the *Federal Reserve Bulletin* in July 2002. The

article can be found on the Board's public website at

http://www.federalreserve.gov/pubs/bulletin/2002/0702lead.pdf.

4. During the course of my career at the Federal Reserve, I have become well versed in the

policy and operations of the Federal Reserve's discount window ("DW"). I have drafted

several internal memorandums and have participated in many discussions on topics such

as the role of DW borrowing in monetary policy implementation, the effects of stigma on

usage of theDW (discussed below), and the role of the DW in failing bank scenarios.

Early in this decade, I played a key role in a major restructuring of the Federal Reserve's

DW facilities and worked closely with Board members and Reserve Bank presidents in that effort. In my current responsibilities as the Director of MA, I have been heavily involved in discussions pertaining to troubled depository institutions and their potential needs for DW loans. In addition, I was actively involved in the establishment of the Term Auction Facility ("TAF") and in the development of many of the other special credit and liquidity facilities ("SCLFs") that the Federal Reserve System has implemented over recent months. These facilities were implemented to address the extraordinary strains in financial markets that have been evident since the summer of 2007 and the potential for those strains to depress overall economic activity.

5.    In the course of my duties as Director of MA, I became aware of a Freedom of Information Act request made by Bruce Becker of plaintiff Fox Business Network ("plaintiff") to the Board by e-mail dated November 10, 2008 and a FOIA request made by Kevin Magee of plaintiff Fox Business News by letter dated November 18, 2008, seeking, among other things, the names of borrowers at the DW and SCLFs, loan amounts, and collateral pledged for specific loans, as well as the amounts, collateral pledged, and participants in specific open market operations ("OMOs"), between August 8, 2007 and November 17, 2008 (the "First and Second FOIA Requests"). Specifically, I was involved in and consulted in connection with the Board's response to the First and Second FOIA Requests and similar FOIA requests the Board received in 2008. Accordingly, I have personal knowledge of the facts herein.

6.    The DW is a mechanism by which the twelve Federal Reserve Banks lend funds on a short-term basis, secured by collateral, to eligible depository institutions within their respective districts. Since 2003, regular DW lending programs have included a primary

credit program, available to depository institutions in generally sound financial condition; a secondary credit program, available to depository institutions not eligible for primary credit; and a seasonal credit program, designed to help small depository institutions manage seasonal swings in their loans and deposits. In August 2007, to promote orderly market functioning, the Board reduced the interest rate on primary DW loans relative to the target federal funds rate and increased the term to as long as 30 days. In March 2008, to bolster market liquidity, the Board further reduced the interest rate on primary DW loans relative to the target federal funds rate and increased the maximum maturity of primary DW loans to 90 days. Under the structure created by Congress in section 10B of the Federal Reserve Act ("FRA"), 12 U.S.C. § 347b, and elsewhere, the Board issues rules and regulations governing DW lending, and reviews and determines the discount rates established by the Federal Reserve Banks. The Board's Regulation A, contained at 12 C.F.R. Part 201, establishes policies that Reserve Banks must follow in their DW lending operations. The Federal Reserve Banks carry out the operational side of DW lending for eligible institutions within their districts. Extensive information regarding the DW can be found at the DW website at http://www.frbdiscountwindow.org.

7.     Beginning in the latter part of 2007, as a result of a severe reduction in liquidity in wholesale dollar funding markets and the adverse implications for the availability of credit and economic growth, the Board authorized the Reserve Banks to establish a new lending facility for depository institutions -- the Term Auction Facility ("TAF"). In September 2008, the Board authorized the Reserve Banks to establish the Asset Backed Commercial Paper ("ABCP") Money Market Mutual Fund Liquidity Facility ("AMLF") to provide liquidity to money market funds.

