UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| FOX NEWS NETWORK, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BOARD OF GOVERNORS OF<br>THE FEDERAL RESERVE<br>SYSTEM,<br>Defendant. | Civ. No. 09-cv-00272 (AKH) |

### DECLARATION OF ALISON M. THRO

I, Alison M. Thro, hereby affirm the following as my testimony in the above-captioned case:

1.  I have been employed as an attorney with the Board of Governors of the Federal Reserve System ("Board") from March 31, 1998 to the present. I was responsible for processing a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") made by Bruce Becker, Vice President, Washington Bureau Chief of plaintiff Fox Business News ("plaintiff") to the Board by e-mail dated November 10, 2008, and a FOIA request made by Kevin Magee, Executive Vice President of plaintiff Fox Business News dated November 18, 2008. Accordingly, I have personal knowledge of the facts herein.

2.  I have been involved with the Board's processing of requests for information under FOIA since 1999. Since 2004, I have been the most senior attorney in the Board's Legal

1

Division responsible for reviewing FOIA requests. My primary responsibilities include supervising the processing of requests for information received under FOIA, and providing legal advice on issues related to FOIA, including the applicability of the FOIA exemptions. As a result of my extensive involvement in processing FOIA requests for the Board, I have experience in searching for a variety of records that are kept by the Board, reviewing those documents in light of a FOIA request, and judging whether those documents are responsive and should be produced in full, redacted, or withheld in their entirety.

3.      When a request is made under FOIA for information that is not "published information and records" as described in 12 C.F.R. §§ 261.10 and .11, and that has not been previously cleared for release to the public, it has been the Board's practice to assign such requests to the Legal Division for review and processing. In general, when such a FOIA request is made, the Board's Freedom of Information office ("FOI office") makes a preliminary review of the request and assembles any responsive documents under its control. The FOI office then sends the request to the Legal Division for processing. The Legal Division contacts other divisions that may have responsive documents. When appropriate, the Legal Division also contacts relevant Federal Reserve Bank staff to determine if they have responsive "Board records" subject to a FOIA request to the Board, as discussed in ¶¶ 30-32 below.

***The First and Second FOIA Requests***

4.      In the course of performing my duties described above, I became aware that the Board received an e-mail, dated November 10, 2008, from Bruce Becker, who was affiliated with the plaintiff, Fox Business Network, requesting documents under FOIA (the "First

FOIA Request"). The First FOIA Request sought "the names of institutions receiving

Federal Reserve lending from programs including but not limited to the following:

Regular OMOs; Single-Tranche OMO Program; Discount Window; Term Discount

Window Program; Term Auction Facility; Primary Dealer Credit Facility; Transitional

Credit Extensions; ABCP Money Market Liquidity Facility; Securities Lending; Term

Securities Lending Facility; Term Securities Lending Facility Options Program; and any

other Federal Reserve lending facility not mentioned above. In addition, we would like

to request an accounting of the collateral provided by these institutions in exchange for

the lending." The First FOIA Request did not seek expedited processing. A true and

correct copy of the plaintiff's November 10, 2008 e-mail is attached hereto as Exhibit A.

5. By letter dated November 18, 2008 to the Board's FOIA office, plaintiff narrowed and

clarified the First FOIA Request to cover the time period August 8, 2007 through

November 17, 2008. A true and correct copy of plaintiff's November 18, 2008 letter is

attached hereto as Exhibit B.

6. Approximately one week after receiving the First FOIA Request, I became aware that the

Board received a letter, dated November 18, 2008, from Kevin Magee, Executive Vice

President of plaintiff Fox Business News seeking documents under FOIA (the "Second

FOIA Request"). The Second FOIA Request indicated that it had been sent by facsimile;

however, the fax number on the letter, (202) 872-7562, was not the fax number for the

Board's FOIA office, which is (202) 872-7565. As a result, the Board's FOIA office

received the Second FOIA Request by UPS on November 20, 2008, and not by an earlier

fax. The Second FOIA Request requested substantially the same information as the First

FOIA Request, but for a shorter time period, and sought expedited processing under 5

U.S.C. § 552(a)(6)(E)(v)(II) and 12 C.F.R. § 261.13(c). The Second FOIA Request sought: "For the months of September 2008 and October 2008, please provide records sufficient to identify all institutions that have participated in any Fed lending program, including, but not limited, to Regular OMO, Single Tranche OMO, Discount Window, Term Discount Window Program, Term Auction Facility, Primary Dealer Credit Facility, Transitional Credit Extensions, ABCP Money Market Fund Liquidity Facility, Securities Lending, Term Securities Lending Facility, and the Term Securities Lending Facility Options Program." The Second FOIA Request went on to request "[f]or each institution identified in response to number '1,' please provide, (i) records sufficient to identify all collateral pledged by each such institution; and (ii) records sufficient to show the amount borrowed or advanced to the institution." Finally, the Second FOIA Request stated: "[p]lease also provide records sufficient to identify all of the collateral held by the Fed at the close of business on November 14, 2008. This response should include information sufficient to match the institutions with the collateral that they pledged." A true and correct copy of the plaintiff's November 18, 2008 letter is attached hereto as Exhibit C.

7.    By letter to the plaintiff dated November 20, 2008, Jeanne M. McLaughlin, Manager of the Board's FOI office, acknowledged receipt of plaintiff's request. By letter to the plaintiff dated December 1, 2008, Ms. Margaret Shanks, Associate Secretary of the Board, granted the plaintiff's request for expedited processing of the Second FOIA Request. By letter dated December 18, 2008, Ms. McLaughlin informed plaintiff that the time period for processing the Second FOIA Request was being extended until January 6, 2009. True and correct copies of the letters dated November 20 and December 1 and 18, 2008, are attached here to as Exhibits D, E, and F, respectively.

### The Board's Search for Responsive Documents

8.    Because the First FOIA Request and the Second FOIA Request sought substantially the same documents over different (overlapping) time periods, I processed the Requests together. The First FOIA Request and the Second FOIA Request were two in a series of approximately 19 FOIA requests the Board received, beginning in or around April 2008, seeking information regarding the names of borrowers, loan amounts, and collateral pledged for various of the Federal Reserve Banks' extensions of credit at the discount window ("DW") and under special credit and liquidity facilities ("SCLFs") authorized by the Board and implemented by the Federal Reserve Banks starting in or around August 2007 (collectively, the "Facilities Requests"). I, and members of the Legal Division working at my direction, processed each of the Facilities Requests. As described below, in response to prior Facilities Requests, I, and Legal Division Staff working at my direction, identified and interviewed Board staff members most likely to have responsive information, or to know where it would be located, and obtained responsive documents from these individuals. We placed electronic versions of these documents on Legal Division servers and reviewed them for responsive records as additional Facilities Requests came in.

9.    There was substantial overlap between previous Facilities Requests and the First and Second FOIA Requests. As described in ¶¶ 15-19 below, I determined that records obtained in response to the Facilities Requests were largely responsive to the First and Second FOIA Requests. The First and Second FOIA requests were somewhat broader than the Facilities Requests, seeking information on additional facilities authorized by the Board under section 13(3) of the Federal Reserve Act not encompassed by prior requests

and records not previously requested related to Regular and Single Tranche Open Market

Operations (together, the "OMOs") of the FOMC's System Open Market Account

("SOMA") and temporary changes to the SOMA's securities lending program ("SLP").

Accordingly, in responding to the First and Second FOIA Requests, I had follow-up

discussions with some Board and Board staff members, as described in ¶¶ 12, 20-21, and

26-29 below.  Because of our experience with the prior Facilities Requests, Legal

Division staff, acting at my direction, were able to identify information responsive to the

First and Second FOIA Requests and to respond to the Second FOIA Request on an

expedited basis as requested by the plaintiff.

10.    In responding to the Facilities Requests, I, and employees of the Legal Division working

at my direction, contacted staff members in the two divisions of the Board most likely to

have responsive records.  My search for documents in the Board's Division of Monetary

Affairs ("MA") is described in ¶¶ 11-14 below.  My search for documents in the Board's

Division of Reserve Bank Operations and Payment Systems ("RBOPS") is discussed in

¶ 20 below.

11.    In responding to the Facilities Requests, we contacted seven staff members in MA,

including the division's director, deputy director, senior associate director and deputy

associate director, believing that they, or individuals working for them, were the most

likely to have responsive information, or to know where it would be located.  MA

supports the Board and the Federal Open Market Committee ("FOMC") in the conduct of

domestic monetary policy by providing information and analyses pertaining to the

SOMA's OMOs and SLP, reserve requirements, the administration of the DW, and

SCLFs authorized by the Board and established and administered by the Reserve Banks,

including: the Term Auction Facility ("TAF"); the Primary Dealer Credit Facility ("PDCF"); Asset Backed Commercial Paper Money Market Fund Liquidity Facility ("AMLF"); Term Securities Lending Facility ("TSLF"); the Term Securities Lending Facility Options Program ("TOP"); and the Commercial Paper Funding Facility ("CPFF"). Because of this function, and MA's added role in compiling data and analysis relating to the DW and all SCLFs, in my experience, I believed that information we had compiled from MA would include information responsive to the First and Second FOIA Requests.

12.   In responding to the Facilities Requests, I provided these seven individuals with copies of the Facilities Requests, discussed the Requests with them, and asked if they, or anyone on their staff (or anyone else at the Board to their knowledge) had responsive information. These MA staff members, and additional MA staff members acting at their direction, searched files in MA that might have information responsive to the Facilities Requests, and responded to my inquiries. As a result of these discussions, I compiled documents on Legal Division servers responsive to the Facilities Requests. In responding to the First and Second FOIA Requests, I, and Legal Division staff working at my direction, reviewed these documents and located responsive information, as described below. In addition, after completing this review, I contacted three MA staff members, reviewed with them the First and Second FOIA Requests, described what we had found, and reconfirmed with them that there were no additional responsive documents in MA (or elsewhere at the Board) to their knowledge, including with respect to items not encompassed by previous Facilities Requests. I believed that through this review and these discussions, I was reasonably likely to uncover any responsive information in MA.

