UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
FOX NEWS NETWORK, LLC,                    :
                                          :
                    Plaintiff,            :  Case No. 09 CV 00272 (AKH)
                                          :
         -against-                        :
                                          :
BOARD OF GOVERNORS OF THE                 :
FEDERAL RESERVE SYSTEM,                   :
                                          :
                    Defendant.            :
-----------------------------------------------------x

## DECLARATION OF JACQUELINE P. PALLADINO

**JACQUELINE P. PALLADINO**, being duly sworn, says:

1. I am a Vice President in the Supervision, Regulation, and Credit Department at the Federal Reserve Bank of Boston (the "Boston Fed" or the "Bank"). I submit this affidavit in support of the motion for summary judgment submitted by the Board of Governors of the Federal Reserve System (the "Board of Governors") in the above-referenced matter. I have personal knowledge of the matters set forth herein.

2. I have worked in the Supervision, Regulation, and Credit Department of the Boston Fed since December 1988. I am responsible for overseeing the Credit, Risk Management, Statistics, and Analytics Unit, which includes the Discount Window, Payments System Risk/Account Management, Surveillance, Regulatory Applications, Statistics, and Business Continuity functions. Prior to becoming the Vice President over the Credit, Risk Management, Statistics, and Analytics Unit, I served as the Boston Fed's Enterprise Risk Management officer and concurrently had responsibility for managing the Supervision, Regulation, and Credit Department's support service functions, and prior to that I held positions

in the Regulatory Applications, Surveillance, and Quantitative Analysis Units of the Supervision, Regulation and Credit Department.

3.      I received a Bachelor of Science degree from Union College, Schenectady, New York, in 1986 and a Masters in Business Administration from Northeastern University, Boston, Massachusetts, in 1988.

4.      I have been informed that the Board of Governors received a request pursuant to the Freedom of Information Act seeking documents relating to, among other things, the Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility (the "AMLF"). As one of the officers at the Boston Fed responsible for the oversight of the AMLF, I am familiar with how it operates, how it is managed and what records are kept at the Boston Fed.

**The Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility**

5.      On September 19, 2008, the Board of Governors authorized the Boston Fed to create the AMLF to promote liquidity in the asset-backed commercial paper ("ABCP") market and thereby enable Money Market Mutual Funds ("MMMF") to sell ABCP to fund customer redemption requests. In the days preceding initiation of the AMLF, some MMMFs experienced significant demands for redemptions by investors. In ordinary circumstances, these MMMFs would have been able to meet those demands by selling assets. In mid- to late-September of 2008, however, many money markets, including the ABCP market, had become extremely illiquid. The AMLF was established to address this illiquidity in the money markets and to facilitate MMMF redemptions. The AMLF was created as a temporary emergency measure and was originally scheduled to terminate on January 30, 2009, but has been extended twice and is currently set to expire on October 30, 2009.

6.      The AMLF is authorized under Section 13(3) of the Federal Reserve Act, which permits the Board of Governors, in unusual and exigent circumstances, to authorize Federal Reserve Banks to extend credit to individuals, partnerships, and corporations that are unable to obtain adequate credit accommodations. It also is authorized under Section 10B of the Federal Reserve Act, which authorizes Federal Reserve Banks to make advances to depository institutions. The program is administered through the Boston Fed's Discount Window.

7.      The AMLF was designed by the Boston Fed, and extends non-recourse loans at the primary credit rate to U.S. depository institutions, bank holding companies (parent companies or U.S. broker-dealer affiliates), and U.S. branches and agencies of foreign banks (the "AMLF Participants") to finance the purchases of high-quality ABCP from MMMFs. This program is intended to assist MMMFs that hold such paper in meeting demands for redemptions by investors and to foster liquidity in the ABCP markets and broader money markets. AMLF Participants must post ABCP purchased from an MMMF as collateral in order to obtain a loan under the AMLF. The types of ABCP eligible to be pledged are determined by the Boston Fed. Other eligibility criteria and additional information about the program are posted on the Federal Reserve's discount window website at http://www.frbdiscountwindow.org/mmmftc.cfm.

8.      AMLF advances are non-recourse to the Boston Fed. Consequently, once an AMLF Participant has borrowed under the facility, it is at no risk of loss on the eligible ABCP unless the ABCP is deemed to be non-conforming.