8.     In light of a further severe deterioration in financial market conditions in early 2008, the
       Board authorized the Federal Reserve Bank of New York to lend to primary dealers
       through two new lending programs -- a Primary Dealer Credit Facility ("PDCF") and a
       Term Securities Lending Facility ("TSLF"). Later in 2008, the Board authorized the
       Term Securities Lending Facilities Options Program ("TOP"), which allows the FRBNY
       to auction options on draws under the TSLF, and the Commercial Paper Funding Facility
       ("CPFF"), which allows the FRBNY to provide liquidity to U.S. issuers of commercial
       paper through a special purpose vehicle ("SPV"). The deterioration in financial market
       conditions resulted initially from escalating credit problems in the subprime mortgage
       market and related instruments. The resulting credit losses experienced by many
       investors led to a broad-based withdrawal from risk-taking by investors in many markets.
       In addition to the TAF, AMLF, PDCF, TSLF, TOP, and CPFF, the Board has established
       other SCLFs in an effort to ease conditions in credit markets and support a resumption of
       sustainable economic growth. A number of these programs utilize statutory authority
       under section 13(3) of the FRA, which allows Federal Reserve Banks to lend to
       "individuals, partnerships, and corporations" in "unusual and exigent" circumstances as
       determined by a vote of at least five members of the Board of Governors. In addition, the
       Reserve Bank must determine that the borrower is unable to obtain reasonable credit
       accommodations from other banking institutions.

9.     The TAF, authorized under section 10B and related sections of the FRA, is a form of DW
       lending which provides longer than overnight ("term") funding to depository institutions
       that are eligible for primary credit through an auction mechanism. The maximum amount
       of funds provided at each auction is determined by the Board. Subject to that maximum

as well as a minimum interest rate, the amount actually provided and the interest rate are determined at auction.  Unlike the PDCF and the TSLF, which are administered by the FRBNY, all Reserve Banks provide credit under the TAF to depository institutions in their districts.

10.    The AMLF, authorized under sections 10B and 13(3) of the FRA, is administered by the Federal Reserve Bank of Boston ("FRBB").  The AMLF assists money market mutual funds in meeting demands for redemptions by providing loans to depository institutions, bank holding companies, and U.S. branches and agencies of foreign banks, to purchase high-quality ABCP from money market mutual funds.  The loans are secured by eligible collateral.

11.    The PDCF is a facility authorized by the Board in March 2008 under section 13(3) of the FRA under which the Federal Reserve Bank of New York ("FRBNY") makes overnight funds available to primary dealers (designated banks and securities broker dealers with whom the FRBNY trades U.S. government and select other securities as trading counterparties in its execution of open market operations).  The PDCF was designed to provide the primary dealers with access to FRBNY funding during this period of liquidity strain.  By easing primary dealers' access to credit, the PDCF is intended to facilitate the continued functioning of financial markets and thus support credit availability and overall economic activity.  To ease the operational burdens of the PDCF, some of the administrative functions of the program, such as processing loan requests and handling payments associated with maturing loans, are now performed by the Federal Reserve Banks of Chicago and Atlanta.

12.   The TSLF, also established in March 2008 utilizing section 13(3) authority, is a term
      lending facility which permits primary dealers to obtain a 28-day loan of Treasury
      securities from the FRBNY by pledging certain other types of securities. Dealers pay a
      fee for a TSLF loan. The TSLF is conducted through an auction administered by the
      FRBNY. The TSLF is designed to promote liquidity in the financing markets for
      Treasury and other collateral and thus to foster the functioning of financial markets more
      generally and to support economic activity. TOP, also established utilizing section 13(3)
      authority, enhances the effectiveness of the TSLF by offering primary dealers added
      liquidity over periods of heightened collateral market pressures, such as quarter-end
      dates. TOP offers options on short-term, fixed-rate TSLF loans of securities from the
      System Open Market Account ("SOMA") in exchange for eligible collateral. While the
      price of the loan is fixed, the price of the option is determined by competitive bidding.
      TOP loans are shorter in duration than regular TSLF loans, with periods of two weeks or
      less.

13.   CPFF, which became operational on October 27, 2008 and was established utilizing
      section 13(3) authority, provides a liquidity backstop to the commercial paper markets by
      allowing an SPV established by the FRBNY to purchase eligible commercial paper
      directly from U.S. issuers. The SPV holds the commercial paper to maturity and uses
      proceeds from maturing commercial paper and other assets to repay its loan from the
      FRBNY. The name of the SPV as well as the outstanding principal amount of, and
      accrued interest payable on, its loan from the FRBNY are published in the Board's
      weekly H.4.1 Statistical Release.