13.    In responding to the Facilities Requests, some MA staff members provided information that I later reviewed and determined not to be responsive to the First and Second FOIA Requests.  For example, an MA officer had data showing, for one day per month, specific collateral that individual depository institutions have on deposit in pledge accounts with the Reserve Banks and that is *eligible for posting* as collateral for DW or TAF loans.  The First FOIA Request sought "an accounting of the collateral provided by these institutions in exchange for the lending" and the Second FOIA Request sought "records sufficient to identify all collateral pledged by each such institution."  As we informed the plaintiff in the response letters discussed in ¶¶ 24-25 below, I interpreted the First and Second FOIA Requests as seeking information regarding specific items pledged as collateral by specific borrowers for specific borrowings, rather than as seeking information on the general categories or types of collateral actually pledged or available for pledge.  The MA data did not show which items of pledged collateral (if any) were posted at any given time as collateral for a specific loan.  Because this additional information was lacking, neither I nor my supervisor regarded the data as responsive to the First and Second FOIA Requests.

14.    As a result of these discussions and this review, I determined that, with the exception of the information discussed in ¶¶ 15-19 below, information in MA relating to the DW, OMOs, or SCLFs consisted of high-level, aggregate data and statistics compiled or obtained by MA staff for monetary policy purposes.  As described below, I identified responsive information relating to the names of some borrowers at the DW and SCLFs, and individual loan amounts, but almost no responsive information relating to specific

items of collateral pledged by specific borrowers for specific loans, and no responsive

information regarding specific OMOs conducted by specific institutions on specific dates.

15.   In response to earlier Facilities Requests, one MA staff member reported receiving daily

data feeds (weekdays only) from each Reserve Bank on the DW and the SCLFs (but not

OMOs). The Reserve Banks in turn had obtained and derived this information from

records of their transactions with borrowing institutions. For the time period covered by

the First and Second FOIA Requests, MA staff used this data to generate three separate

types of reports on business days during that period. The first type of report, prepared

between February 11, 2008 and November 17, 2008 (the "Remaining Term Report")

listed outstanding extensions of credit under the DW and SCLFs by calendar days to

maturity. The Remaining Term Reports were internally classified as "FR Restricted"

(essentially, highly confidential) and then distributed, in accordance with the Board's

information security policies, to select senior staff in MA and RBOPS and select senior

staff at the Federal Reserve Bank of New York ("FRBNY") on a need-to-know basis.

The Remaining Term Reports (for the relevant time period) contain some information

responsive in part to the First and Second FOIA Requests, including the names of the

borrowers, amount of individual loans, the credit facility (DW or an SCLF), and

origination and maturity dates of specific loans. Much of the information is redundant; in

other words, it is carried over from day to day on successive Reports. The Remaining

Term Reports do not contain information regarding collateral pledged by the borrowers

for the loans as requested in the First and Second FOIA Requests.

16.   The second type of report, prepared by MA staff each business day between August 20,

2007 and November 17, 2008 (the "Origination Report"), listed extensions of primary

credit under the DW originating the previous business day. In or around March 2008, the Origination Report was expanded to include secondary credit DW loans and emergency loans. In or around September 2008, the Report included information regarding the specific SCLF from which credit was extended (e.g., PDCF, AIG, etc.). Like the Remaining Term Reports described in ¶ 14 above, the Origination Reports list the name of the borrower, amount borrowed, and maturity date for loans originating the previous business day. This information is responsive in part to the First and Second FOIA Requests. The Origination Reports do not contain information regarding collateral pledged for the loans as requested in the First and Second FOIA Requests. Like the Remaining Term Reports, the Origination Reports are internally classified as "FR Restricted" and were distributed to similar staff in a similar manner.

17.    The third type of report, prepared by MA staff each business day between September 19, 2008 and November 17, 2008 (the "Emergency Credit Report") listed, among other information, the names of institutions borrowing from identified SCLFs authorized by the Board under section 13(3) of the Federal Reserve Act ("FRA"), the amount borrowed, and the maturity date for individual loans responsive in part to the First and Second FOIA Requests. The Emergency Credit Reports for the relevant time period do not contain information regarding collateral posted for individual loans responsive to the Requests. The Emergency Credit Reports also are internally classified "FR Restricted," and distributed to similar staff in a similar manner as the Reports described in ¶¶ 15-16 above. Like the Remaining Term Reports described in ¶ 15 above, information in the Emergency Credit reports is highly redundant, that is, information on one day's report is carried forward to the next day until a loan has matured.

10

18.    In discussing the Origination Reports described in ¶ 16 above with MA staff, the MA

staff member formerly responsible for distributing the Reports provided me with e-mails

for various dates between August 22, 2007 and March 19, 2008 that he had sent to MA,

RBOPS, and FRBNY staff members attaching the Reports.  Some of those e-mails

contain information that is responsive to the First FOIA Request, such as the name of a

borrowing institution or an individual loan amount, along with non-responsive

information.  I determined that the e-mails, which consist of 94 pages of responsive and

non-responsive information, were responsive in part to the First FOIA Request.

Responsive information in the e-mails is duplicative of (or could be derived from)

information in the Origination Reports.  Beginning in or around March 2008, the task of

circulating the Origination Reports was assigned to another MA staff member who did

not send e-mails containing responsive information.

19.    In interviewing MA staff listed in ¶ 11 above and RBOPS staff listed in ¶ 20 below, I

learned that on or around July 30, 2008, the Board approved guidelines for collateral

requirements on long-term primary credit at the DW and TAF.  To ensure compliance

with the new guidelines, the FRBNY, in collaboration with other Federal Reserve Banks,

prepared enhanced collateral monitoring procedures for use by the Federal Reserve

Banks in extending credit at the DW and TAF.  On or around August 15, 2008, a draft of

those procedures (the "Draft Procedures") was transmitted by the FRBNY to certain

Board staff in MA and RBOPS for comment.  The Draft Procedures contain a number of

inserts for illustrative purposes that include the names of a few borrowers at the DW and

TAF, the value of collateral pledged by those borrowers, and additional collateral

required for specific loans, among other data.  Upon reviewing the Draft Procedures, I

determined that these illustrative inserts, which total between 1-2 pages, are responsive in
part to the First FOIA Request, and that the remainder of the document is non-responsive.

20.     In response to the earlier Facilities Requests, I, and Legal Division staff working at my
direction, contacted six staff members in RBOPS, which oversees the Federal Reserve
Banks' provision of financial services to depository institutions and other eligible
borrowers. Because of RBOPS's role in overseeing DW and SCLF administration by the
Reserve Banks, these individuals were identified by MA as potentially having documents
responsive to the Facilities Requests. I reviewed the earlier Facilities Requests with
them. As had been the case with MA, these individuals informed me that the majority of
information in RBOPS concerning the DW or SCLFs related to high level policy issues
and the Board's oversight of Reserve Bank lending facilities, and that, with the exception
of the information described in ¶¶ 15-19 above, RBOPS did not have specific information
regarding the names of borrowers, individual loan amounts, or collateral pledged for
specific loans. These individuals confirmed that no other groups or individuals within
RBOPS (or the Board, outside of MA, to their knowledge) were reasonably likely to have
information responsive to the Facilities Requests. I gathered information from these
RBOPS staff members responsive to the earlier Facilities Requests, which I stored on
Legal Division servers. In responding to the First and Second FOIA Requests, I reviewed
this information, and determined that the three types of Reports, e-mails, and Draft
Procedures discussed in ¶¶ 15-19 above (all of which had been distributed to RBOPS
staff) were responsive to the First and Second FOIA Requests. My review did not reveal
any additional information from RBOPS responsive to the First and Second FOIA

12

Requests. I reconfirmed orally with three staff members in RBOPS that RBOPS had no

additional information responsive to the First and Second FOIA Requests.

21.    In addition to the information described in ¶¶ 15-19 above relating to the DW and

SCLFs, the First and Second FOIA Requests sought information relating to institutions

that have participated in OMOs. Through my discussions with MA staff members, and in

responding to prior FOIA requests, I learned that pursuant to directives issued by the

FOMC, the FRBNY conducts OMOs, that is, the purchase and sale of government

securities to help achieve the targeted federal funds (interest) rate. The FRBNY conducts

OMOs with primary dealers -- designated banks and securities broker-dealers with whom

the FRBNY trades government securities as trading counterparties. The primary dealers

are listed on the FRBNY's public website at

http://www.ny.frb.org/markets/pridealers_current.html. Because the names of the

primary dealers are public, I interpreted the First and Second FOIA Requests as seeking

specific information on institutions participating in OMOs on specific days. I showed

MA staff the Requests and asked if they, or anyone on their staffs, or at the Board, to

their knowledge, had responsive information regarding specific institutions participating

in OMOs on specific days. MA staff confirmed, as I had learned in response to prior

FOIA requests, that the Board does not have responsive records on counterparties in

routine OMOs, including single tranche OMOs, or the SLP, and does not have responsive

records on which primary dealers participate in specific OMOs (and in what volume) on

any given day. MA staff confirmed that, because MA is the division responsible for

advising the Board and FOMC on the conduct of OMOs, it was unlikely that responsive

information would be located in other divisions.

13

22.   Through my discussions with the seven individuals in MA and six individuals in RBOPS,
      I, and staff members working at my direction, determined that it was not reasonably
      likely that responsive information of the type requested by the plaintiff would reside with
      staff in other divisions of the Board, because no other division had responsibility directly
      for overseeing the Reserve Banks' provision of DW and SCLF services to eligible
      institutions or to provide data and statistics to Board staff (and to the FOMC, in the case
      of OMOs) relating to the DW, SCLFs, or OMOs. I reviewed the Remaining Term
      Reports, Origination Reports, Emergency Credit Reports, e-mails and Draft Procedures
      described in ¶¶ 15-19 above for the relevant time period to determine whether they were
      responsive to the First and Second FOIA Requests and whether they contained any
      material exempt from release under FOIA. From my experience with FOIA matters, it
      appeared that the information in these documents was "commercial or financial" in
      nature, it was obtained from the Federal Reserve Banks, which had obtained and derived
      the information from records of transactions with borrowers at the DW and the SCLFs,
      that these entities were "persons" under FOIA, and that disclosure of this information:
      was likely to cause substantial harm to the competitive position of the borrowers; could
      impair the Board's ability to carry out its statutory mission; or could impair the Board's
      monetary functions or commercial interests, and that the documents contained no
      reasonably segregable, non-exempt responsive information. Accordingly, I, with the
      concurrence of my supervisors, determined that these documents, comprising
      approximately 6008 full pages of information, should be withheld in full from the
      plaintiff under Exemptions 4 and 5 of FOIA.