9.      Procedurally, each day, an AMLF Participant that wants to borrow from the AMLF contacts the Boston Fed to receive approval of ABCP it plans to purchase from an MMMF. The Boston Fed verifies that the ABCP meets AMLF eligibility criteria and then

instructs the AMLF Participant to transfer the ABCP to the Boston Fed's restricted account at Depository Trust Company (the "DTC Account"). Once the Boston Fed receives notice that the ABCP has been pledged to the DTC Account, it credits the loan amount to the Federal Reserve Bank account of the AMLF Participant or its correspondent.

10. On the ABCP maturity date, the Boston Fed will debit the Federal Reserve Bank account that was credited with the loan proceeds for the amount of the loan plus accrued interest and the AMLF Participant will withdraw the maturing ABCP from the DTC Account. If the issuer of the ABCP defaults and the AMLF Participant provides the requisite notice to the Boston Fed, the Boston Fed will make reversing entries to return the amount of the loan plus accrued interest to the AMLF Participant and take ownership and possession of the defaulted ABCP. The Boston Fed will pursue recoveries of defaulted ABCP.

11. Aggregate information on AMLF borrowing is published each Thursday in the Board of Governors' H.4.1 Statistical Release, which is available on the Board of Governors' website. The release shows the total amount of AMLF credit outstanding as of the close of business on the prior Wednesday and the average daily amounts for each week.

12. Although the AMLF was authorized by the Board of Governors, the Board of Governors does not have a role in the daily operations of the AMLF. The Board of Governors approved the basic parameters of the program and the Board of Governors has oversight responsibility for the AMLF as part of its general oversight responsibilities for all Federal Reserve Bank operations. But the Board of Governors is not involved in the daily operations of the AMLF; those operations are handled by and conducted at the Boston Fed

13. AMLF Participants provide the Boston Fed with spreadsheets that contain security-level information on the collateral pledged by each borrower (e.g., CUSIP, rating,

amortized cost). The Boston Fed stores the data it receives from the AMLF Participants in a secure electronic database maintained at the Boston Fed. The Boston Fed generates various reports and spreadsheets based on the information it receives from the AMLF Participant. Information and documents relating to the AMLF are maintained by the Boston Fed. They are highly confidential and are not made available to anyone outside of the Boston Fed and, even within the Boston Fed, access to the records is on a need-to-know and limited basis. The Boston Fed does, however, provide select members and staff of the Board of Governors with daily reports on AMLF borrowing, which includes, among other information, the names of the AMLF Participants that have borrowed from the AMLF, individual loan amounts and maturity dates, and aggregate outstanding balance for each AMLF Participant. The interest rate for AMLF loans is the primary credit rate; however, because the date individual loans are made is not public, the interest rate paid on specific loans also is non-public.

**Disclosure of Information**

14. I have been informed that the Board of Governors has received two requests pursuant to the Freedom of Information Act seeking various documents relating to, among other things, the names of institutions receiving Federal Reserve lending from August 8, 2007 through November 14, 2008, the collateral pledged by these institutions for the loans, the amount borrowed or advanced to the institutions, and all collateral held by the Federal Reserve at the close of business on November 14, 2008.. I understand that these requests seek information concerning specific collateral posted for these loans, the identities of the borrowers, and specific amounts advanced to each borrower..

15. The information being requested is highly sensitive and confidential commercial information. The AMLF is administered through the Boston Fed's Discount Window. There is

an explicit understanding amongst the Boston Fed and the institutions that borrow at the Discount Window that information relating to the Discount Window will not be disclosed by the Boston Fed. Specifically, it is understood that the Boston Fed will keep confidential specific information relating to the loan, including the identity of the borrower, the amount of the loan, the collateral pledged and the interest rate of individual loans. Additionally, a Boston Fed public statement on the Federal Reserve System's Discount Window website relating to the AMLF specifically states that "[t]here will not be any public disclosure of the individual borrowers participating in this program or the amounts of individual advances made to the borrowers." See http://www.frbdiscountwindow.org/mmmf.cfm#f21. Release of this information in violation of this public statement would undercut institutions' confidence in Federal Reserve System statements and undermine the effectiveness of the Discount Window and Federal Reserve System monetary policy tools if institutions are unwilling to use the facilities for fear of public disclosure of specific loan information.