14.    OMOs are the purchase and sale of securities conducted by a central bank and, in routine

circumstances, are the Federal Reserve System's principal tool for implementing

monetary policy. These purchases and sales are used to control the federal funds rate --

the interest rate at which depository institutions lend balances at Federal Reserve Banks

to other depository institutions on an overnight basis. The federal funds rate in turn

affects monetary and financial conditions, which in turn influences employment,

economic output, and the overall level of prices. The target federal funds rate is

established by the FOMC, which is responsible by statute for overseeing OMOs. The

FOMC meets on a regular basis eight times a year and conducts additional meetings as

needed by conference call. OMOs are carried out by the Domestic Trading Desk (the

"Desk") at the FRBNY under authorization of the FOMC. The Desk conducts purchases

and sales of securities with primary dealers through an auction mechanism. The Desk

determines the type and volume of OMOs on a daily basis based on directives issued by

the FOMC, forecasts of the daily demand and supply of Federal Reserve balances, and

other factors. Under sections 12A and 14 of the FRA, the FOMC has authority to direct

and regulate OMOs while the Federal Reserve Banks have the authority to purchase and

sell securities in the open market.

15.    The SOMA Securities Lending program ("SLP") offers securities for loan from the

FRBNY's SOMA portfolio to primary dealers to promote the smooth clearing of U.S.

Treasury securities. SLP loans are made on an overnight basis against other Treasury

securities as collateral. The SLP is a permanent program designed to facilitate OMOs,

and not an SCLF.

16.     The Board itself does not have the legal authority to extend credit. All lending is
        conducted by the Federal Reserve Banks subject to general policies and oversight by the
        Board. A typical DW borrowing request would be received by the lending officer of a
        Reserve Bank. Reserve Bank staff would review the request, verify collateral and, if
        approved, enter the loan in the Reserve Bank's loan and accounting systems. The Federal
        Reserve Banks, in conjunction with the Board, have established a number of important
        risk management policies and practices in support of these lending operations. The
        financial condition of potential borrowers is carefully monitored, often in consultation
        with a borrower's primary federal regulator. In addition, the Federal Reserve Banks lend
        only against acceptable collateral. Collateral is generally revalued frequently and
        margins ("haircuts") are applied in determining the lendable value of the collateral. The
        Board is only rarely involved in decisions regarding the extension of credit to individual
        institutions, and would not ordinarily be involved at all in the processing of individual
        loan requests or the maintenance of loan documents or information regarding specific
        collateral pledged as security for a loan. Information of this type generally is maintained
        by the Reserve Banks or their agents (such as third party custodians that may hold
        collateral on behalf of a Reserve Bank). Likewise, while the FOMC issues the directives
        that the FRBNY follows in executing OMOs, the Desk is responsible for the day-to-day
        operations of OMOs and the SLP.

17.     The staff of MA is primarily concerned with the policy aspects of the DW and other
        lending programs and OMOs. As a result, many of the operational details concerning the
        DW, other lending programs, and OMOs are maintained by the Federal Reserve Banks.
        Some information requested by the plaintiff, such individual loan amounts, borrower

9

names, and securities posted as collateral for specific loans, is maintained by the Federal

Reserve Bank extending the loan or by other parties on behalf of the lending Federal

Reserve Bank.

18.     For the time period covered by the First and Second FOIA Requests, that is, August 8,

2007 through November 17, 2008, MA does have some information on individual

borrowers under certain programs such as the primary and secondary credit program of

the DW and the SCLFs.  For example, in connection with its role in assisting the Board

with its monetary policy responsibilities, MA produces three reports (the "Remaining

Term Report," the "Origination Report," and the "Emergency Credit Report")

(collectively, the "Reports") which contain some limited information responsive to the

First and Second FOIA Requests, which sought, among other things, information about

the identity of borrowers and the amount borrowed.  The Reports include, among other

information, the names of some institutions borrowing at the DW or other lending

facilities, the originating Federal Reserve Bank, the type of credit extended, individual

loan amounts, and origination and maturity dates of some loans; but do not contain

information regarding collateral pledged for these loans.  MA also has some e-mails ("e-

mails") transmitting these Reports and a draft of collateral monitoring procedures ("Draft

Procedures") for long-term primary DW and TAF loans that contain some very limited

borrower and collateral information responsive to the First and Second FOIA Requests.

While MA staff supports the FOMC and advises the Board in the conduct of monetary

policy, including OMOs, and obtains information from the FRBNY necessary to fulfill

this function, MA (or other Board staff to my knowledge) does not have information

regarding specific OMOs conducted by specific borrowers on specific dates or specific transactions under the SLP responsive to the First and Second FOIA Requests.