                                          14

23.  A true and correct description of the withheld documents is contained in the two <u>Vaughn</u> Indices ("<u>Vaughn</u> Indices") filed in U.S. District Court in the Southern District of New York on February 19, 2009 in this action. The <u>Vaughn</u> Indices set forth the contents of the withheld documents, identify the FOIA exemption(s) under which each category of document is withheld, and detail why those exemptions pertain to the document(s), therefore providing the legal justification for nondisclosure.

## *The Board's Response to the Plaintiff*

24.  By letter dated January 6, 2009, the Secretary of the Board responded to the Second FOIA Request (for which expedited treatment had been granted). The Secretary's letter informed the plaintiff of extensive public sources of information on the Board's and Federal Reserve Banks' websites regarding OMOs, the DW and SCLFs. The letter also informed the plaintiff that staff's search had revealed documents that were being withheld under FOIA Exemptions 4 and 5, and that the documents had been reviewed for, but determined not to contain, reasonably segregable non-exempt information. A true and correct copy of the Secretary's January 6, 2009 letter (without enclosure) is attached hereto as Exhibit G.

25.  By letter dated January 16, 2009, the Secretary of the Board responded to the First FOIA Request. Like the January 6, 2009 letter discussed above, the Secretary's letter informed the plaintiff of extensive public sources of information regarding OMOs, the DW and SCLFs, and informed the plaintiff that the staff's search had revealed responsive documents that were exempt from disclosure under FOIA Exemptions 4 and 5, and that the documents contained no reasonably segregable non-exempt information. A true and

correct copy of the Secretary's January 16, 2009 letter (without enclosure) is attached

hereto as Exhibit H.

## *The Board Conducts an Additional Search*

26.    In connection with preparing this declaration, I learned that two members of the Board

and one MA staff member had received e-mails from the FRBNY attaching a weekly

report which contained, among other things, the names of primary dealers utilizing

FRBNY liquidity facilities, and some general collateral information such as the market

value, share, or type of collateral pledged by specific primary dealers for those facilities.

I learned that, in some cases, these weekly reports contained the name of a particular

facility utilized by a particular primary dealer. I learned that the weekly reports did not

contain specific collateral information by loan in a particular facility. I also learned that

these same three individuals had received e-mails from the FRBNY attaching a second

weekly report which contained the names of some institutions participating in certain

FRBNY lending programs on certain dates, as well as information from which one could

derive the approximate amount of borrowing under particular facilities by particular

borrowers on stated dates. Because I believed that portions of these two types of reports

could be responsive to the First and Second FOIA Requests, I contacted the two Board

members and the one MA staff member and asked them to provide me with these two

types of reports so that I could review them for FOIA purposes. All three of these

individuals informed me they had not retained any copies of either type of these reports

or the e-mails (either paper or electronic) for the relevant time period (August 8, 2007 –

November 17, 2008), and that it had been their practice since receiving the e-mails and

reports to delete or destroy them shortly after receiving them because there was no need

to retain copies of this information to perform their duties for the Board. Through our discussions, I determined that, because these e-mails and reports were deleted or destroyed shortly after they were received, there were no copies (paper or electronic) at the Board for the relevant time period, and that there had been no copies when we received the First and Second FOIA Requests. These individuals reviewed their records and informed me, based on that review, that they did not provide copies of, or forward, these e-mails or reports to any other Board or Board staff member or to any location where they would be stored in Board records. Based on these discussions, I, with the concurrence of my supervisor, concluded that there were no agency records of either type of these reports or e-mails responsive to the First and Second FOIA Requests.

27.    In connection with preparing this declaration, I learned that, beginning on or about November 6, 2008, a very few members of the Board and Board staff had received weekly e-mails from the FRBNY containing information about aggregate activity under the CPFF, which had become operational on October 27, 2008. I followed up with Board and Board staff members who had received these e-mails and determined that one of the e-mails fell within the relevant time period. Accordingly, I reviewed the e-mail to determine if it contained responsive information regarding specific issuers participating in the CPFF, amounts they borrowed, or specific collateral they pledged for loans. I determined that the e-mail itself did not contain information responsive to the First and Second FOIA Requests. The e-mail had an attachment. However, the recipients informed me that they had not opened the attachment or otherwise used, reviewed or relied upon it in the course of their duties for the Board (other than at my request for FOIA purposes), and that they had not forwarded (and, because of restrictions placed on

17

the e-mail by the FRBNY, could not have forwarded) the e-mail or attachment to any other member of the Board or Board staff, or to any location where it would be stored in Board records. Based on this review and these discussions, I, with the concurrence of my supervisor, concluded the e-mail was not responsive, and that the attachment was not an agency record subject to FOIA.

28.   In connection with the preparation of this declaration, I also learned that one Board officer, who was specifically detailed to work on Facilities issues and who also serves as the Board's liaison for Chairman Bernanke to the President's Working Group ("PWG"), received e-mails from the FRBNY attaching a Daily PDCF Collateral Report which might contain information responsive to the First and Second FOIA Requests. Like the Reports described in ¶¶ 15-17 above, these Daily PDCF Collateral Reports are internally classified as "F.R. Restricted," (essentially, highly confidential), and distribution at the FRBNY and the Board is strictly limited on a need to know basis. I contacted this Board officer, and learned that, to his recollection, he had received these Reports each weekday since inception of the PDCF in March 2008, but had retained only 47 of these Reports for the relevant time period, most of them from September and October, 2008. I learned that the Board officer had archived the majority of these e-mails without opening the e-mails or the attachment, which would indicate that they are not agency records subject to FOIA. However, upon reviewing the e-mails and Reports he had archived, and discussing them with him, neither he nor I could not determine which e-mails he had opened and which he had not. As a result, in an abundance of caution, I treated these documents as agency records subject to FOIA, reviewed them, and determined that, along with mostly non-responsive information, the Reports contain some limited information responsive to the

First and Second FOIA Requests. Approximately 41 pages of transmittal e-mails contained responsive information which was cumulative of information in the Reports, along with non-responsive information. The daily PDCF Collateral Reports contain the names of some primary dealers receiving loans at the PDCF on dates listed in the Reports, the amounts of overnight borrowing by each primary dealer, and total borrowings by all primary dealers on specific dates, and responsive portions of the e-mails highlight this information. This responsive information, which totals approximately 47 pages in the Reports and references on 41 pages of transmittal e-mails (for a total of 88 pages), is to an extent cumulative of information in the Reports described in ¶¶ 15-17 above, and I, with the concurrence of my supervisor, determined that it is exempt for the same reasons. In addition, the same Board official sometimes received e-mails from the FRBNY reporting on the liquidity position of specific financial institutions, and these e-mails sometimes included references to specific PDCF borrowings by affiliated primary dealers. This Board official also sometimes received additional e-mails reporting on intra- and end-of-the day borrowings by specific primary dealers at the PDCF, and loan amounts, along with other non-responsive information. These two types of e-mails were separate from the transmittal e-mails described above. As with the daily PDCF Collateral Reports described above, most of these two types of e-mails were unopened and archived. However, out of an abundance of caution, I have included the responsive portions of these two types of e-mails (consisting of references on approximately 90 total pages) among the agency records withheld by the Board. The borrower identities and end-of-the day borrowing figures are cumulative of information

in the Reports described in ¶¶ 15-17 above, and I, with the concurrence of my supervisor, determined that all of this information is exempt for the same reasons.

29.     I have prepared a Supplemental Vaughn Index, attached hereto as Exhibit I, which sets forth the contents of the additional withheld documents described in ¶ 28 above, the FOIA exemption(s) under which each category of document is being withheld, and why those exemptions pertain to the document(s), therefore providing the legal justification for nondisclosure. As described in Exhibit I, there are approximately 475 pages of daily PDCF Collateral Reports, of which approximately 47 pages contain responsive information, and the remainder of information in the Reports is non-responsive. There are 41 pages of transmittal e-mails containing cumulative responsive information, and the remainder of information in the transmittal e-mails is non-responsive. Finally, there are 163 pages of additional e-mails, of which approximately 90 pages contain responsive information, and the remainder of information in these e-mails is non-responsive. The total of additional responsive pages withheld is approximately 178.

### Documents at the FRBNY and FRBB

30.     In addition to Board records maintained on site at the Board, I am aware, as a result of my duties relating to FOIA, that Board records include a narrow subset of documents in the possession or control of the Federal Reserve Banks as a result of the Reserve Banks' performance of certain functions for or on behalf of the Board. By Board regulation, contained at 12 C.F.R. § 261.2(i)(1)(i), this small category of records relates to functions performed by the Reserve Banks under delegated authority from the Board, such as bank examination materials, and does not include records of the Reserve Banks relating to

commercial transactions with depository institutions or primary dealers, which are records of the Reserve Banks.

31.     In the course of processing the Facilities Requests, I learned through discussions with the Board staff members mentioned in ¶¶ 11 and 20 above, and with staff of the FRBNY, that lending at the DW and under the SCLFs, and the conduct of OMOs, was not considered to be an activity conducted by the Reserve Banks under Board-delegated authority. I also learned that the FRBNY, by virtue of its statutory authority to lend at the DW and TAF, statutory authority to conduct OMOs, and statutory authority with Board authorization to establish and lend under the SCLFs, had obtained transaction-level information responsive to the First and Second FOIA Requests. I also learned that responsive information had been obtained by the Federal Reserve Bank of Boston ("FRBB"), which established and oversees the AMLF. Through my discussions with these Board and FRBNY staff members, I determined that, except as discussed above, responsive FRBNY documents were and have at all times been in the possession and control of the FRBNY, FRBB, or entities acting on their behalf. I confirmed with staff in MA and RBOPS, and with FRBNY staff, that, except as discussed above, Board staff had not obtained, reviewed, or relied upon responsive Reserve Bank records in the performance of any Board function.