16. This understanding of confidentiality is very important to institutions that borrow from the Discount Window because of the stigma that is associated with borrowing from the "lender of last resort."

17. A borrower's competitive position could be severely harmed if the market became aware of the fact that the institution obtained funds at the Discount Window, including through the AMLF. Institutions borrowing at the Discount Window face competition in the market for retail and commercial banking services from other domestic and international institutions. If the name of an institution that borrowed from the Discount Window were to be made public by the Boston Fed, there is a real concern that market participants, including financial analysts, customers, and competitors of the borrowing institution, would draw adverse conclusions about

the borrowing institution that were based on conjecture and speculation. In particular, it could fuel speculation that the institution is experiencing liquidity strains, a shortage of capital, or is less financially sound than publicly reported.

18. These rumors have the potential to cause substantial competitive harm to institutions borrowing at the Discount Window because, in reaction to the rumors, customers could withdraw deposits and private lenders could accelerate loans or refuse to provide additional funding to the borrowing institution. This in turn would cause capital and liquidity strains, leaving the borrowing institution in a weakened position vis-à-vis its competitors. Such rumors and speculation about the health of institutions could quickly spiral into market turmoil, as has been apparent in recent months in the financial markets.

19. In addition to the likelihood of substantial competitive harm to the institutions borrowing at the Discount Window, if details regarding MMMFs that sold ABCP to AMLF Participants were publicly disclosed, there would also be a likelihood of substantial competitive harm to these MMMFs. This would occur because public disclosure of the collateral being pledged would fuel speculation regarding the soundness of the MMMFs. The market would question the financial condition of the MMMF based on the volume of ABCP sold to an AMLF Participant and pledged to secure AMLF advances and the fact that the MMMF seller was unable to readily sell the ABCP in private financial markets to fund redemption requests. MMMF customers would likely withdraw deposits and private lenders would likely accelerate loans or refuse to provide additional funding to the MMMF. This in turn would leave the MMMF in a weakened position vis-à-vis its competitors or cause it to suspend MMMF investors' right of redemptions per SEC rules, which could result in failure of the MMMF. While the speculation about an MMMF might have no basis in fact, such rumors and speculation about the health of

institutions could quickly spiral into market turmoil, as has been apparent in recent months in the financial markets.

20.     In addition to the likelihood of substantial competitive harm to the institutions borrowing at the Discount Window and the MMMFs that sold ABCP to AMLF Participants, if details regarding collateral posted as security by an individual institution were publicly disclosed there would also be a likelihood of substantial competitive harm to the ABCP programs that have been pledged as collateral (the "Issuers") for AMLF loans. This would occur because public disclosure of the collateral being pledged would fuel speculation regarding the soundness of the Issuers. The market would question the financial condition of the Issuers based on the volume of a particular ABCP program that was pledged and the fact that the MMMF seller was unable to readily sell the ABCP program in private financial markets. While the speculation about an Issuer might have no basis in fact, the rumors alone could place this Issuer in a weakened condition vis-à-vis its competitors and again create illiquidity in the ABCP market, particularly in these times of market stress.

21.     Public disclosure of details regarding which institutions are availing themselves of the AMLF would also cause substantial harm to the Boston Fed because disclosure would undermine the Boston Fed's ability to achieve its policy mandate and mission. If the names of these institutions were to become public, it would cause financial institutions to avoid using Federal Reserve System liquidity tools – even when needed – to alleviate market pressures, thus rendering the Boston Fed's policy tools ineffective. Without these policy tools, the Boston Fed would no longer be able to meet its mandate to promote orderly and well-functioning markets.

22.     Finally, public disclosure of details regarding AMLF Participants or the specific collateral pledged for AMLF loans would be disruptive to markets. Because the purpose of the

AMLF is to allow MMMFs to meet redemption demands by selling otherwise illiquid ABCP to AMLF Participants at amortized cost, the utility of the facility in providing liquidity to MMMFs and the ABCP market will be undermined if MMMFs or AMLF Participants are unwilling to use the facility for fear of public disclosure of specific loan information.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Boston, Massachusetts, on this 23rd day of March 2009.

*Jacqueline Palladino*
Jacqueline P. Palladino