19.    In my opinion, as described in ¶¶ 22-29 below, public release of information in the Reports, e-mails, and Draft Procedures would be likely to cause substantial competitive harm to the borrowers identified on the withheld documents. Moreover, as described in ¶¶ 31-32 below, I believe that public disclosure of this information would impair the Board's ability to meet its statutory responsibility "to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates" specified in section 2A of the FRA, as amended, 12 U.S.C. § 225a. In addition, as described in ¶¶ 33-35 below, public disclosure of such information would impair the ability of the Board to limit financial strains by utilizing its authority under section 13(3) of the FRA to authorize lending by the Reserve Banks to non-depository institutions in "unusual and exigent circumstances," and its authority under section 10B and other sections of the FRA to authorize DW, TAF, and AMLF lending by the Reserve Banks. As explained below, the publication of such information would lead to an increased reluctance of borrowers to use such facilities. As a result, the ability of Federal Reserve lending to serve as a safety valve in relieving liquidity strains for individual depository institutions and the banking system, and to complement OMOs in achieving the target federal funds rate by making Federal Reserve balances available to depository institutions when the supply of balances falls short of demand would be reduced. This reduced capacity to mitigate financial strains and to control the federal funds rate could adversely affect the ability of the Federal Reserve to achieve its macroeconomic objectives.

20.     The Board, the FRBNY, and the other Federal Reserve Banks publish extensive

        information about the DW and the SCLFs on their websites and elsewhere. This

        information includes: terms of, and eligibility for, the lending facilities; interest rates;

        acceptable forms of collateral; sample lending documentation; collateral margin tables;

        aggregate current lending data (published weekly and broken down by Federal Reserve

        district and by credit facility); historical lending data, mechanics of DW and SCLF

        borrowing; and relevant statutory and regulatory provisions. Likewise, the FRBNY

        publishes a detailed explanation of OMOs in its annual report and on its website

        including the terms, rates, and conditions of OMOs; information on specific types of

        OMOs such as short-term and reverse repurchase agreements and repos; the par value,

        CUSIP numbers, coupon rate, and percentage of U.S. Treasury and agency securities held

        in SOMA; current and historical federal funds data; and names of the primary dealers,

        among other information. In addition, on February 23, 2009, the Board launched a new

        section of its public website designed to enhance transparency in its conduct of monetary

        policy and the new tools developed to address the financial crisis. The website section,

        entitled "Credit and Liquidity Programs and the Balance Sheet," includes, among other

        information: a detailed explanation of the Federal Reserve Banks' balance sheets;

        descriptions of all of the Federal Reserve's liquidity and credit facilities; information on

        collateral eligibility, information on the valuation and margins ("haircuts") applied to

        collateral by program; and information on the general types and aggregate value of

        collateral pledged to the various facilities as of December 2008. That website is available

        at http://www.federalreserve.gov/monetarypolicy/bst.htm.

21.     However, with the exception of lending in connection with certain specific systemically

        important institutions such as Bear Stearns or AIG, neither the Board nor the Federal

        Reserve Banks publicly disclose the names of borrowers at the DW or the SCLFs,

        identify specific collateral pledged for specific loans, the terms, the rates for specific

        loans (although some general rate information is published), documentation for specific

        loans, the valuation of specific loans vis-à-vis the collateral pledged (the "haircut"),

        collateral rejected for specific loans, or other information that could lead to the

        identification of borrowers by counterparties, market analysts, news media organizations,

        or the public at large.  Likewise, neither the Board (to the extent that it has such

        information) nor the FRBNY discloses details regarding specific OMOs or SLP

        transactions with particular counterparties.  There are a number of important reasons,

        described below, that both the Board (to the extent that it has loan- or OMO-specific

        information) and the Federal Reserve Banks keep this information confidential.