32.     Through my discussions with Board staff members, and staff members at the FRBNY, I determined that these transaction-level documents at the FRBNY and FRBB are not "records of the Board" under FOIA because they were obtained by these Reserve Banks in the course of extending credit at the DW or SCLFs or in the course of conducting OMOs. Extending credit is a fundamental part of the business of banking and a

21

commercial activity in which the Reserve Banks are authorized to engage, but the Board

is not. Because the establishment and administration of the DW and the SCLFs are

commercial banking activities, not a function "performed for or on behalf of the Board,"

the Reserve Banks' records relating to the DW and the SCLFs are not Board records

under the Board's regulations. Likewise, the purchase and sale of securities in the course

of OMOs is a commercial activity in which the Reserve Banks are statutorily authorized

to engage, under regulations and guidelines issued by the FOMC, but the Board is not.

Accordingly, documents at the FRBNY relating to specific OMOs executed on specific

days are proprietary records of the FRBNY, and not records of the Board under the

Board's regulations. Staff of the FRBNY also stated their view that responsive records,

which were obtained or derived from records of their transactions with the borrowers or

other entities, were commercial or financial in nature, and that their public disclosure

would likely result in substantial competitive harm to the FRBNY or FRBB or the

borrowers or issuers of the securities held as collateral and were therefore protected under

FOIA exemptions 4 and 5. As a result, I, with the concurrence of my supervisors,

determined that these transaction-level documents at the FRBNY and FRBB were not

records of the Board subject to FOIA.

I declare under penalty of perjury that the foregoing is true and correct. Executed in the

city of Washington, D.C. on this **26** day of March, 2009.

Alison M. Thro

Alison M. Thro

# Exhibit A

*2009- 73*

 bruce.becker@foxbusiness.com on 11/10/2008 10:03:30 AM

To:         FOI.Requests@frb.gov
cc:

Subject:    FOIA Request

Date: Nov 10, 2008
-----------------------------------------

Name:                        Bruce  Becker
Affiliation:        Fox Business Network
Category of
Affiliation:        News Media
Address1:           400 N. Capitol St. NW
Address2:                   Suite 500
City, State:        Washington, DC
Zip:                       20001
E-Mail:                   bruce.becker@foxbusiness.com
Country:                  UNITED STATES
Country Code:       840
PostalCode:
Telephone:                202-824-6370 (work/home not specified)
Fax:
-----------------------------------------
Max. Fee:                 $500.00
Fee Waiver:
-----------------------------------------


Delivery:                 Please call for pick up


-----------------------------------------
Request: We would like to request the names of institutions receiving Federal
Reserve lending from programs including but not limited to the following:
Regular OMOs;
Single-Tranche OMO Program;
Discount Window;
Term Discount Window Program;
Term Auction Facility;
Primary Dealer Credit Facility;
Transitional Credit Extensions;
ABCP Money Market Liquidity Facility;
Securities Lending;
Term Securities Lending Facility;
Term Securities Lending Facility Options Program;

and any other Federal Reserve lending facility not mentioned above.

In addition, we would like to request an accounting of the collateral provided by these institutions in exchange for the lending.

Thank you.

# Exhibit B



2009-73

400 N. Capitol Street NW, Suite 550
Washington, DC 20001
Phone 202.824.6370
bruce.becker@foxbusiness.com

**Bruce Becker**
Vice President
Washington Bureau Chief

*clarification*

November 18, 2008

**BY UPS OVERNIGHT MAIL**
**AND FAX (202) 872-7562**

Ms. Jeanne M. McLaughlin
Manager
Freedom of Information Office
Board of Governors of the Federal Reserve System
20th & Constitution, NW
Washington DC 20551

> Re:  **Freedom of Information Act Request**
> **FOIA Request No. 2009100073**

Dear Ms. McLaughlin:

I am in receipt of your letter dated November 10, 2008, in which you acknowledge receipt of Fox News's November 10, 2008 FOIA request. I am writing to clarify and narrow Fox News's request. First, the request seeks the names of institutions receiving Federal Reserve lending pursuant to any Federal Reserve lending facility. Second, our request seeks an accounting of the collateral provided by these institutions. In addition, we would like to limit our request to all Federal Reserve lending that occurred between August 8, 2007 and November 17, 2008.

In closing, be assured that Fox News will pay all fees incurred in the processing of my request. Please contact me if you have any questions.

Very truly yours,

Bruce Becker
Vice President,
Washington Bureau Chief



**Fox Business Network**
400 North Capitol Street
Suite 550
Washington, DC 20001
Phone: (202) 684-4000
Fax: (202) 715-1695

# Facsimile Cover Sheet

| | | | |
|---|---|---|---|
| **To:** | Ms. Jeanne M. McLaughlin | **From:** | Bruce Becker |
| **Fax:** | (202) 872-7562 | **Date:** | 11/18/08 |
| **Phone:** | | **Pages:** | 2 |
| **Re:** | FOIA Request No. 2009100073 | **CC:** | |

☐ Urgent    ☑ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

**· Comments:**

# Exhibit C



*2009-106*

1211 Avenue of the Americas
New York, NY 10036
Phone 212.301.3030
kevin.magee@foxbusiness.com

**Kevin Magee**
Executive Vice President

November 18, 2008                    *Expedite Requested*

BY UPS OVERNIGHT MAIL
 AND FAX (202) 872-7562

Freedom of Information Office
Board of Governors of the Federal Reserve System
20th & Constitution, NW
Washington DC 20551

Re:    **Freedom of Information Act Request and
         Request for Expedited Processing**

Dear Sir or Madam:

I am an Executive Vice President of Fox News, responsible for the operations of
the 24/7 national cable television business news network known as "The Fox Business
Network". This is a request for information pursuant to the Freedom of Information Act,
5 U.S.C. § 552 and 12 CFR 261 *et seq.* ("FOIA"). I am seeking expedited processing of
this request pursuant to 5 U.S.C. §552(a)(6)(E)(v)(II) and 12 CFR 261.13(c). This
request seeks records maintained by the Board of Governors of the Federal Reserve
System (the "Fed").

<u>Fox News's Request for Records</u>

1.  For the months of September 2008 and October 2008, please provide records
    sufficient to identify all institutions that have participated in any Fed lending
    program, including, but not limited, to Regular OMO, Single Tranche OMO,
    Discount Window, Term Discount Window Program, Term Auction Facility,
    Primary Dealer Credit Facility, Transitional Credit Extensions, ABCP Money
    Market Fund Liquidity Facility, Securities Lending, Term Securities Lending
    Facility, and the Term Securities Lending Facility Options Program.

2.  For each institution identified in response to number "1", please provide,

    (i)    records sufficient to identify all collateral pledged by each such
           institution; and

    (ii)   records sufficient to show the amount borrowed or advanced to the
           institution.

3. Please also provide records sufficient to identify all of the collateral held by the Fed at the close of business on November 14, 2008. This response should include information sufficient to match the institutions with the collateral that they pledged.

### Expedited Processing

Pursuant to 5 U.S.C. § 552 (a)(6)(E)(v)(ii), expedited processing is warranted for the following reasons:

1. Fox News is a member of the news media as defined in 12 CFR 261.2. Fox News is primarily engaged in the dissemination of information to the public.

2. The subject matter of Fox News's request for records concerns actual operations of the Fed relating to its current lending practices.

3. Additionally, the requested records concern matters of current exigency to the American public. Specifically, the American public has a compelling need to be immediately and fully informed about the Fed's current practices of lending public money to private financial institutions and the quality of the pledged collateral, in particular. The current financial crisis in America is impacting all Americans. For example, the widespread financial turmoil is resulting in increased joblessness and housing foreclosures, and is causing significant losses in personal and retirement savings. This financial turmoil is rapidly changing and spreading such that increasing numbers and varieties of private entities are seeking public financial assistance from the Fed. Public confidence in the Fed's lending practices is important to the stability and recovery of the American financial system. Thus, the American public has a compelling need for the requested information so that it can ensure that its interests are being safeguarded.

4. Any delay in the release of the requested information would significantly compromise the American public's ability to assess the Fed's lending practices on an ongoing basis. In addition, any delay would disrupt the public's ability to make its views known to public officials. Significantly, any delay will undermine public confidence in the integrity and reliability of the Fed which will further erode the American financial system.

### Conclusion

I look forward to your response within ten (10) calendar days. If this request is denied in whole or in part please include in your response the legal basis for such denials. Fox News agrees to pay reasonable fees for the requested records. Please notify me to make the appropriate arrangements for payment.

Pursuant to 5 U.S.C. §552(a)(6)(E)(vi), I hereby certify that my statements concerning the need for expedited processing are true and correct to the best of my knowledge and belief.

Very truly yours,

Kevin Magee
Executive Vice President

Exhibit D



**BOARD OF GOVERNORS
OF THE
FEDERAL RESERVE SYSTEM
WASHINGTON, D. C. 20551**

ADDRESS OFFICIAL CORRESPONDENCE
TO THE BOARD

November 20, 2008

Mr. Kevin Magee
Executive Vice President
Fox News
1211 Avenue of the Americas
New York, NY 10036

FOIA Request No. 2009100106

Dear Mr. Magee,

This will acknowledge receipt of your letter dated 11/18/2008 and received by the
Board on 11/20/2008, in which you request, pursuant to the Freedom of Information
Act ("FOIA"), 5 U.S.C. § 552, records pertaining to the institutions that have
participated in any Federal Reserve lending program from September 2008 through
October 2008. Additionally, you seek records to identify all collateral held by the
Federal Reserve related to these lending programs as of November 14, 2008.

In accordance with section 261.17 of the Board's Rules Regarding Availability of
Information, unless a request for a fee waiver is granted, this letter also confirms our
assumption that you will pay all fees incurred in the processing of your request.

The Board makes every effort to fulfill requests in a timely manner; however, there
may be delays in fulfilling complex requests or those that require consultation.
Please feel free to contact the Board's FOIA Requester Service Center at (202) 452-
3684 to obtain information about the status of your request.