22.     First, release of this information is likely to cause substantial competitive harm to the

        commercial and financial interests of the borrowers -- including depository institutions

        and other institutions eligible to borrow at the DW and the SCLFs.  These institutions

        face competition in the market for retail and commercial banking and financial services

        from other domestic and international institutions.  In my experience as director of MA, I

        have observed that depository institutions that may potentially borrow at the DW

        recognize that their customers, lenders and other counterparties, market analysts, and

        news media organizations, among others, may draw adverse inferences from their

        decision to borrow from the Federal Reserve Banks.  This stigma, as described in ¶¶ 23-

        29 below, can quickly place an institution in a weakened condition vis-à-vis its

13

competitors by causing a loss of public confidence in the institution, a sudden outflow of

deposits (a "run"), a loss of confidence by market analysts, a drop in the institution's

stock price, and a withdrawal of market sources of liquidity. In extreme cases, such

developments can lead to closure of the institution.

23.    The "stigma" associated with DW borrowing results from the fact that the DW can serve

as an emergency, back-up source of liquidity for institutions that may not have access to

ordinary, market sources of funding on a short term basis. An institution may experience

a sudden funding need for any number of reasons. Some of these reasons, such as an

unexpectedly large loan request from a customer or a runoff in liabilities as a major

depositor makes payments to third parties, may result from routine developments and

may not indicate an underlying capital or liquidity problem. However, the fact that an

institution borrowed from the DW may suggest to customers, creditors, analysts, or the

news media that its liquidity shortage stems from a financial problem at the institution

that is not known by the public at large.

24.    This "stigma" associated with borrowing can, in turn, inhibit borrowers from turning to

the DW even if they are in sound financial condition and their funding need is unrelated

to any issues of financial condition. Often, the stigma intensifies during periods of

financial distress when market participants have a heightened concern that financial firms

could be in a weakened condition. For example, the stigma associated with DW

borrowing became very acute during the banking crisis in the early 1990s and again in

1998-1999 amid the global financial market turbulence that followed the Russian debt

default. During these periods, the stigma associated with borrowing from the Federal

Reserve was evident in the very high rates that banks were willing to pay to borrow money in the private federal funds market rather than borrow at the DW.

25.     Banks were willing to pay such high rates because rumors about their financial condition -- even if unfounded -- could result in customers' withdrawing deposits and private creditors' refusing to lend to these institutions. Such a sudden withdrawal of deposits and drying up of private sources of liquidity could quickly lead to an institution's demise. Moreover, even if the institution managed to meet its funding needs and survive, it would be at a disadvantage vis-à-vis its competitors in the market because it could be forced to pay very high rates to borrow and might be limited in its ability to issue longer-term debt. Potential customers would tend to direct their business to other institutions that were thought to be in better financial condition. In short, there is an important sense in which rumors about an institution's financial condition can be self-fulfilling, and particularly in an environment in which financial strains are widespread.

26.     The likelihood of substantial competitive harm described in ¶¶ 22-25 above also applies to institutions that borrow at the TAF, PDCF, TSLF, TOP, AMLF, and other SCLFs, and issuers of securities purchased by the CPFF. Because these facilities were created in response to severe liquidity strains in the financial markets, the use of these facilities by primary dealers or financial institutions could suggest to customers, creditors, market analysts and news media organizations that the borrower is less financially sound than publicly reported (whether or not that is true), likely leading to the substantial competitive harm described in ¶ 22 above. In designing the TAF, the Federal Reserve took care to reduce the likelihood that borrowing institutions would be concerned about stigma. Nevertheless, borrowers likely would be concerned if they believed that their

borrowing would be revealed to the public. Indeed, the rate determined at recent TAF auctions has been much lower than comparable-maturity funding from market sources, suggesting that some borrowers remain concerned about borrowing from the TAF.

27.    As a result of stigma, if institutions perceive any chance that their DW or SCLF borrowing might be revealed to the public, they may avoid borrowing at virtually any cost. For example, rumors that Citibank might be borrowing at the DW in the early 1990s reportedly sparked runs at some of its offices in Asia. The risks to an institution posed by the possibility of such depositor behavior are likely to cause institutions to be very cautious in borrowing from the DW.   Indeed, a March 2007 report issued by the Institute of International Finance -- a group including a number of the largest global financial institutions among its members -- specifically advises that "[i]n the United States, discount window facilities should not be considered available in a name-specific event as this could signal to the markets that the firm is in dire straits and could exacerbate the crisis. The Federal Reserve publishes statistics related to the use of the discount window by district. Although the name of the borrower is not disclosed, if there were concerns about a particular institution there would be speculation about its borrowing that could lead to reputation issues."[1]

28.    In addition to not releasing details regarding specific DW or SCLF loans, neither the Board nor the Reserve Banks publicly disclose which institutions are *eligible* for primary or secondary credit at the DW. This is so because primary credit is available only to institutions in generally sound financial condition—those with CAMELS[2] composite

---

[1] See page 43, "Principles of Liquidity Risk Management," published by the Institute of International Finance, March 2007. http://www.iif.com/press/press+25.php.