Very Truly Yours,

Jeanne M. McLaughlin
Manager, Freedom of Information Office

# Exhibit E



BOARD OF GOVERNORS
OF THE
FEDERAL RESERVE SYSTEM
WASHINGTON, D. C. 20551

ADDRESS OFFICIAL CORRESPONDENCE
TO THE BOARD

December 1, 2008

Mr. Kevin Magee
Executive Vice President
Fox Business News
1211 Avenue of the Americas
New York, NY 10036

Dear Mr. Magee:

This is in response to your letter dated November 18, 2008, and received by the Board's Freedom of Information office on November 20. Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, you request the following:

1.  For the months of September 2008 and October 2008, please provide records sufficient to identify all institutions that have participated in any Fed lending program, including, but not limited, to Regular OMO, Single Tranche OMO, Discount Window, Term Discount Window Program, Term Auction Facility, Primary Dealer Credit Facility, Transitional Credit Extensions, ABCP Money Market Fund Liquidity Facility, Securities Lending, Term Securities Lending Facility, and the Term Securities Lending Facilities Options Program.

2.  For each institution identified in response to number "1", please provide,

    (i)   records sufficient to identify all collateral pledged by each such institution; and

    (ii)  records sufficient to show the amount borrowed or advanced to the institution.

3.  Please also provide records sufficient to identify all of the collateral held by the Fed at the close of business on November 14, 2008 . . . [including] information sufficient to match the institutions with the collateral that they pledged.

You have requested expedited treatment for your request. The Board's Rules Regarding Availability of Information and the FOIA require a requester to demonstrate "a compelling need for expedited processing" with facts sufficient to show that you are "primarily engaged in

-2-

disseminating information," and that there is an "urgency to inform the public concerning actual or alleged Board activity." 12 CFR 261.13(c)(1).

Your request is on behalf of Fox Business News, a member of the news media primarily engaged in disseminating information to the public. You represent that the subject matter of the request is related to the current lending practices of the "Fed" (defined by you as the Board). You further aver that the American public has a "compelling need to be immediately and fully informed about the Fed's current practices of lending public money to private financial institutions and the quality of the pledged collateral, in particular . . . so that it can ensure that its interests are being safeguarded."

We assume that you intend by your references to refer to the Board's exercise of authority under section 13(3) of the Federal Reserve Act and the public's general interest in ensuring that the Board exercises this extraordinary authority appropriately. In light of these assumptions and your representations regarding your media status, the Secretary has determined to grant expedited treatment of your request. Accordingly, your request will be processed by the Board as soon as practicable.

Very truly yours,

Margaret M Shanks

Margaret McCloskey Shanks
Associate Secretary of the Board

# Exhibit F



**BOARD OF GOVERNORS**
OF THE
**FEDERAL RESERVE SYSTEM**
WASHINGTON, D. C. 20551

ADDRESS OFFICIAL CORRESPONDENCE
TO THE BOARD

December 18, 2008

Mr. Kevin Magee
Executive Vice President
Fox News
1211 Avenue of the Americas
New York, NY 10036

Request No. 2009100106

Dear Mr. Magee:

On November 20, 2008 the Board of Governors (Board) received your request dated November 18, 2008, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 for records pertaining to the institutions that have participated in any Federal Reserve lending program from September 2008 through October 2008. Additionally, you seek records to identify all collateral held by the Federal Reserve related to these lending programs as of November 14, 2008.

Pursuant to section (a)(6)(B)(i) of the FOIA, we are extending the period for our response until January 6, 2009, in order to consult with another agency or with two or more components of the Board having a substantial interest in the determination of the request.

If a determination can be made before January 6, 2009, we will respond to you promptly. It is our policy to process FOIA requests as quickly as possible while ensuring that we disclose the requested information to the fullest extent of the law.

Sincerely,

Jeanne M. McLaughlin
Manager
Freedom of Information Office

Exhibit G



**BOARD OF GOVERNORS**
**OF THE**
**FEDERAL RESERVE SYSTEM**
**WASHINGTON, D. C. 20551**

ADDRESS OFFICIAL CORRESPONDENCE
TO THE BOARD

January 6, 2009

Mr. Kevin Magee
Executive Vice President
Fox Business News
1211 Avenue of the Americas
New York, NY 10036

Dear Mr. Magee:

This is in response to your letter dated November 18, 2008, and received by the Board's Freedom of Information office on November 20.[1]  Pursuant to the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552, you request the following:

1.  For the months of September 2008 and October 2008, . . . records sufficient to identify all institutions that have participated in any Fed lending program, including, but not limited, to Regular OMO, Single Tranche OMO, Discount Window, Term Discount Window Program, Term Auction Facility, Primary Dealer Credit Facility, Transitional Credit Extensions, ABCP Money Market Fund Liquidity Facility, Securities Lending, Term Securities Lending Facility, and the Term Securities Lending Facilities Options Program.

2.  For each institution identified in response to number "1", . . .

    (i)  records sufficient to identify all collateral pledged by each such institution;[2] and

    (ii)  records sufficient to show the amount borrowed or advanced to the institution.

3.  Please also provide records sufficient to identify all of the collateral held by the Fed at the close of business on November 14, 2008 . . . [including] information sufficient to match the institutions with the collateral that they pledged.

---

[1] Although your letter indicates that a copy of the request was sent to the Board's Freedom of Information office by facsimile, the Board does not have any record of having received the request by facsimile. The request was delivered to the Board by United Parcel Service and received by the Board's Freedom of Information office on November 20, 2008.

[2] We have interpreted your request as seeking detailed information regarding specific items pledged as collateral by specific borrowers for specific borrowings, rather than as seeking information on the general categories or types of collateral actually pledged.

-2-

As you know, the Board and the Federal Reserve Banks publish and regularly update information on Federal Reserve lending activities.[3] Open market operations are the Federal Reserve's principal tool for implementing monetary policy. The short-term objective for open market operations ("OMOs") is specified by the Federal Open Market Committee ("FOMC"), and OMOs are arranged by the Domestic Trading Desk at the Federal Reserve Bank of New York (the "Desk"). Operations are conducted in domestic securities, primarily U.S. Treasury and federal agency securities, principally with primary securities dealers. Information on the terms, rates, and conditions of OMOs, specific OMO operations, and the identity of primary dealers is accessible through the public website of the Federal Reserve Bank of New York ("FRBNY").[4]

Discount window ("DW") lending is a commercial and financial transaction between the Federal Reserve Banks and individual depository institutions that is used by depository institutions to manage their reserves and liquidity. DW lending helps relieve liquidity strains in a depository institution and in the banking system as a whole. Extensive information on the terms, rates, and conditions of DW operations is accessible through the Board's public website and the public websites of the Federal Reserve Banks.[5]

The Board and the Federal Reserve Banks also publish extensive information on their respective public websites on recent changes to the Federal Reserve's liquidity provision, including modifications to the DW and emergency liquidity facilities authorized by the Board and established and administered

---

[3] A summary of all forms of Federal Reserve Bank lending to financial institutions may be found at the following link: http://www.newyorkfed.org/markets/Forms_of_Fed_Lending.pdf. Among other things, this chart identifies eligible participants, eligible collateral, general loan terms, the administering Federal Reserve Bank(s), and the scope and frequency of publicly reported statistics.

[4] This information is available through the following link: http://www.newyorkfed.org/markets/openmarket.html. Information on the Securities Lending program for primary dealers, including program terms and conditions and operational results, is available at: http://www.newyorkfed.org/markets/securitieslending.html. On March 7, 2008, the Federal Reserve announced that the Desk would expand its conventional OMOs by conducting a series of weekly single tranche repurchase transactions with primary dealers posting as collateral any of the types of securities that are eligible as collateral in conventional OMO repurchase operations. Information on the terms and conditions and results of these so-called Single Tranche OMOs also is available on the public website of the FRBNY, at: http://www.newyorkfed.org/markets/operating_policy_030708.html and http://www.newyorkfed.org/markets/omo/dmm/temp.cfm. On November 25, 2008, the Federal Reserve announced that it would initiate a program to purchase agency mortgage-backed securities. The program became operational on January 5, 2009, and is being managed at the direction of the FOMC by the FRBNY. Information on this program is available at: http://www.newyorkfed.org/markets/gses_faq.html.

[5] At www.frbdiscountwindow.org, you will find, among other information, descriptions of the purposes, functions, and mechanics of the DW; relevant statutory provisions and regulations pursuant to which DW lending is authorized and conducted; operating circulars issued by the Federal Reserve Banks governing the general terms and conditions, including applicable rates, terms, and eligible collateral; form agreements; and collateral margins tables. Each week, the Board publishes aggregate data on Federal Reserve Bank lending under the DW, as part of the H.4.1 statistical release, "Factors Affecting Reserve Balances of Depository Institutions and Condition Statement of Federal Reserve Banks" (see http://www.federalreserve.gov/releases/h41/). The Board also publishes historical lending data (see http://www.federalreserve.gov/releases/h41/hist/h41hist5.txt).

-3-

by the Federal Reserve Banks (principally, the FRBNY).[6]  As these resources explain, these facilities have been introduced incrementally since August 2007, in response to changing market conditions, with the common objectives of reducing risks to financial stability and strengthening the effectiveness of monetary policy in addressing risks to the outlook for growth and inflation.[7]  In general, the suite of facilities now in place is designed to enable a set of institutions that play an important role in financial markets to access liquidity from the Federal Reserve Banks against collateral they normally would be able to finance easily with other financial market participants.  By giving these institutions more confidence in their access to current and future funding, these facilities are intended to reduce the incentives these institutions otherwise would face in these exceptionally challenging market conditions to take actions that might exacerbate pressure on market functioning.  These facilities also should improve the institutions' ability to extend funding to their customers and counterparties.  The Board and FRBNY publish extensive information on the terms, rates, and conditions of the emergency liquidity facilities.[8]

---

[6] See, e.g., http://www.federalreserve.gov/newsevents/recentactions.htm and http://www.newyorkfed.org/markets/Understanding_Fed_Lending.html.  Changes include substantial modifications to the terms of the primary credit program of the DW and the introduction of additional facilities:  the Term Auction Facility ("TAF"), announced December 12, 2007;  the Term Securities Lending Facility ("TSLF"), announced March 11, 2008; the Primary Dealer Credit Facility ("PDCF"), announced March 16, 2008; the Term Securities Lending Facilities Options Program ("TOP"), announced July 30, 2008; the Asset-Backed Commercial Paper Money Market Fund Liquidity Facility ("AMLF"), announced September 19, 2008; the Commercial Paper Funding Facility ("CPFF"), announced October 7, 2008; the Money Market Investor Funding Facility ("MMIFF"), announced October 21, 2008; and the Term Asset-Backed Securities Loan Facility ("TALF"), announced November 25, 2008.  They also include the provision of emergency liquidity to JPMorgan Chase & Co. with respect to Bear Stearns (announced in March 2008) and to AIG (announced in September and October 2008, and subsequently modified in November 2008) and transitional credit extensions to U.S. and London broker-dealer subsidiaries of Goldman Sachs, Morgan Stanley, and Merrill Lynch (announced September 21, 2008).