[2] CAMELS is an acronym for the composite rating scale used by federal banking regulators to rate an institution's soundness on the basis of Capital, Assets, Management, Earnings, Liquidity,

examination ratings of 1, 2, or 3 (or equivalent) and that are adequately or well-
capitalized. Secondary credit may be made available to institutions that do not qualify
for primary credit. The terms of secondary credit are more stringent than those for
primary credit; for example, the interest rate is higher, collateral haircuts are higher, and
credit is generally extended only on an overnight basis. Revealing an institution's
eligibility for primary or secondary credit would therefore reveal non-public information
regarding its financial condition, which, if the information is not favorable, could result in
substantial competitive harm, as described in ¶ 22 above. In fact, neither the Board nor
the Reserve Banks routinely share information regarding an institution's DW borrowing
even with Federal Reserve supervisory staff and those from the other banking regulators,
though regulators may obtain information about an institution's borrowing history when
investigating potential supervisory problems.

29.     Even the release of the dollar amounts of individual DW or SCLF loans without the
        borrowers' names could contribute to financial institutions' reluctance to use Reserve
        Bank liquidity facilities. If the amounts borrowed are large, and the Federal Reserve
        Bank originating the loan is identified, market participants may speculate that the
        borrower must be one of the few large banks in that Federal Reserve district or, for very
        large loans, in the country. This speculation would discourage large banks from using the
        Federal Reserve Banks' facilities and could potentially force large banks publicly to state
        that they are not borrowing at the discount window or SCLFs. Speculation about the

---

and Sensitivity to Market Risk with "1" being a sound institution and "5" being an institution in
danger of failure. CAMELS ratings are designated "confidential supervisory information" under
the Board's regulations and are not made public by the Board, Reserve Banks, or the institution
in question.

identity of borrowers poses similar problems to actual identification of borrowers, and a

greater number of institutions could adversely be affected.

30.    In addition to the likelihood of substantial competitive harm to the borrowers, public

disclosure of information regarding specific securities pledged as collateral for individual

DW, TAF, PDCF, TSLF, TOP, AMLF, CPFF or other SCLF loans would significantly

harm the Government's monetary functions or commercial interests. Although it is my

understanding that Board records do not contain collateral-specific information

responsive to the First and Second FOIA Requests (with the very limited exception of the

Draft Procedures), such information likely is in the possession and control of the Federal

Reserve Banks (or third party custodians acting on their behalf). Some of the SCLFs are

designed to enhance liquidity by allowing borrowers to pledge as collateral a wide range

of securities that might not readily be pledged in the private funding markets. These

securities might be illiquid in the short term for a variety of reasons, including an excess

of similar securities on the markets, difficulties valuing the securities, doubts about the

financial stability of the issuer, and similar reasons. Revealing information regarding the

specific volume and type of collateral pledged for individual DW, TAF, PDCF, TSLF,

TOP, AMLF, CPFF or other SCLF loans might create a negative inference in the markets

regarding the valuation of this collateral, which in turn could lower the price the Reserve

Banks are able to obtain should they need to sell the collateral. This would harm the

Reserve Banks' commercial interests, as a seller of securities in the market place, in

maximizing recovery on collateral should securities pledged to the Reserve Banks need to

be liquidated.

31.     In addition to the harm to individual borrowers and Reserve Banks, public disclosure of
        information responsive to the First and Second FOIA Requests would impair the Board's
        ability to carry out the statutory mandates described in ¶ 19 above. In particular,
        disclosure would have a significant adverse impact on the effectiveness of Federal
        Reserve Bank lending facilities in addressing strains in the financial markets and in
        acting as a safety valve for individual depository institutions, primary dealers and the
        banking system as a whole, and on the Board's conduct of monetary policy.