[7] The facilities are a crucial component in addressing systemic risk and stability issues.  Authorization, establishment, and administration of these facilities involve both the public and private components of the Federal Reserve System.  For instance, section 13(3) of the Federal Reserve Act (12 U.S.C. § 343), which provides the statutory basis for several of the liquidity facilities, permits the Board, in unusual and exigent circumstances, to authorize Federal Reserve Banks to expand their lending powers by extending credit to individuals, partnerships, and corporations that the Reserve Banks determine are unable to obtain adequate credit accommodations from other banking institutions.  Transactional documents, collateral-specific details, and lending data are gathered and maintained by and at the Federal Reserve Banks, much as commercial lenders gather and maintain documents on individual lending transactions.  As necessary for monetary policy purposes, Board staff access or receive and evaluate select aggregate data (typically, high level and market-oriented) on Reserve Bank lending activity, maintained and derived from Reserve Bank proprietary systems.

[8] Terms and conditions governing the TAF are located at:  http://www.federalreserve.gov/monetarypolicy/files/TAFtermsandconditions.pdf.  TAF auction results, including rates, are at http://www.federalreserve.gov/monetarypolicy/taf.htm.  TSLF terms and conditions are at:  http://www.newyorkfed.org/markets/tslf_terms.html.  TSLF auction results, including rates, are at http://www.newyorkfed.org/markets/tslf/termseclending.cfm.  PDCF terms and conditions may be found at:  http://www.newyorkfed.org/markets/pdcf_terms.html.  The PDCF rate is equal to the primary credit rate.  Terms and conditions governing the TOP may be found at:  http://www.newyorkfed.org/markets/top_terms.html.  TOP auction results and other relevant data may be found at:  http://www.newyorkfed.org/markets/top/topseclending.cfm.  Information on the terms and conditions of the AMLF is available at: http://www.frbdiscountwindow.org/mmmftc.cfm?hdrID=14&dtlID.  Terms, conditions, rates, and other information on the CPFF is available at:  http://www.newyorkfed.org/markets/cpff.html.  Information on the MMIFF, including terms and conditions, is available at:  http://www.newyorkfed.org/markets/mmiff.html.  The MMIFF became operational in late November 2008.  Terms and conditions governing the TALF are located at:  http://www.newyorkfed.org/markets/talf_terms.html.  The TALF is scheduled to become operational in February 2009.  Detailed information on the JPMC/BS and AIG facilities, respectively, is available through the following links:

-4-

In addition to the information and data described above that are available to you and others on the Board's public website and that of the FRBNY, you seek transaction level information (identity of, and amounts borrowed and specific collateral pledged by, individual participants) regarding the commercial and financial arrangements between the Federal Reserve Banks and third-party financial services provided pursuant to FOMC directives and under the DW and facilities authorized and established to address unprecedented disruptions in the markets. Within the context described infra in note 7, staff a searched Board records and located documents that are responsive, in part, to items 1 and 2 of your request. These consist of daily reports (averaging approximately 90 pages per day) for September and October 2008, and November 14, 2008 (the time periods and date identified in your request) with information on the DW, TAF, PDCF, AMLF, CPFF, AIG, and JPMC/BS facilities. Together, the reports identify participants by facility, the originating Federal Reserve Bank district, individual loan amounts per borrower, and origination and maturity dates. Staff also located portions (less than one page) of two documents (draft procedures for monitoring collateral requirements on long-term loans under the TAF) which include, for illustrative purposes, the names of a few borrowers and the loan amounts outstanding, among other data. I have determined that this information contains or consists of the following kinds of exempt information: trade secrets and commercial or financial information obtained from a person and privileged or confidential; and inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. Such information will be withheld from you under authority of exemptions 4 and 5 of the Act, respectively, 5 U.S.C. §§ 552(b)(4) and (b)(5). The documents containing this information have been reviewed under the requirements of subsection (b) of the Act, 5 U.S.C. § 552(b), but no reasonably segregable nonexempt information was found.

In making this determination, I am mindful that as market conditions have deteriorated, lending under the DW and emergency facilities has dramatically increased. This has led to increasing calls by the media, members of Congress, and the public for enhanced transparency, with disclosure characterized as especially important given the interests of and risks to taxpayers.

While the Board strongly supports transparency (as evidenced, in part, by its publication of extensive information on DW and emergency operations of the Federal Reserve Banks), the Board also has a legal obligation under the FOIA to consider the significant adverse consequences that release of responsive information would have on the effectiveness of Federal Reserve Bank lending activity in addressing liquidity strains of financial markets and institutions and the potential adverse effects on the economy now and in the future. The Board also has to be and is mindful of the commercial and

---

http://search.newyorkfed.org/search/frbny.jsp?querybox=Bear+Stearns and

http://www.newyorkfed.org/newsevents/aig_loan.html. Information on the transitional credit extensions is available at: http://www.federalreserve.gov/newsevents/press/bcreg/20080921a.htm. The weekly H.4.1 statistical release, referenced in note 5, above, captures aggregate data on Federal Reserve Bank lending. The historical data provide aggregate borrowing data by category.

The Emergency Economic Stabilization Act (EESA) included provisions that further enhance the transparency and public accountability associated with Federal Reserve lending programs. The EESA requires that the Federal Reserve report to Congress on a regular basis regarding any exercise of its emergency lending authorities under section 13(3) of the Federal Reserve Act. These reports must include a justification for exercising the authority, the terms of any actions under the authority, and an assessment of the expected cost to the taxpayer of exercising the authority. The Federal Reserve fully supports the goals of this additional reporting and has submitted several reports to Congress to date.

-5-

financial interests of borrowers, the institutions whose collateral secures the borrowings, and the financial integrity of the Federal Reserve Banks.[9]

In the experience of the Board and the Federal Reserve Banks, institutions that may potentially borrow from the DW recognize that counterparties and market analysts may draw adverse inferences about their financial health if the institutions turn to the window, and, for that reason, such institutions can be extremely concerned about the stigma of borrowing at the window. Indeed, if institutions perceive any chance that their DW borrowing might be revealed to the public, they may avoid borrowing at virtually any cost. Such behavior tends to exacerbate strains in financial markets. Confidentiality of data concerning individual transactions thus is considered essential to ensuring that DW operations are utilized, proceed smoothly, and achieve their intended purpose. Confidentiality of these data also protects both borrowers and the Federal Reserve Banks against substantial commercial or financial harm.

These sensitivities are especially acute with respect to lending under emergency facilities. Certain of the emergency facilities have been designed and implemented in a manner intended to mitigate the stigma associated with resort to DW lending. This has been especially important considering the extraordinary liquidity conditions in the market and the crucial role of these facilities in addressing those conditions. Nevertheless, anecdotal evidence suggests that material concerns remain about public disclosure of borrowers' reliance on these facilities. The effectiveness of these facilities depends critically on the willingness of individual borrowers to utilize them. Publishing information about individual borrowers would deter usage of the liquidity facilities and undermine the ability of these programs to address severe strains in financial markets and foster a return to strong economic growth. It also would harm individual borrowers' competitiveness and materially impede the ability of the Federal Reserve Banks to maximize recovery on posted collateral (and, thus, ultimately to provide maximum protection to taxpayers).

We are facing an unprecedented crisis, with market events moving rapidly and unpredictably. As we have seen throughout this crisis, the loss of confidence in and between financial institutions can occur with lightning speed and devastating effects. The Board has had to work to stabilize financial markets, reduce systemic risk, and avoid broader economic contagion which could have disastrous effects on individual taxpayers. Credit markets largely have been frozen, denying businesses and consumers access to vital funding and credit. Financial institutions have been under extreme pressure, and investor confidence in our system has been dangerously low. Thus, notwithstanding calls for enhanced transparency, the Board must protect against the substantial, multiple harms that might result from disclosure. In its considered judgment and in view of current circumstances, it would be a dangerous step to release this otherwise confidential information.

With respect to item 3 of your request and those portions of items 1 and 2 that are not addressed above, staff searched Board records and made suitable inquiries but did not locate any information within the control of the Board that is responsive to your request. Accordingly, we cannot provide you with this information. A determination that no responsive records exist is considered to be an "adverse determination" under the Act. You may appeal this determination as set forth below.

---

[9] In fact, confidentiality in this instance ultimately advances the interests of taxpayers, preserving the integrity and effectiveness of financial stability measures and, in the long term, preserving an opportunity for maximum recovery by the Federal Reserve Banks in the event of default by individual borrowers.

-6-

Your request for information is denied for the reasons stated above. If you believe you have a legal right to any information that is being withheld, or if you believe that the determination of no responsive Board records is incorrect, you may appeal either or both of these determinations in accordance with section 261.13(i) of the Board's Rules Regarding Availability of Information, a copy of which is enclosed for your information.

Very truly yours,

Jennifer J. Johnson
Secretary of the Board

Enclosure

cc:    Steven G. Mintz, Esq.
       Mintz & Gold LLP

# Exhibit H



BOARD OF GOVERNORS
OF THE
**FEDERAL RESERVE SYSTEM**
WASHINGTON, D. C. 20551

ADDRESS OFFICIAL CORRESPONDENCE
TO THE BOARD

January 16, 2009

Mr. Bruce Becker
Vice President, Washington Bureau Chief
Fox Business News
400 N. Capitol Street NW, Suite 550
Washington, D.C. 20001

Dear Mr. Becker:

This is in response to your e-mail message dated November 10, 2008 and letter dated November 18, 2008, received on those respective dates by the Board's Freedom of Information office. Pursuant to the Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552, you request, for the period August 8, 2007, through November 14, 2008, the names of institutions participating in any and all Federal Reserve lending programs, including:

Regular OMOs; Single Tranche OMO Program; Discount Window; Term Discount Window Program; Term Auction Facility; Primary Dealer Credit Facility; Transitional Credit Extensions; ABCP Money Market Fund Liquidity Facility; Securities Lending; Term Securities Lending Facility; and the Term Securities Lending Facilities Options Program.