32.     The Board and the FOMC use the instruments of monetary policy to carry out their
        statutory mandate under section 2A of the Federal Reserve Act "to promote effectively
        the goals of maximum employment, stable prices, and moderate long term interest rates."
        Monetary policy is the process by which a government, generally through a central bank,
        affects the level of interest rates and the supply of money in pursuit of particular policy
        goals.  OMOs are an especially important tool in monetary policy implementation.  In the
        case of the Federal Reserve, as described in ¶ 14 above, the FRBNY's Desk conducts
        OMOs by buying and selling government securities to adjust the aggregate supply of
        reserve balances so as to achieve a target rate in the federal funds market.  The federal
        funds market is the market for unsecured overnight and term loans in which depository
        institutions and certain other participants trade deposit balances at the Federal Reserve.
        DW lending complements OMOs in achieving the target federal funds rate by making
        Federal Reserve balances available to depository institutions when the aggregate supply
        of reserve balances in the market falls short of demand.  When the demand for reserve
        balances is high relative to supply of such balances, the federal funds rate tends to move
        higher and depository institutions then tend to borrow at the DW to obtain needed

reserves. This increased supply of reserves from the DW reduces the upward pressures

on the federal funds rate. However, if institutions are unwilling to access the DW for fear

of public disclosure, this "safety valve" role of the DW is impaired, and the task of

achieving a desired level of short-term interest rates through OMOs is greatly

complicated. The inability to achieve a desired level of short-term interest rates, in turn,

adds to uncertainty in financial markets and makes it more difficult for the Federal

Reserve to achieve its statutory objectives of maximum employment, stable prices and

moderate long term interest rates.

33.     Releasing non-public information about individual borrowings at the special facilities

such as the PDCF, TSLF, TOP, AMLF, CPFF and other SCLFs would impair the

Board's ability under section 13(3) of the FRA to address "unusual and exigent

circumstances" in the domestic economy by authorizing the Reserve Banks to lend to

non-depository institutions. The effectiveness of the SCLFs depends critically on

institutions' willingness to use them. The reluctance to borrow at the SCLFs would

undermine the goal of many of these facilities in supporting the liquidity of individual

institutions and markets. If eligible institutions are unwilling to use these facilities for

fear of the "stigma" described in ¶¶ 23-27 above, important financial institutions and

markets will be deprived of critically needed funding. As just one example, the CPFF

has extended hundreds of billions of dollars to borrowers in the commercial paper

market. Institutions often borrow in the commercial paper market to meet short-term

funding needs such as financing inventories or making payments to employees and

vendors. If commercial paper issuers had feared that their usage of the CPFF would

become known, many would likely not have borrowed from the CPFF over recent months

and would have been forced instead to take other actions such as scaling back production and laying off workers.

34.  Finally, a reluctance of institutions to borrow at the DW because of confidentiality concerns would impair the Federal Reserve's statutory function under section 10B and related provisions of the FRA to act as a "lender of last resort" to depository institutions at the discount window.  As described in ¶¶ 6, 7, 9-10, and 19 above, the DW, TAF, and AMLF serve as a safety valve in relieving liquidity strains in individual depository institutions, money market funds, and the banking system.  If institutions are reluctant to turn to the DW, TAF, or AMLF for fear of public disclosure of details regarding their borrowing, the Board's and Reserve Bank's ability to use these facilities as an emergency, back-up source of liquidity for depository institutions, and to provide liquidity to money market funds, will be impaired.  The adverse impact on the economy could be severe as diminished access to liquidity could result in the failure of some institutions, a further tightening in credit conditions, and a slowing of economic growth.

35.  For example, over recent months, many banks have faced unexpected funding needs as securitization markets have shut down and as loans and other assets that had previously been held in off-balance sheet vehicles had to be funded by the bank.  At the same time, a number of banks -- despite being well-capitalized -- have experienced difficulties in raising funds as many creditors became very wary of lending to their usual counterparties.  In this environment, credit obtained through the primary credit program and the TAF has been extremely useful to depository institutions in meeting such unexpected funding pressures.  If depository institutions were reluctant to use these lending programs, they would likely have been forced to conduct so-called "fire sales" of

assets that would, in turn, have depressed asset prices and further impaired the condition

of important financial institutions and markets.

I declare under penalty of perjury that the foregoing is true and correct. Executed in the city of

Washington, D.C. on this 23rd day of March, 2009.

B~ F Madigan

Brian F. Madigan