You also request "an accounting of the collateral provided by these institutions in exchange for the lending."[1]

As you know, the Board and the Federal Reserve Banks publish and regularly update information on Federal Reserve lending activities.[2] Open market operations are the Federal Reserve's principal tool for implementing monetary policy. The short-term objective for open market operations ("OMOs") is specified by the Federal Open Market Committee ("FOMC"), and OMOs are arranged by the Domestic Trading Desk at the Federal Reserve Bank of New York (the "Desk"). Operations are

---

[1] We interpret your request as seeking detailed information regarding specific items pledged as collateral by specific borrowers for specific borrowings, rather than as seeking information on the general categories or types of collateral actually pledged. As discussed infra, information on types or categories securities eligible for posting as security for each of the facilities is publicly available on the websites of the Board and the Federal Reserve Bank of New York.

[2] A summary of all forms of Federal Reserve Bank lending to financial institutions may be found at the following link: http://www.newyorkfed.org/markets/Forms_of_Fed_Lending.pdf. Among other things, this chart identifies eligible participants, eligible collateral, general loan terms, the administering Federal Reserve Bank(s), and the scope and frequency of publicly reported statistics.

-2-

conducted in domestic securities, primarily U.S. Treasury and federal agency securities, principally with primary securities dealers. Information on the terms, rates, and conditions of OMOs, specific OMO operations, and the identity of primary dealers is accessible through the public website of the Federal Reserve Bank of New York ("FRBNY").[3]

Discount window ("DW") lending is a commercial and financial transaction between the Federal Reserve Banks and individual depository institutions that is used by depository institutions to manage their reserves and liquidity. DW lending helps relieve liquidity strains in a depository institution and in the banking system as a whole. Extensive information on the terms, rates, and conditions of DW operations is accessible through the Board's public website and the public websites of the Federal Reserve Banks.[4]

The Board and the Federal Reserve Banks also publish extensive information on their respective public websites on recent changes to the Federal Reserve's liquidity provisions, including modifications to the DW and emergency liquidity facilities authorized by the Board and established and administered by the Federal Reserve Banks (principally, the FRBNY).[5] As these resources explain, these facilities

---

[3]This information is available through the following link: http://www.newyorkfed.org/markets/openmarket.html. Information on the Securities Lending program for primary dealers, including program terms and conditions and operational results, is available at: http://www.newyorkfed.org/markets/securitieslending.html. On March 7, 2008, the Federal Reserve announced that the Desk would expand its conventional OMOs by conducting a series of weekly, single tranche repurchase transactions with primary dealers posting as collateral any of the types of securities that are eligible as collateral in conventional OMO repurchase operations. Information on the terms and conditions and results of these so-called Single Tranche OMOs also is available on the public website of the FRBNY, at:
http://www.newyorkfed.org/markets/operating_policy_030708.html and
http://www.newyorkfed.org/markets/omo/dmm/temp.cfm. On November 25, 2008, the Federal Reserve announced that it would initiate a program to purchase agency mortgage-backed securities. The program became operational on January 5, 2009, and is being managed at the direction of the FOMC by the FRBNY. Information on this program is available at: http://www.newyorkfed.org/markets/gses_faq.html.

[4] At www.frbdiscountwindow.org, you will find, among other information, descriptions of the purposes, functions, and mechanics of the DW; relevant statutory provisions and regulations pursuant to which DW lending is authorized and conducted; operating circulars issued by the Federal Reserve Banks governing the general terms and conditions, including applicable rates, terms, and eligible collateral; form agreements; and collateral margins tables. Each week, the Board publishes aggregate data on Federal Reserve Bank lending under the DW, as part of the H.4.1 statistical release, "Factors Affecting Reserve Balances of Depository Institutions and Condition Statement of Federal Reserve Banks" (see http://www.federalreserve.gov/releases/h41/). The Board also publishes historical lending data (see http://www.federalreserve.gov/releases/h41/hist/h41hist5.txt).

[5] See, e.g., http://www.federalreserve.gov/newsevents/recentactions.htm and
http://www.newyorkfed.org/markets/Understanding_Fed_Lending.html. Changes include substantial modifications to the terms of the primary credit program of the DW and the introduction of additional facilities: the Term Auction Facility ("TAF"), announced December 12, 2007; the Term Securities Lending Facility ("TSLF"), announced March 11, 2008; the Primary Dealer Credit Facility ("PDCF"), announced March 16, 2008; the Term Securities Lending Facilities Options Program ("TOP"), announced July 30, 2008; the Asset-Backed Commercial Paper Money Market Fund Liquidity Facility ("AMLF"), announced September 19, 2008; the Commercial Paper Funding Facility ("CPFF"), announced October 7, 2008; the Money Market Investor Funding Facility ("MMIFF"), announced October 21, 2008; and the Term Asset-Backed Securities Loan Facility ("TALF"), announced November 25, 2008. They also include the provision of emergency liquidity to JPMorgan Chase & Co. with respect to Bear Stearns (announced in March 2008) and to AIG (announced in September and October 2008, and subsequently modified in November 2008) and transitional credit extensions to U.S. and London broker-dealer subsidiaries of Goldman Sachs, Morgan Stanley, and Merrill Lynch (announced September 21, 2008).

have been introduced incrementally since August 2007, in response to changing market conditions, with the common objectives of reducing risks to financial stability and strengthening the effectiveness of monetary policy in addressing risks to the outlook for growth and inflation.[6] In general, the suite of facilities now in place is designed to enable a set of institutions that play an important role in financial markets to access liquidity from the Federal Reserve Banks against collateral they normally would be able to finance easily with other financial market participants. By giving these institutions more confidence in their access to current and future funding, these facilities are intended to reduce the incentives these institutions otherwise would face in these exceptionally challenging market conditions to take actions that might exacerbate pressure on market functioning. These facilities also should improve the institutions' ability to extend funding to their customers and counterparties. The Board and FRBNY publish extensive information on the terms, rates, and conditions of the emergency liquidity facilities.[7]

---

[6] The facilities are a crucial component in addressing systemic risk and stability issues. Authorization, establishment, and administration of these facilities involve both the public and private components of the Federal Reserve System. For instance, section 13(3) of the Federal Reserve Act (12 U.S.C. § 343), which provides the statutory basis for several of the liquidity facilities, permits the Board, in unusual and exigent circumstances, to authorize Federal Reserve Banks to expand their lending powers by extending credit to individuals, partnerships, and corporations that the Reserve Banks determine are unable to obtain adequate credit accommodations from other banking institutions. Transactional documents, collateral-specific details, and lending data are gathered and maintained by and at the Federal Reserve Banks, much as commercial lenders gather and maintain documents on individual lending transactions. As necessary for monetary policy purposes, Board staff access or receive and evaluate select aggregate data (typically, high level and market-oriented) on Reserve Bank lending activity, maintained and derived from Reserve Bank proprietary systems.

[7] Terms and conditions governing the TAF are located at:
http://www.federalreserve.gov/monetarypolicy/files/TAFtermsandconditions.pdf. TAF auction results, including rates, are at http://www.federalreserve.gov/monetarypolicy/taf.htm. TSLF terms and conditions are at:
http://www.newyorkfed.org/markets/tslf_terms.html. TSLF auction results, including rates, are at
http://www.newyorkfed.org/markets/tslf/termseclending.cfm. PDCF terms and conditions may be found at:
http://www.newyorkfed.org/markets/pdcf_terms.html. The PDCF rate is equal to the primary credit rate. Terms and conditions governing the TOP may be found at: http://www.newyorkfed.org/markets/top_terms.html. TOP auction results and other relevant data may be found at: http://www.newyorkfed.org/markets/top/topseclending.cfm. Information on the terms and conditions of the AMLF is available at: http://www.frbdiscountwindow.org/mmmftc.cfm?hdrID=14&dtlID. Terms, conditions, rates, and other information on the CPFF is available at: http://www.newyorkfed.org/markets/cpff.html. Information on the MMIFF, including terms and conditions, is available at: http://www.newyorkfed.org/markets/mmiff.html. The MMIFF became operational in late November 2008. Terms and conditions governing the TALF are located at: http://www.newyorkfed.org/markets/talf_terms.html. The TALF is scheduled to become operational in February 2009. Detailed information on the JPMC/BS and AIG facilities, respectively, is available through the following links: http://search.newyorkfed.org/search/frbnv.jsp?querybox=Bear+Stearns and
http://www.newyorkfed.org/newsevents/aig_loan.html. Information on the transitional credit extensions is available at: http://www.federalreserve.gov/newsevents/press/bcreg/20080921a.htm. The weekly H.4.1 statistical release, referenced in note 5, above, captures aggregate data on Federal Reserve Bank lending. The historical data provide aggregate borrowing data by category.

The Emergency Economic Stabilization Act (EESA) included provisions that further enhance the transparency and public accountability associated with Federal Reserve lending programs. The EESA requires that the Federal Reserve report to Congress on a regular basis regarding any exercise of its emergency lending authorities under section 13(3) of the Federal Reserve Act. These reports must include a justification for exercising the authority, the terms of any actions under the authority, and an assessment of the expected cost to the taxpayer of exercising the authority. The Federal Reserve fully supports the goals of this additional reporting and has submitted several reports to Congress to date.

In addition to the information and data described above that are available to you and others on the Board's public website and that of the FRBNY, you seek transaction level information (identity of, and specific collateral pledged by, individual participants) regarding the commercial and financial arrangements between the Federal Reserve Banks and third-party financial services provided pursuant to FOMC directives and under the DW and facilities authorized and established to address unprecedented disruptions in the markets. Within the context described in note 7, staff searched Board records and located documents that are responsive, in part, to items 1 and 2 of your request. These consist of daily reports for August 8, 2007, through November 17, 2008 (the time period identified in your request) with information on the DW, TAF, PDCF, AMLF, CPFF, AIG, and JPMC/BS facilities.[8] Together, the reports identify participants by facility and the originating Federal Reserve Bank district, among other details. Staff also located portions (less than one page) of two documents (draft procedures for monitoring collateral requirements on long-term loans under the TAF) which include, for illustrative purposes, the names of a few borrowers, among other data. I have determined that this information contains or consists of the following kinds of exempt information: trade secrets and commercial or financial information obtained from a person and privileged or confidential; and inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency. Such information will be withheld from you under authority of exemptions 4 and 5 of the Act, respectively, 5 U.S.C. §§ 552(b)(4) and (b)(5). The documents containing this information have been reviewed under the requirements of subsection (b) of the Act, 5 U.S.C. § 552(b), but no reasonably segregable nonexempt information was found.

In making this determination, I am mindful that as market conditions have deteriorated, lending under the DW and emergency facilities has dramatically increased. This has led to increasing calls by the media, members of Congress, and the public for enhanced transparency, with disclosure characterized as especially important given the interests of and risks to taxpayers.

While the Board strongly supports transparency (as evidenced, in part, by its publication of extensive information on DW and emergency operations of the Federal Reserve Banks), the Board also has a legal obligation under the FOIA to consider the significant adverse consequences that release of responsive information would have on the effectiveness of Federal Reserve Bank lending activity in addressing liquidity strains of financial markets and institutions and the potential adverse effects on the economy now and in the future. The Board also has to be and is mindful of the commercial and financial interests of borrowers, the institutions whose collateral secures the borrowings, and the financial integrity of the Federal Reserve Banks.[9]

---

[8] The reports were initiated on August 20, 2007, pursuant to changes to discount window policy effective August 17. For the period August 20, 2007, through February 8, 2008, there was a single report, averaging approximately one page per working day. Beginning on February 11, 2008, the single report was split into two: one showing originations for the previous working day and the other showing borrowings by date of maturity. For the remainder of February 2008, the reports together averaged two pages per working day. Between March and September 18, 2008, the daily average combined length of the reports increased from three to 29 pages. On September 19, 2008, another report was added, showing borrowings under each facility authorized by the Board and established by the Federal Reserve Bank of New York under section 13(3) of the Federal Reserve Act. From that date through November 17, 2008, the total combined length of the three reports averaged approximately 90 pages per working day, primarily as a result of an increase in the length of the borrowings-to-maturing report.

[9] In fact, confidentiality in this instance ultimately advances the interests of taxpayers, preserving the integrity and effectiveness of financial stability measures and, in the long term, preserving an opportunity for maximum recovery by the Federal Reserve Banks in the event of default by individual borrowers.

-5-

In the experience of the Board and the Federal Reserve Banks, institutions that may potentially borrow from the DW recognize that counterparties and market analysts may draw adverse inferences about their financial health if the institutions turn to the window, and, for that reason, such institutions can be extremely concerned about the stigma of borrowing at the window. Indeed, if institutions perceive any chance that their DW borrowing might be revealed to the public, they may avoid borrowing at virtually any cost. Such behavior tends to exacerbate strains in financial markets. Confidentiality of data concerning individual transactions thus is considered essential to ensuring that DW operations are utilized, proceed smoothly, and achieve their intended purpose. Confidentiality of these data also protects both borrowers and the Federal Reserve Banks against substantial commercial or financial harm.

These sensitivities are especially acute with respect to lending under emergency facilities. Certain of the emergency facilities have been designed and implemented in a manner intended to mitigate the stigma associated with resort to DW lending. This has been especially important considering the extraordinary liquidity conditions in the market and the crucial role of these facilities in addressing those conditions. Nevertheless, anecdotal evidence suggests that material concerns remain about public disclosure of borrowers' reliance on these facilities. The effectiveness of these facilities depends critically on the willingness of individual borrowers to utilize them. Publishing information about individual borrowers would deter usage of the liquidity facilities and undermine the ability of these programs to address severe strains in financial markets and foster a return to strong economic growth. It also would harm individual borrowers' competitiveness and materially impede the ability of the Federal Reserve Banks to maximize recovery on posted collateral (and, thus, ultimately to provide maximum protection to taxpayers).

We are facing an unprecedented crisis, with market events moving rapidly and unpredictably. As we have seen throughout this crisis, the loss of confidence in and between financial institutions can occur with lightning speed and devastating effects. The Board has had to work to stabilize financial markets, reduce systemic risk, and avoid broader economic contagion which could have disastrous effects on individual taxpayers. Credit markets largely have been frozen, denying businesses and consumers access to vital funding and credit. Financial institutions have been under extreme pressure, and investor confidence in our system has been dangerously low. Thus, notwithstanding calls for enhanced transparency, the Board must protect against the substantial, multiple harms that might result from disclosure. In its considered judgment and in view of current circumstances, it would be a dangerous step to release this otherwise confidential information.

With respect to those portions of items 1 and 2 that are not addressed above, staff searched Board records and made suitable inquiries but did not locate any information within the control of the Board that is responsive to your request. Accordingly, we cannot provide you with this information. A determination that no responsive records exist is considered to be an "adverse determination" under the Act. You may appeal this determination as set forth below.

Your request for information is denied for the reasons stated above. If you believe you have a legal right to any information that is being withheld, or if you believe that the determination of no responsive Board records is incorrect, you may appeal either or both of these determinations in

-6-

accordance with section 261.13(i) of the Board's Rules Regarding Availability of Information, a copy of which is enclosed for your information.

Very truly yours,

Jennifer J. Johnson
Secretary of the Board

Enclosure

# Exhibit I

## SUPPLEMENTAL INDEX OF WITHHELD MATERIAL

### March 27, 2009

### Fox News FOIA Request 2009-73, November 10, 2008 ("First FOIA Request") and

### Fox News FOIA Request 2009-106, Nov. 18, 2008 ("Second FOIA Request")

**Document Category 5**

| | |
|---|---|
| **Title:** | **Daily Primary Dealer Credit Facility Collateral Report ("Daily PDCF Collateral Report") and transmittal e-mails.** |
| **From:** | **Prepared by the FRBNY and sent by e-mail to a Board officer who serves as the Board's liaison for Chairman Bernanke to the President's Working Group. The Daily PDCF Collateral Reports are internally classified as "F.R. Restricted," and are highly confidential. Distribution at the FRBNY and the Board is strictly limited on a need to know basis.** |
| **Pages:** | **Forty seven Reports totaling approximately 475 pages of mainly non-responsive information. Responsive information on the Reports (described below) totals approximately 47 pages. There is additional, cumulative responsive information (along with non-responsive information) on 41 pages of the transmittal e-mails, for a total of approximately 88 pages (containing responsive and non-responsive information) withheld. Responsive information is to an extent cumulative of information in the Reports described on the <u>Vaughn</u> Indices filed in U.S. District Court for the Southern District of New York in this action on February 19, 2009.** |
| **Dates :** | **Various dates between March 2008 and November 2008, with most Reports falling between September and October, 2008.** |

| Description of Reports and e-mails and Basis for Withholding | Exemption(s) |
|---|---|
| Each Daily PDCF Collateral Report contains some limited information responsive in part to the First and Second FOIA Requests, in particular, the names of primary dealers receiving loans at the PDCF on dates listed in the Reports, the amount of overnight borrowing by each primary dealer, and total borrowings by each primary dealer on specific dates. In addition, 41 of the transmittal e-mails contained limited responsive information (along with non-responsive information) which is cumulative of information on the Reports. The remainder of information in the Reports and e-mails (the majority of information) is non-responsive. The | 4, 5 |

| | |
|---|---|
| Reports and e-mails do not contain responsive information regarding specific collateral pledged for any loan. The Reports and e-mails are prepared by the FRBNY using information obtained and derived from transactions with primary dealers, and transmitted to one Board officer by e-mail, as described above. The Board officer reported not having opened or reviewed most of the Reports and e-mails. It was not possible to tell, however, which Reports had been opened and which had not. Accordingly, the defendant has included responsive portions of the Reports and e-mails among agency records in this litigation out of an abundance of caution. Information in the Reports and e-mails is highly confidential, and is not released to the public. The Reports and e-mails contain no reasonably segregable, responsive non-exempt information. Responsive portions of the Reports and e-mails are being withheld in their entirety under FOIA exemption 4 because they contain trade secrets and commercial or financial information obtained from a person and privileged or confidential, public disclosure of which is likely to cause substantial competitive harm to the borrowing institutions, or to impair the Board's ability to fulfill statutory functions. In addition, responsive portions of the Reports and e-mails are being withheld in full under FOIA exemption 5 because they are inter-agency or intra-agency memoranda which contain sensitive information, not otherwise available, immediate release of which would significantly harm the Government's monetary functions or commercial interests. | |

**Document Category 6**

**Title:**      **E-mails**

**From:**      **From the FRBNY to a Board officer who serves as the Board's liaison for Chairman Bernanke to the President's Working Group.**

**Total Pages: Approximately 163 pages of e-mails, containing responsive and non-responsive information. Responsive information appears on approximately 90 pages.**

**Dates:**      **Various dates between March 2008 and November 2008**

| Description of e-mails  and Basis for Withholding | Exemption(s) |
|---|---|
| One group of e-mails (separate from the e-mails described in category 5 above) reports on the liquidity position of specific financial institutions, and sometimes includes references to specific PDCF borrowings by affiliated primary dealers. | 4, 5 |

2

These references are responsive to the First and Second FOIA Requests, and the remainder of information in this group of e-mails is non-responsive. A second, separate group of e-mails contains responsive references to intra- and end-of-the day borrowings by specific primary dealers at the PDCF, and loan amounts. The remainder of information in these two groups of e-mails is non-responsive. The Board officer reported not having opened or reviewed most of the two groups of e-mails and attachments. It was not possible to tell, however, which e-mails had been opened and which had not. Accordingly, the defendant has included them among agency records in this litigation out of an abundance of caution. The e-mails are highly confidential, and information in them is not released to the public. The e-mails contain no reasonably segregable, responsive non-exempt information. Responsive portions of the e-mails are being withheld in their entirety under FOIA exemption 4 because they contain trade secrets and commercial or financial information obtained from a person and privileged or confidential, public disclosure of which is likely to cause substantial competitive harm to the borrowing institutions, or to impair the Board's ability to fulfill statutory functions. In addition, responsive portions of the e- mails are being withheld in full under FOIA exemption 5 because they are inter-agency or intra-agency memoranda which contain sensitive information, not otherwise available, immediate release of which would significantly harm the Government's monetary functions or commercial interests.