**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
FOX NEWS NETWORK, LLC,                          :
                                                :
                                  Plaintiff,    :          Case No. 09-cv-00272 (AKH)
              -against-                         :
                                                :                ECF Case
BOARD OF GOVERNORS OF THE                       :
FEDERAL RESERVE SYSTEM,                         :
                                                :
                                  Defendant.    :
-------------------------------------------------------------X

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR**
**<u>SUMMARY JUDGMENT</u>**

**MINTZ & GOLD LLP**
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel:  (212) 696-4848
Fax:  (212) 696-1231
*Attorneys for Plaintiff*
*Fox News Network, LLC*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ......................................................................... 1

FACTS ................................................................................................................ 5

ARGUMENT ...................................................................................................... 12

I.     THE BOARD CONDUCTED AN INADEQUATE SEARCH FOR
RECORDS RESPONSIVE TO THE FOIA REQUESTS ....................................... 12

     A.     The Evidence Establishes Inconsistencies and Tangible Indications of
an Incomplete Search for Responsive Information ........................................ 12

     B.     The Board's Deletion of Responsive Records Violates FOIA and
Applicable Federal Regulations ..................................................................... 14

     C.     Fox Business is Entitled to Conduct Discovery to Test the Adequacy
of the Search Performed by the Board ........................................................... 15

     D.     Any "Expert" Witness Must Be Deposed ...................................................... 16

II.     THE BOARD HAS NOT MET ITS BURDEN UNDER RULE 56 OF
PRODUCING SUFFICIENT EVIDENCE OF ENTITLEMENT TO AN
EXEMPTION UNDER SECTION 552(b)(4) OF FOIA ........................................ 16

     A.     The Requested Information Concerning the Identity of Borrowers,
the Amount Borrowed and the Collateral Pledged Came From the
FRBs and Is Therefore Not "Information Obtained from a Person"
Under FOIA ..................................................................................................... 17

          1.     The FRBs Are Not Persons ............................................................... 17

          2.     The Information Sought from the Board Constitutes
Information Created and Maintained by the Board, Not
Data Submitted by the Borrowers ..................................................... 19

     B.     The Federal Reserve Cannot Establish a Likelihood of Competitive
Harm on the Basis of Speculation ................................................................. 20

          1.     The Board Has Not Adduced Sufficient Evidence of
Substantial Harm to a Private Competitive Interest ......................... 21

          a.   The Board Identifies No Basis in the Federal Reserve Act or FOIA for Withholding Records on the Basis of a "Stigma," But Relies Entirely Upon Speculation ........................ 23

          b.   No Institutional Borrower Has Objected to the Release of Information in Response to Fox Business's FOIA Requests or Filed a "Reverse-FOIA" Suit .................................... 30

          c.   The Board Does Not Adduce Evidence that Responsive Evidence is Subject to any Confidentiality Agreements .............. 31

     2.   The So-Called "Third Prong" of National Parks Does Not Afford a Valid Basis Upon Which to Find that the Requested Information May Be Withheld ......................................... 32

III.   THE FOIA EXEMPTION FOR INTER- AND INTRA-AGENCY MEMORANDA DOES NOT APPLY TO THE INFORMATION FOX BUSINESS IS SEEKING ......................................................................... 34

    A.   The Board Has Not Established That Any of the Withheld Documents Are Pre-Decisional, Deliberative Materials ................................ 34

    B.   The Exemption for Confidential Business Commercial Information Under *FOMC v. Merrill* Does Not Apply ....................................... 35

IV.   RESPONSIVE DOCUMENTS AT THE FRBNY AND FRBB ARE "AGENCY RECORDS" ............................................................................ 37

    A.   For Purposes of FOIA, the Board and the FRBs are in Actuality One Unitary Agency of the United States ....................................... 37

    B.   Board Regulations Make Clear that Documents at the FRBs Are Records of the Board for Purposes of FOIA ................................... 39

CONCLUSION .......................................................................................................... 43

**TABLE OF AUTHORITIES**

**Cases**                                                                                        **Page**

*9 to 5 Org. for Women Office Workers v. Board of Governors*,
    721 F.2d 1 (1st Cir. 1983) ................................................................... 33

*Armstrong v. Executive Office of the President*,
    1 F.3d 1274 (D.C. Cir. 1993) ........................................................ 14, 15

*Associated Press v. United States Department of Defense*,
    410 F. Supp. 2d 147 (S.D.N.Y. 2006) .................................................. 28

*Baker & Hosteller LLP v. United States Dep't of Commerce*,
    473 F.3d 312 (D.C. Cir. 2006) ............................................................. 14

*Black Hills Alliance v. U.S. Forest Service*,
    603 F. Supp. 117 (D.S.D. 1984) ..................................................... 28, 31

*Brink's, Inc. v. Board of Governors of Federal Reserve System*,
    466 F.Supp. 116 (D.D.C. 1979) .......................................................... 19

*Buffalo Evening News, Inc. v. Small Business Administration*,
    666 F. Supp. 467 (W.D.N.Y. 1987) ...................................... 2, 17, 20, 34

*Burka v. United States Dep't of Health and Human Servs.*,
    87 F.3d 508 (D.C. Cir. 1996) .............................................................. 41

*Carney v. United States Dep't of Justice*,
    19 F.3d 807 (2d Cir.),
    *cert. denied*, 513 U.S. 823 (1994) ............................................... 12, 15

*CNA Financial Corp. v. Donovan*,
    830 F.2d 1132 (D.C. Cir. 1987) .......................................................... 27

*Clarke v. United States Department of the Treasury*,
    No. 84-1873, 1986 WL 1234 (E.D. Pa. Jan. 28, 1986) ...................... 34

*Comstock  Int'l (U.S.A.), Inc. v. Export-Import Bank*,
    464 F. Supp. 804 (D.D.C. 1979) .................................................... 23, 33

*Continental Stock Transfer & Trust Co. v. Securities and Exchange Comm'n*,
    566 F.2d 373 (2d Cir. 1977) .......................................................... 20, 21

*Cooper Cameron Corp. v. United States Dept. of Labor, Occupational*,
    *Safety and Health Admin*,
    280 F.3d 539 (5th Cir. 2002) .............................................................. 23

*Critical Mass Energy Project v. NRC*,
    975 F.2d 871 (D.C. Cir. 1992),
    *cert. denied*, 507 U.S. 984 (1993) ................................................................ 3, 33

*Defense of Animals v. National Institutes of Health*,
    543 F.Supp. 2d 70 (D.D.C. 2008) ................................................................ 42

*Environmental Protection Agency v. Mink*,
    410 U.S. 73 (1973) ................................................................ 35

*Fasano v. Federal Reserve Bank of New York*,
    457 F.3d 274 (3rd Cir. 2006) ................................................................ 18

*Federal Bureau of Investigation v. Abramson*,
    456 U.S. 615 (1982) ................................................................ 21

*Federal Reserve Bank of Boston v. Commissioner of Corporations and*
    *Taxation Of Com. Of Massachusetts*,
    499 F.2d 60 (1st Cir. 1974) ................................................................ 38

*Federal Reserve Bank of Richmond v. Kalin*,
    77 F.2d 50 (4th Cir. 1935) ................................................................ 19

*Federal Reserve Bank of St. Louis v. Metrocentre Improvement Dist.*,
    657 F.2d 183 (8th Cir. 1981) ................................................................ 19

*Federal Open Market Committee v. Merrill*,
    443 U.S. 340 (1979) ................................................................ 3, 35-38

*Founding Church of Scientology of Washington, D. C., Inc. v. National Sec. Agency*,
    610 F.2d 824 (D.C. Cir. 1979) ................................................................ 12

*Government Land Bank v. General Services Admin*,
    671 F.2d 663 (1st Cir. 1982) ................................................................ 36, 37

*Grand Central Partnership v. Cuomo*,
    166 F.3d 473 (2d Cir. 1999) ................................................................ 35

*Hopkins v. United States Dep't of Housing and Urban Development*,
    929 F.2d 81 (2d Cir. 1991) ................................................................ 35

*Inner City Press/Community on the Move v. Board of Governors of the Federal Reserve*,
    463 F. 2d 239 (2d Cir. 2006) ................................................................ 16, 20, 31, 33

*Judicial Watch v. F.D.A.*,
    449 F.3d 141 (D.C. Cir. 2006) ................................................................ 14, 16

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) ..................................................... 30

*Landmark Legal Foundation v. E.P.A.*,
    272 F.Supp.2d 70 (D.D.C. 2003) ................................................ 14

*Lee Const. Co., Inc. v. Federal Reserve Bank of Richmond*,
    558 F.Supp. 165 (D. Md. 1982) ............................................. 18, 19

*Lewis v. United States*,
    680 F.2d 1239 (9th Cir. 1982) .................................................. 19

*Lion Raisins, Inc. v. USDA*,
    354 F.3d 1072 (9th Cir. 2004) ............................................. 22, 23

*Miami Herald Pub. Co. v. Small Business Administration*,
    670 F.2d 610 (5th Cir. 1982) ................................................... 20

*Nadler v. Federal Deposit Insurance Corp.*,
    92 F.3d 93 (2d Cir. 1996) ........................................ 16, 20, 31, 33

*National Parks Conservation Ass'n v. Morton*,
    498 F.2d 765 (D.C. Cir. 1974) ........................................... *Passim*

*Natural Resources Defense Council, Inc. v. Defense Nuclear Facilities Safety Bd.*,
    969 F.2d 1248 (D.C. Cir. 1992) ................................................ 22

*New York Public Interest Research Group v. United States*
*Environmental Protection Agency,*
    249 F. Supp. 2d 327 (S.D.N.Y. 2003) .................................. 21, 30, 33

*Newry Ltd. v. U.S. Customs and Bordr Protection Bureau*,
    No. Civ.A. 04-02110 (HHK), 2005 WL 3273975, at *4 (D.D.C. July 29, 2005) .......... 31

*News Group boston, Inc. v. National R.R. Passenger Corp.*,
    799 F. Supp. 1264 (D. Mass. 1990) ............................................ 28

*NLRB v. Sears Roebuck & Co.*,
    421 U.S. 132 (1975) ...................................................... 34, 35

*Pacific Architects and Engineers, Inc. v. Renegotiation Board*,
    505 F.2d 383 (D.C. Cir. 1974) ................................................ 28

*Petkas v. Staats*,
    501 F.2d 887 (D.C. Cir. 1974) ................................................ 32

*Public Citizen Health Research Group v. F.D.A.*,
    704 F.2d 1280 (D.C. Cir. 1983) ............................................... 27

*Public Citizen Health Research Group v. F.D.A.,*
    964 F. Supp. 413 (D.D.C. 1997) ............................................................. 27

*Teich v. F.D.A.,*
    751 F. Supp. 243 (D.D.C. 1990) ............................................................. 32

*Tigue v. United States Department of Justice,*
    312 F.3d 70 (2d Cir. 2002),
    *cert. denied,* 538 U.S. 1056 (2003) ...................................................... 35

*United States Dep't of Justice v. Reporters Committee For Freedom of Press,*
    489 U.S. 749 (1989) ................................................................................ 22

*Weisberg v. United States Dep't of Justice,*
    627 F.2d 365 (D.C. Cir. 1980) ................................................................ 12

*Wiley Rein & Fielding v. United States Dep't of Commerce,*
    782 F. Supp. 675 (D.D.C. 1992) ............................................................. 31

*Wolf v. C.I.A.,*
    473 F.3d 370 (D.C. Cir. 2007) .......................................................... 22, 23

## Statutes and Rules

12 C.F.R. § 261.15 ...................................................................................... 30

12 C.F.R. § 261.16 ...................................................................................... 30

12 C.F.R. § 261.2(i)(1)(i) ...................................................................... *Passim*

12 C.F.R. § 261.2(i)(1)(ii) .............................................................. 4, 40, 41

12 C.F.R. § 261.3(a) .............................................................................. 4, 41

12 C.F.R. § 265.11 .............................................................................. 39, 40

12 C.F.R. § 271.5 ........................................................................................ 36

36 C.F.R. § 1234.32(d) ............................................................................... 15

5 U.S.C. § 551(2) ........................................................................................ 17

5 U.S.C. § 552(b)(4) .............................................................................. *Passim*

5 U.S.C. § 552(b)(5) ........................................................................ 3, 12, 34

5 U.S.C. § 552(b)(8) .................................................................................... 27

5 U.S.C. § 552(f)(1) .................................................................................... 17

12 U.S.C. § 302 ........................................................................................... 18

12 U.S.C. § 248 ........................................................................................... 18

12 U.S.C. § 248(f) ....................................................................................... 18

12 U.S.C. § 290 ........................................................................................... 18

12 U.S.C. § 341 ........................................................................................... 18

12 U.S.C. § 347(b)(a) .................................................................................. 41

12 U.S.C. § 391 ........................................................................................... 39

12 U.S.C. § 521 ........................................................................................... 18

44 U.S.C. § 2101 .........................................................................................14

44 U.S.C. § 2901 .........................................................................................14

44 U.S.C. § 3101 .........................................................................................14

44 U.S.C. § 3301 .....................................................................................14, 15

44 U.S.C. § 3314 .........................................................................................15

Fed. R. Civ. P. 26(a)(2) ...............................................................................16

Fed. R. Civ. P. 56(c) ................................................................................... 28

Fed. R. Civ. P. 56.1 ................................................................................ 13, 30

H. R. Rep. No. 1497 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2418 ...................................... 27

H.R. Rep. No. 93-876 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6267 ................................... 18

**Table of Declaration and Exhibits in Opposition to Federal Reserve Motion:**

**Declaration of Terence W. McCormick, dated April 17, 2009**

Exhibit 1 – Annual Report on Form 10-K of JP Morgan Chase & Co.

Exhibit 2 – Annual Report on Form 10-K of Citigroup, Inc.

Exhibit 3 – Annual Report on Form 10-K of Merrill Lynch & Co.

Exhibit 4 – Treasury Department List of TARP Recipients

## PRELIMINARY STATEMENT

Defendant, the Board of Governors of the Federal Reserve System (the "Board"), has failed to adduce sufficient evidentiary facts to establish a *prima facie* claim of entitlement to Exemptions 4 and 5 under the Freedom of Information Act ("FOIA").   The Board erroneously claims those exemptions in response to two requests for information from Fox News Network, LLC ("Fox News"), owner of the Fox Business Network (collectively "Fox Business") regarding institutional borrowing from the Discount Window and other emergency liquidity facilities during the financial crisis that began in the summer of 2007.[1]  The gist of the Board's position is that records of institutional borrowing at the Discount Window and other facilities must be kept secret because disclosure could threaten the health and competitive position of the borrowing banks (the "stigma theory") and might interfere with the Board's performance of its statutory mandate.  Neither theory has any support within the FOIA statute.

The Board's concern about a "stigma" that it imagines *could* result if institutional borrowers are identified is not only without evidentiary support in the record, but is fatally undermined by the borrowers' own public reporting of their transactions through the Federal Reserve System's liquidity facilities, and the failure of any borrower to assert so-called "confidentiality rights" in this proceeding.  While it is widely known that the banks have been using these facilities, the Board is curiously unable to point to any *tangible* evidence of a resulting "stigma," or the expected public alarm it describes.  More to the point, however, the sole rule of decision under FOIA is not whether the Board's policy concerns are or are not valid,

---

[1]      In addition to information relating to Discount Window borrowing, Fox Business's FOIA Requests sought information regarding lending under several recently adopted Special Credit and Liquidity Facilities ("SCLFs"), including: the Term Auction Facility ("TAF"); the Primary Dealer Credit Facility ("PDCF"); the Term Securities Lending Facility ("TSLF"); the Term Securities Lending Facility Options Program ("TOP"); the Asset Backed Commercial Paper  Money Market Mutual Fund Liquidity Facility ("AMLF"); and the Commercial Paper Funding Facility ("CPFF"). The FOIA Requests also sought records relating to Open Market Operations, or OMOs.

but rather whether there is a statutory exemption justifying the agency's refusal to disclose those records.  On that point, the Board has utterly failed to satisfy its burden.

The information that Fox Business is seeking is not covered by 5 U.S.C. § 552 (b)(4) ("Exemption 4") because (a) the Federal Reserve Banks ("FRBs") that provided the information to the Board are agencies and not "persons" and (b) the information in question, which was generated by the lending activities of the Federal Reserve System, is not "confidential" as that term has been construed by the case law.  The inapplicability of Exemption 4 is revealed by the internal inconsistency of the Board's argument.   On the one hand, the Board is claiming that the "persons" from which the transactional information was obtained are the FRBs, which submitted the information to the Board.  This claim is made to sidestep the problem that would arise if the borrowing banks were the claimed submitters.  As the court held in *Buffalo Evening News, Inc. v. Small Business Administration*, 666 F. Supp. 467 (W.D.N.Y. 1987), borrowers are not the "submitters" of loan information (*i.e.*, the amount borrowed and collateral pledged) since such information does not belong to them but is the end product of the lending process itself.

However, treating the FRBs as the "submitters" is problematic for the Board because it is the borrowing banks rather than the FRBs that the Board claims would suffer the "competitive harm" if information about their borrowing were disclosed.  Thus, the test for "privileged and confidential" information set forth in *National Parks Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) would not be satisfied if the FRBs were treated as the submitters.  To remedy this fatal flaw, the Board has reversed itself and argued its case under *National Parks* from the premise that the borrowing banks are the "persons" from whom the information was obtained.   Manifestly, the Board cannot have it both ways.  Either the "submitters" of the information are the FRBs – in which case they *National Parks* competitive-harm test is not

satisfied – or the claimed "submitters" are the borrowing banks – in which case the Exemption 4 claim must fail because the information in question was not information "obtained from" the borrowers.

The Board's third effort to bring itself within Exemption 4 by relying on an alternative test for "privileged and confidential" information set forth in *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 879 (D.C. Cir. 1992), *cert. denied,* 507 U.S. 984 (1993), is equally flawed. The *Critical Mass* test, which rests on the premise that information can be deemed "confidential" if its disclosure would impair "a governmental interest in efficiency and effectiveness" has not been adopted by the Second Circuit and has, indeed, been met with considerable skepticism—for good reason. If such broad "governmental interests" were a valid basis for withholding disclosure, agencies could effectively use Exemption 4 to write FOIA out of the United States Code whenever it suited them.

The Board's alternative argument, based upon 5 U.S.C. §552(b)(5) ("Exemption 5") is also unavailing. The documents at issue are, on the face of the *Vaughn* indexes, arrangements of raw data, and not pre-decisional, deliberative material. Nor are they "confidential commercial information" for purposes of any current lending that the Board is engaged in today. And, significantly, if the Board insists that FRBs are not "agencies" for purposes of Exemption 4, then it cannot simultaneously claim that the documents sought by *Exemption 5* are "inter-agency" records. The FRBs cannot be agencies for purposes of one exemption under FOIA but not another. Nor is the narrow interpretation of Exemption 5 recognized in *Federal Open Market Committee v. Merrill*, 443 U.S. 340 (1979), relevant. That case, which permitted withholding information that could cause the government commercial harm *for a very limited time period*,

has no application to this situation, where the government's commercial interests are not at issue and the agency is seeking to avoid disclosure of information that is five to twenty months old.

The remainder of the Board's defense to its FOIA obligation consists of the argument that data in the possession of the FRBs are not records of the Board. As stated in Fox Business's motion for summary judgment, the Board's argument consists of nothing more than a shell game. The FRBs are an integral part of the Federal Reserve System, and the Board's own regulations make records held by the FRBs "records of the Board" for purposes of the FOIA Requests. Notably, although the Board has made a tortured argument regarding the meaning and effect of 12 C.F.R. § 261.2(i)(1)(i), it has not even mentioned 12 C.F.R. §§ 261.2(i)(1)(ii) or 261.3(a), both of which also make clear that the records of the Board include records held by the FRBs.

Finally, recently disclosed information about the documents in the Board's possession raises serious questions about the adequacy of its search and leads to the conclusion that discovery and, possibly, an evidentiary hearing, is required. Although the Board initially represented that it did not possess any records at all regarding pledged collateral, Fox Business learned upon a review of the agency's two *Vaughn* indexes that the Board *was* in possession of at least some information regarding collateral. Then, during a face-to-face meeting, counsel for the Board indicated that there were documents in the possession of the FRBs that were not described in the *Vaughn* indexes. Finally, in the context of this motion, and in a brand-new "Supplemental *Vaughn* index," the Board revealed that, even at the Board level, there are additional records regarding, among other things, collateral, that were not previously disclosed. Further, the record reveals positive indications of overlooked materials as well as a steadily evolving explanation regarding the Board's efforts to comply with FOIA. A "daily data feed" from the FRBs is unaccounted for, and documents have been deleted, ignored or both. Even the Board's latest

submission, specifically the Declaration of Alison Thro ("Thro Decl."), contains within itself ambiguities regarding what records actually are in the Board's possession. Thus, material facts concerning the Board's search remain in dispute, precluding summary judgment in the Board's favor and warranting further exploration through discovery and a hearing.

### FACTS

The facts demonstrating Fox Business's entitlement to judgment as a matter of law are set forth in the papers submitted in support of Fox Business's motion for summary judgment and are not repeated at length here. Additional facts that emerge from the declarations submitted by the Board in connection with its own motion for summary judgment further confirm that the Board is in possession of records responsive to *each* of the categories identified in the FOIA Requests (identification of institutions participating in Federal Reserve lending programs, the amounts they borrowed and the collateral pledged to secure the loans). Those same declarations also reveal that the Board had received records from the FRBs that were not previously disclosed in the Board's first two *Vaughn* indexes or in the letters denying Fox Business's FOIA Requests. (*See* Declaration of Steven G. Mintz, dated March 27, 2009 ("Mintz Decl.") at Exhibits 3, 8, 12 and 13). This is in stark contrast to the original representations of the Board, in which the Board did not indicate that it had located any documents reflecting pledges of collateral.

A.    The Missing "Daily Data Feeds"

It is apparently uncontested that the Board possesses records detailing the identity of borrowers and the amounts that they borrowed from the Federal Reserve System's various liquidity facilities. Specifically, the Board's Division of Monetary Affairs ("MA") received "daily data feeds" from each FRB detailing borrowing at the Discount Window and various special credit and liquidity facilities ("SCLFs"), which include the facilities described in the two

FOIA Requests submitted by Fox Business.  *See* Declaration of Alison M. Thro ("Thro Decl.") at

¶ 15.  For the time period covered by the two FOIA Requests, MA staff used that data to

generate three reports, which included information sufficient to identify the borrower and the

amounts borrowed, but not the collateral pledged in support of such lending:

- The Remaining Term Report, which contains names of borrowers, amounts of individual loans, the relevant credit facility and the origination and maturity dates of specific loans during the period between February 11, 2008 and November 17, 2008;

- The Origination Report, which listed extensions of primary credit and then, beginning in March 2008, secondary credit.  Starting in September 2008, the Origination Report specifically identified the facility from which credit was extended.  The Origination Reports list the name of the borrower, the amount borrowed and the maturity date of the loan.[2]

- The Emergency Credit Report, which lists the names of borrowers who draw funds from SCLFs authorized by the Board pursuant to section 13(3) of the Federal Reserve Act, the amount borrowed and the maturity dates. This report included responsive data for the period between September 19, 2008 and November 17, 2008.

*See* Thro Decl. at ¶¶ 15-17.  Tellingly, the Board does not indicate what it has done with the

"daily data feed" from which it produced these three reports, what form that "data feed" takes or

what its content might be (*e.g.*, whether the "daily data feed" includes information regarding the

collateral posted by the borrowing institutions).  Rather, after the description of the "Remaining

Term Report," the "Origination Report" and the "Emergency Credit Report," the "daily data

feed" from which they were derived conveniently departs from the discussion.

    B.    The Board Re-Defines the FOIA Requests to Improperly Narrow Their Scope

    The Board's submission also reveals that it engaged in a unilateral, self-serving effort to

re-define the scope of the FOIA Requests.  The FOIA Requests called for, *e.g.*, "records

---

[2]    Ms. Thro additionally discloses that the Board is in possession of 94 pages of e-mails containing records responsive in part to the First FOIA Request, derived from or duplicating information contained in the Origination Report.  (Thro Decl. at ¶ 18).

sufficient to identify *all* collateral pledged by each . . . institution." (Emphasis supplied). However, in Ms. Thro's Declaration, she reveals that "I interpreted the First and Second FOIA Requests as seeking information regarding *specific* items pledged as collateral by *specific* borrowers for *specific* borrowings, rather than as seeking information on the general categories or types of collateral actually pledged or available." (Thro Decl. at ¶ 13) (Emphasis supplied). Later, the Board indicated that its search was conducted on a "transaction-level" basis, also without explaining how that comported with the actual scope of Fox Business's FOIA Requests. (*See* Def. Mem. at 5, 37, 38). With the FOIA Requests thus restricted, the Board proceeded to assert that, as to some categories (*e.g.*, OMOs), it had no responsive records at all, and then identified the categories of documents for which documents were located (but withheld). However, the FOIA Requests are not so limited. Thus, to the extent that the Board refrained from searching for or identifying records of collateral that is not "for specific borrowings."[3] (*See* Thro Decl. at ¶¶ 13, 14), it has failed, *prima facie*, to conduct a proper search.

    C.   <u>The Board Now Concedes That It Has Documents Evidencing Pledges of Collateral</u>

    The Board's representations to Fox Business regarding the existence of documents evidencing the pledge of collateral have shifted over time:

1.     In its letters denying the FOIA Requests, the Board did not acknowledge that it possessed any documents reflecting pledges of collateral by institutional borrowers. (*See* Letter of January 16, 2009 and January 6, 2009, attached as <u>Exhibit 3</u> and <u>Exhibit 8</u> to Mintz Decl., respectively).

2.     In the first two *Vaughn* indexes, it disclosed that some information was contained in an August 15, 2008 draft of procedures governing "collateral for long-term primary credit at the discount window and TAF loans." The *Vaughn* indexes did not otherwise disclose that the Board possessed any documents relating to collateral from institutional borrowers. (*See* Mintz Decl. at <u>Exhibit 12</u> and <u>Exhibit 13</u>).

---

[3]     The Board's convenient "interpretation" of the FOIA Requests may explain how 47 reports totaling 475 pages of information regarding the PDCF Collateral Reports referred to in the Supplemental *Vaughn* index (Thro Decl. at ¶ 29 and <u>Exhibit I</u>, p. 1) have now been reduced to approximately 47 pages of "responsive" information.

3.  In the face-to-face meeting between counsel for the Board and Fox Business, the Board's counsel represented that the Board did not possess any records of collateral pledged by institutional borrowers. (Declaration of Carlotta Cassidy at ¶ 5).

4.  Then, on the instant motion, the Board revealed for the first time in the Supplemental *Vaughn* index that potentially hundreds of pages of documents detailing collateral were, in fact, in the Board's possession all along. Specifically, it now appears that two Board members and one MA staff member have received e-mails from the FRBNY, attaching (i) weekly reports regarding primary dealers using FRBNY liquidity facilities and containing "some general collateral information such as the market value, share, or type of collateral pledged by specific primary dealers" and (ii) a second type of weekly report reflecting the names of certain institutions participating in FRBNY lending programs on certain dates, including information regarding the approximate amount of borrowing. (Thro Decl. at ¶ 26).

The Board also revealed, under the caption "The Board Conducts an Additional Search," that in preparation of its motion, the Board identified other categories of records that were not described in the letters denying the FOIA Requests or the in the Vaughn indexes. Those documents include:

- Weekly e-mails from the FRBNY containing information about aggregate activity under the CPFF, of which one fell within the relevant time period. While Ms. Thro asserts that, upon review she determined that this e-mail did not contain responsive information, the Thro Declaration goes on to reveal that the e-mail had an attachment. Ms. Thro does not indicate whether the attachment is responsive or not; instead she recites that "the recipients informed me that they had not opened the attachment or otherwise used, reviewed or relied upon it in the course of their duties for the Board . . .. Based on this review and these discussions, I, with the concurrence of my supervisor, concluded the e-mail was not responsive, and that the attachment was not an agency record subject to FOIA." (Thro Decl. at ¶ 27).

- E-mails from the FRBNY, addressed to the "Board's liaison for Chairman Bernanke," attaching a daily PDCF Collateral Report. Again, Ms. Thro reveals that while the liaison officer retained 47 of these reports covering the time period of the FOIA Requests, he had "archived the majority of these e-mails without opening the e-mails or the attachment, which would

indicate that they are not agency records subject to FOIA."[4]  Nevertheless, in what Ms. Thro describes as "an abundance of caution," she treated the documents as agency records and determined that they contained responsive information relating to overnight borrowing by some of the FRBs' primary dealers, but found the documents to be exempt for the same reasons that the Remaining Term Report, Origination Report and Emergency Credit Report had been found to be exempt under Exemption 4 and 5.  The liaison officer also received e-mails from the FRBNY containing intra- and end-of-day PDCF borrowings.  As with all the foregoing categories, it is not readily apparent whether information regarding the collateral posted by institutional borrowers was within the liaison officer's possession, inasmuch as the Board likely restricted itself to a search for documents tied to specific pledges of collateral by specific borrowers.  (Thro Decl. at ¶ 28).

D.    Records of the Board Held at the FRBs

The Board also determined that responsive transaction-level information concerning the collateral pledged for loans under the DW and various SCLFs was in the possession and control of the FRBNY and FRBB.  (Def. Mem. at 5, Thro Decl. at ¶ 31).  The FRBNY obtains and generates collateral and loan documentation through its transactions with borrowers, clearing banks, and, for the CPFF, its asset manager and custodial administrator.  *See* Declaration of Susan E. McLaughlin ("McLaughlin Decl.") at ¶ 17; Declaration of Lorie K. Logan ("Logan Decl.") at ¶¶ 12, 28-29; and Declaration of Anne F. Baum ("Baum Decl.") at ¶ 13.  The FRBB obtains and generates similar documentation in the course of transactions with participants at the AMLF.  Declaration of Jacqueline P. Palladino ("Palladino Decl.") at ¶ 13.

However, the Board did not undertake to search and review those documents.  Instead, Ms. Thro states, in part:

I learned through discussions with the Board staff members . . . and with staff of the FRBNY, that lending at the [Discount Window] and under the SCLFs, and the conduct of [Open Market Operations], was not considered to be an activity conducted by the Reserve Banks under Board-delegated authority.  . . .  Through

---

[4]    The Board identifies no basis within FOIA upon which to assert that a document is not an agency record as long as the recipient has not opened or reviewed it.

my discussions with these Board and FRBNY staff members, I determined that, as discussed above, responsive FRBNY documents were and have at all times been in the possession and control of the FRBNY, FRBB, or entities acting on their behalf. . . .

Through my discussions with Board staff members, and staff members at the FRBNY, I determined that these transaction-level documents at the FRBNY and FRBB are not "records of the Board" under FOIA because they were obtained by these Reserve Banks in the course of extending credit at the [Discount Window] or SCLFs or in the course of conducting [Open Market Operations].  Extending credit is a fundamental part of the business of banking and a commercial activity in which the Reserve Banks are authorized to engage, but the Board is not. Because the establishment and administration of the [Discount Window] and the SCLFs are commercial banking activities, not a function "performed for or on behalf of the Board," the Reserve Banks' records relating to the [Discount Window] and the SCLFs are not Board records under the Board's regulations. . . . (Thro Decl. at ¶¶ 31-32).

E.    The Board Has Deleted and/or Failed to Account for Records Subject to Disclosure Under FOIA

With regard to the weekly reports identified in paragraph 26 of the Thro Declaration, Ms. Thro reveals that "all three of these individuals  . . . had not retained any copies of either type of these reports (either paper or electronic) . . . and that *it had been their practice since receiving the e-mails and reports to delete them* shortly after receiving them because there was no need to retain copies of this information to perform their duties for the Board.  In addition to frustrating Fox Business's entitlement to receive responsive documents under FOIA, the deletion of government records implicates federal law requiring the preservation of such records.  The Board offers no explanation of the steps it has taken to determine whether the subject records are retrievable.

F.    After Conducting an Inadequate Search, The Board Then Withholds the Documents Upon an Invalid Claim to FOIA Exemptions 4 and 5.

The Board's description of the reasons for withholding the documents under FOIA Exemptions 4 and 5 was even less satisfying than its account of the search for those documents.

10

The Thro Declaration offers little more to justify the asserted FOIA exemptions than the following conclusory statement:

> From my experience with FOIA matters, it appeared that the information in these documents was "commercial or financial" in nature, it was obtained from the Federal Reserve Banks, which had obtained and derived the information from records of transactions with borrowers at the [Discount Window] and the SCLFs, that these entities were "persons" under FOIA, and that disclosure of this information was likely to cause substantial harm to the competitive position of the borrowers; could impair the Board's ability to carry out its statutory mission; or could impair the Board's monetary functions or commercial interests, and that the documents contained no reasonably segregable, non-exempt responsive information. Accordingly, I, with the concurrence of my superiors, determined that these documents, comprising approximately 6008 full pages of information, should be withheld in full from the plaintiff under Exemptions 4 and 5 of FOIA.

(Thro Decl. at ¶ 22). Likewise, as detailed more fully in Part II.B.1.a., *infra*, the Board's other declarations offer equally terse statements, to the effect that release of the records under FOIA "could" result in a stigma, that "there is a real concern" that market participants would speculate about the health of the borrowing institutions, and so forth.[5]

For the reasons that follow, and for the reasons set forth in Fox Business's initial submissions, the Board's motion for summary judgment should be denied.

* * * * *

---

[5]    *See* Baum Decl. at ¶¶ 15, 16; Burke Decl. at ¶ 25; Logan Decl. at ¶ 37; McLaughlin Decl. at ¶¶ 21, 23, 26; Palladino Decl. at ¶¶ 17, 18; Madigan Decl. at ¶ 27.

**ARGUMENT**

**I**

**THE BOARD CONDUCTED AN INADEQUATE SEARCH FOR RECORDS
RESPONSIVE TO THE FOIA REQUESTS**

As the Board concedes, under FOIA "the defending agency has the burden of showing

that its search was adequate and that any withheld documents fall within an exemption to the

FOIA." (Def. Mem. at 7) (quoting *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812

(2d Cir.), *cert. denied*, 513 U.S. 823 (1994)). Federal courts will ordinarily find a search to be

sufficient on a motion pursuant to Rule 56 if the agency supplies evidentiary facts establishing

that the agency has conducted a thorough search and provides "reasonably detailed explanations

why any withheld documents fall within an exemption." *Id.* However, where the record reveals

"positive indications of overlooked materials," or otherwise contains evidence refuting the

government's claim that it conducted a complete search for responsive information, the

government may not obtain summary judgment. *Founding Church of Scientology of

Washington, D. C., Inc. v. National Sec. Agency*, 610 F.2d 824, 837 (D.C. Cir. 1979). *See also

Weisberg v. United States Dep't of Justice*, 627 F.2d 365, 370, (D.C. Cir. 1980) ("if the

sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary

judgment is not in order").

    A.    The Evidence Establishes Inconsistencies and Tangible Indications of an
           Incomplete Search for Responsive Information.

Here, even before the Court considers the issue of whether the Board has claimed valid

exemptions under section 552(b)(4) or (b)(5), there are threshold questions regarding the

adequacy of the Board's search in the first instance. The Board's steadily morphing

representations, particularly regarding records concerning collateral, constitute a moving target:

at first, the Board denied having any documents regarding collateral at all (Mintz Decl. at

<u>Exhibits</u> 12, 13); the Board reiterated this position during the "face-to-face" meeting (Declaration of Carlotta Cassidy at ¶ 5); then the Board disclosed that it did, in fact, have some documents (Thro Decl. at ¶¶ 19, 28), and filed a Supplemental *Vaughn* index with its motion for summary judgment. Moreover, even putting aside the inconsistent positions that the Board adopted over time, the Thro Declaration, on its face, contains unanswered questions regarding several categories of documents that the Board now admittedly has. Specifically:

- The Board has failed to account for records obtained from the FRBs in the "daily data feed" from which it had generated the Remaining Term Report, Origination Report and Emergency Credit Report. (*See* Thro Decl. at ¶ 15).

- Responsive documents have been deleted, but the Board has not explained what steps it has taken to retrieve them, *e.g.*, from archive folders, hard drives or back-up tapes. (*See id.* at ¶ 26).

- One or more documents attached to e-mails have not even been opened in the course of the Board's search on the ground that, since the original recipient never opened or reviewed them, they are therefore not records of the Board. (*See id.* at ¶ 27). No law is cited to support this proposition.

- The Board erroneously asserts that documents in possession of the FRBs are not records of the Board, thus relieving the Board of any responsibility for searching for or producing them. (*See* Point IV, *infra*).

In addition, the declarations submitted by the Board reveal critical ambiguities regarding the existence of FRB documents in the possession of the Board. For example, in paragraph 14 of her declaration, Ms. Thro states that she identified "almost no responsive information relating to specific items of collateral . . . ," and in its Rule 56.1 Statement (¶14) the Board declared that "no board staff member obtained, reviewed or relied upon transaction level documents responsive to the First and Second FOIA Requests at the FRBNY or FRBB in the course of performing and function of the Board." However, Ms Thro confirmed that (i) two members of the Board and one MA staff member received weekly e-mails from the FRBNY (¶ 26); (ii) "a very few members of the Board and Board staff had received weekly e-mails from the FRBNY" (¶ 27);

(iii) a Board officer who serves as the liaison between Chairman Bernanke and the President's Working Group received daily e-mails from the FRBNY attaching a "Daily PDCF Collateral Report" (¶ 28); and responsive documents were and have at all times been in the possession and control of the FRBNY and FRBB (¶ 31). Thus, whatever presumptions might otherwise attach to the government's declarations are inapplicable in this case and the Board may not obtain summary judgment.

     B.     The Board's Deletion of Responsive Records Violates FOIA and <u>Applicable Federal Regulations</u>.

Simply because an e-mail document is "deleted" does not mean that copies of it do not exist. At the very least, Fox Business is entitled to an explanation as to why the deleted emails are irretrievable. *Cf. Baker & Hostetler LLP v. United States Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006) (agency's FOIA response sufficient only where its explanation as to why it was unable to recover certain deleted emails was adequate and unrebutted by the plaintiff).

More troubling is the fact that the FRBNY Reports may not have been preserved. Certainly, if the reports were destroyed or deleted after the FOIA request was received, then issues as to spoliation of evidence come into play.[6] However, even if the FRBNY Reports were deleted or destroyed before receipt of the FOIA request, the Board may have violated the law by failing to preserve them. The Federal Records Act (the "<u>FRA</u>") governs the creation, management and disposal of all documents of federal agencies. *See Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1278 (D.C. Cir. 1993); 44 U.S.C. §§ 2101, *et seq*., 2901, *et seq*., 3101, *et seq*., and 3301, *et seq*. The FRA prescribes the exclusive mechanism for disposal

---

[6]    *See Landmark Legal Foundation v. E.P.A.*, 272 F. Supp. 2d 70 (D.D.C. 2003) (agency committed contempt by reformatting hard drives and erasing e-mail back-up tapes); *Judicial Watch, Inc. v. United States Dep't of Commerce*, 34 F. Supp. 2d 28, 43-44 (D.D.C. 1998) ("the status of a particular document at the time the FOIA request is submitted determines whether the unreasonable failure to produce that document is an unlawful withholding.").

of federal records.  *Armstrong*, 1 F.3d at 1278; 44 U.S.C. §3314; *see also* 36 C.F.R. §1234.32(d)

("[e]lectronic mail records may not be deleted or otherwise disposed of without prior disposition

authority from NARA.")  "Records" are described as "all books, papers, maps, photographs,

machine readable [*i.e.*, electronic] materials, or other documentary materials, regardless of

physical form or characteristics, made or received by an agency of the United States Government

under Federal law or in connection with the transaction of public business and preserved or

appropriate for preservation by that agency or its legitimate successor as evidence of the

organization, functions, policies, decisions, procedures, operations, or other activities of the

Government or because of the informational value of data in them."  *Id.*; 44 U.S.C. §3301.

> C.    Fox Business is Entitled to Conduct Discovery to Test the Adequacy of
>        the Search Performed by the Board and to Determine Whether Responsive
>        <u>Documents Still Exist</u>.

Where, as here, a federal agency's affidavits contain conflicting information concerning

the very information sought by a FOIA requester, the presumption of good faith no longer will

be conclusive on the issue of whether a stated exemption applies.  *Carney, supra*, 19 F.3d at 813.

Due to the many unresolved questions surrounding the Board's search for documents, the record

reveals, *prima facie*, several "positive indications" of deliberately overlooked categories of

documents.  Thus, the Board has not fulfilled its obligations under FOIA to search for and

produce responsive information.  At the very least, this Court should authorize discovery,

including, at a minimum, the deposition of Ms. Thro and the liaison officer identified above, as

well as any other person who would have knowledge regarding the opening, deletion or

archiving of e-mails, for the purpose of identifying the character and location of responsive

documents.  Discovery is also proper to learn the dates when the FRBNY Reports were deleted;

whether and to what extent the documents are subject to retention schedules adopted by Board;

whether they were deleted at someone's direction; whether back-up copies of the reports exist;

and whether FRBNY otherwise has other copies of the reports.  *See Judicial Watch, Inc. v. United States Dep't of Commerce*, 34 F. Supp. 2d 28, 46-47 (D.D.C. 1998).

       D.      <u>Any "Expert" Witness Must Be Deposed</u>.

      On a separate matter, while the Board avoids using the word "expert," it also appears that the Declaration of Brian F. Madigan ("<u>Madigan Decl.</u>") is couched in language suggesting that he is offered as an expert on matters relevant to one or more FOIA exemptions.  However, the Madigan Declaration is not accompanied by an expert report, nor does it identify the facts or documents upon which any such expert opinion is based.  *See* Fed. R. Civ. P. 26(a)(2).  If the Board does, in fact, offer Mr. Madigan's declaration as opinion evidence, Fox Business seeks leave to take Mr. Madigan's deposition so that a full record may be established regarding the factual basis of his opinion.

**II**

**THE BOARD HAS NOT MET ITS BURDEN UNDER RULE 56 OF
PRODUCING SUFFICIENT EVIDENCE OF ENTITLEMENT TO
<u>AN EXEMPTION UNDER SECTION 552(b)(4) OF FOIA</u>**

      The Board principally relies upon 5 U.S.C. 552(b)(4) ("<u>Exemption 4</u>"), which exempts from disclosure "trade secrets and commercial and financial information obtained from a person [that is] privileged or confidential."  5 U.S.C. § 552(b)(4).  It is uncontested that Exemption 4 applies only if ***all three*** elements of a tri-partite test are satisfied: (1) the information sought must be a trade secret or "commercial or financial" in character; (2) it must have been "*obtained from a person*;" and (3) it must be "privileged or confidential."  *See* Def Mem. at 18; *Inner City Press/Community on the Move v. Board of Governors of the Federal Reserve*, 463 F.3d 239, 244 (2d Cir. 2006); *Nadler v. Federal Deposit Ins. Corp.*, 92 F.3d 93, 95 (2d Cir. 1996).

Regarding the first prong, there is no dispute that the records in question are "commercial or financial" in character.  However, Fox Business disputes the Board's position as to each of the two other prongs, because the information in question was not obtained "from a person" within the meaning of FOIA and is not otherwise entitled to protection on the grounds of confidentiality.

A.    The Requested Information Concerning the Identity of Borrowers, the Amount Borrowed and the Collateral Pledged Came From the FRBs and Is Therefore Not "Information Obtained from a Person" Under FOIA

The Board takes the position that each of the FRBs and the borrowing institutions is a "person" within the meaning of FOIA.  With regard to the borrowing institutions, the Board cites the definition of "person" provided in 5 U.S.C. § 551(2) ("an individual, partnership, corporation, association, or public or private organization other than an agency").  Similarly, the Board refers to the FRBs as "corporations," and thus "persons" from whom confidential information may be obtained for purposes of Exemption 4.   In addition to misreading the FOIA statute, the Board tortures common sense: the three items of information sought by the FOIA Requests are the identity of the borrowers, the amounts borrowed and the collateral pledged – information generated and maintained by the Federal Reserve System in the course of its involvement with the borrowers.  *See Buffalo Evening News, Inc. v. Small Business Admin.*, 666 F. Supp. 467, 468-69 (W.D.N.Y. 1987).  For the reasons that follow, Exemption 4 does not apply.

1.    The FRBs Are Not "Persons"

Section 551(2) of FOIA excludes "agencies" from the definition of "persons."  For purposes of FOIA, an "agency" includes "any executive department, military department, Government corporation, [or] *Government controlled corporation.*"  5 U.S.C. § 552(f)(1) (emphasis added).  Both organizationally and operationally, the FRBs certainly fall within this

17

description.  Three of the nine directors of each FRB are designated by the Board, and any

officer or director of the FRB may be suspended or removed by the Board.  12 U.S.C. §§ 302,

248(f).  The selection of the president and the first vice president of each FRB is also subject to

the prior approval of the Board.  12 U.S.C. § 341.  Branch banks are established upon the

direction of the Board, and their directors "hold office during the pleasure of the Board."  12

U.S.C. § 521.  FRB operations are subject to close Board supervision.  12 U.S.C. §§ 248.

Federal Reserve Banks are required to transfer their net earnings to the U.S. Treasury. 12 U.S.C.

§ 290.  And as the Board's own submissions before this Court reveal, the Board has statutory

power to delegate its own agency functions to the FRBs.

From an operational viewpoint, the position of the FRBs within the federal regulatory

scheme is even more obvious.  As the Board *itself* points out, the FRBs were "created by

Congress in 1913 as the 'monetary and fiscal agents of the United States.'"  (Def. Mem. at 42)

(quoting *Fasano v. Federal Reserve Bank of New York*, 457 F.3d 274, 277 (3rd Cir. 2006), *cert.*

*denied*, 549 U.S. 1115 (2007)).  The Board's own submissions on this motion describe the Open

Market Operations and Discount Window lending as the principal tools by which it executes

monetary policy – operations that are conducted on the Board's behalf *by* the FRBs.[7]  (Madigan

Decl. at ¶ 14; Def. Mem. at 4, 36).  Accordingly, FRBs are not "persons" but an agency of the

federal government, and the inquiry into whether Exemption 4 applies ends right there.[8]

This result is consistent with judicial decisions considering whether FRBs are agencies

under other statutes.  *See Lee Const. Co., Inc. v. Federal Reserve Bank of Richmond,* 558 F.

---

[7]     The legislative history of the 1974 Amendments to FOIA demonstrates that Congress intended to expand
the definition of "agencies" to include those entities that "perform governmental functions and control information
of interest to the public."  H.R. Rep. No. 93-876, at 8-9 (1974), *as reprinted in* 1974 U.S.C.C.A.N. at 6267, 6274.

[8]     If FRBs are not "agencies," but simply private corporations as the Board argues here, *a fortiori* the Board's
invocation of Exemption 5, for inter- or intra-agency memoranda, is fatally inconsistent and cannot succeed.  The
Board cannot treat the FRBs as agencies for the purpose of one FOIA exemption but not another.

Supp. 165, 179 (D. Md. 1982) (FRBs are government "agencies" under the Administrative

Procedure Act, which defines the term more narrowly than it is defined for purposes of FOIA).

Other courts have also held that the FRBs are agencies, based upon the language of the relevant

statute. *See, e.g., Federal Reserve Bank of Richmond v. Kalin*, 77 F.2d 50, 51 (4th Cir. 1935)

("Federal Reserve Banks . . . had become important agencies of the federal government in its

control of banking and currency"); *Brink's, Inc. v. Board of Governors of Federal Reserve*

*System*, 466 F. Supp. 116 (D.D.C. 1979) (citing authorities holding Federal Reserve Banks

agencies of the United States under Service Contract Act). *Accord*, *Federal Reserve Bank of St.*

*Louis v. Metrocentre Improvement Dist.*, 657 F.2d 183, 185-86 (8th Cir. 1981), aff'd, 455 U.S.

995 (1982). *But see Lewis v. United States*, 680 F.2d 1239 (9th Cir. 1982) (Federal Tort Claims

Act). Since the FRBs are "agencies" under FOIA, they are not "persons" from whom

confidential business information can be received and Exemption 4 cannot apply.

    2.   The Information Sought from the Board Constitutes Information Created and
<u>Maintained by the Board, Not Data Submitted by the Borrowers</u>.

Although the Board begins its argument with the premise that the information in question

was obtained from the FRBs, it also contends that the information was "obtained" from the

borrowing banks. However, the information Fox Business seeks was not information "obtained

from" the borrowing banks because the information involves only the ultimate facts emerging

from the Federal Reserve System's lending process, *i.e.*, the names of institutional borrowers, the

amounts they have borrowed and the collateral they have pledged. Fox Business has not

requested information that the Federal Reserve System obtained from the borrower, such as the

borrowing institutions' balance sheets, the value and character of the assets they hold or their

creditworthiness. Thus, the information sought by Fox Business's FOIA Requests did not come

from a "person" within the meaning of 5 U.S.C. § 552(b)(4).

Under closely analogous facts, the court in *Buffalo Evening News*, 666 F. Supp. 467, 469 (W.D.N.Y. 1987), squarely held that the sums borrowed and outstanding balances on loans to small business borrowers were not "obtained" from an extra-governmental source, but were generated by the agency in the course of its involvement with the borrowers. The *Buffalo Evening News* court held that Exemption 4 did not authorize the Small Business Administration to withhold records identifying "individual loan amounts, . . . outstanding balances and payment, collection, or discharge status," as that information had been generated by the government and "in no way implicate[d] any of the financial information provided by the borrowers to the government."[9] *Id. Accord*, *Miami Herald Pub. Co. v. Small Business Admin.*, 670 F.2d 610, 615 (5th Cir. 1982) (FOIA exemption not implicated where requested records did not involve borrowers' information supplied in support of SBA loan applications). *Cf. Inner City Press*, 463 F.3d at 244-48 (applying Exemption 4 to information contained in bank merger application submitted to the Board). Consequently, since the records in the Board's possession did not come from a "person" within the meaning of the FOIA statute, the Board has not satisfied the second prong of the test set forth in *Nadler*, and Exemption 4 does not apply.

B.     The Federal Reserve Cannot Establish a Likelihood of Competitive
       Harm on the Basis of Speculation

Even if this Court were to find that the Board obtained the records from a "person," the Board still may not withhold the information under Exemption 4 because the records are not "privileged and confidential." Under the test articulated in *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974), and adopted by the Second Circuit in *Continental Stock Transfer & Trust Co. v. Securities and Exchange Comm'n*, 566 F.2d 373, 375 (2d Cir. 1977), information is "privileged and confidential" if, as a threshold matter, it is not

---

[9]     Tellingly, the Board does not address *Buffalo Evening News* in its memorandum of law.

ordinarily released to the public and "'its disclosure would have the effect either '(1) of impairing the government's ability to obtain . . . necessary information . . . in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'" *Nadler,* 92 F.3d at 96 (quoting *Continental Stock Transfer*, 566 F.2d at 375 (2d Cir. 1977)).

The substance of the Board's argument is that disclosure of Discount Window and other borrowing would impose a "stigma" upon the borrowers. However, the Board points to: (i) nothing in the Federal Reserve Act or FOIA that requires (or authorizes) withholding documents otherwise subject to FOIA on the basis of a "stigma"; (ii) no objection by a single institutional borrower, and no reverse-FOIA litigation in response to Fox Business's FOIA Requests; and (iii) no bilateral confidentiality agreements and no bilateral undertakings of confidentiality. Since FOIA's exemptions are to be construed narrowly, the Board's attempt to expand Exemption 4 under the new "stigma" theory must fail. *See New York Public Interest Research Group ("NYPIRG") v. United States Environmental Protection Agency*, 249 F. Supp. 2d 327, 331 (S.D.N.Y. 2003) (Hellerstein, J.) (quoting *Federal Bureau of Investigation v. Abramson*, 456 U.S. 615, 630 (1982)) ("[b]ecause the basic objective behind FOIA is disclosure, not secrecy, the nine [FOIA] exemptions are to be 'narrowly construed'").

1. The Board Has Not Adduced Sufficient Evidence of Substantial Harm to a Private Competitive Interest.

As a threshold matter, the Board does not argue that disclosure of the records sought by Fox Business's FOIA Requests would "impair[] the government's ability to obtain . . . necessary information . . . in the future," *i.e.*, the *governmental* interest in confidentiality. *National Parks*, 566 F.2d at 375; *Nadler,* 92 F.3d at 96. Having thus conceded the first prong of the *National Parks* test, the Board instead principally relies upon the second prong, which would justify

21

withholding documents only if their disclosure would be likely to harm the institutional *borrowers'* interest in confidentiality. But the second prong of *National Parks* does not justify withholding the documents at issue in this case because the record does not support a finding of competitive harm.

Regarding the supposed threat to the borrowers' private competitive interest, the Board has offered little more than the *ipse dixit* of its own personnel, including one affiant whom it (apparently) wishes the Court to treat as an expert, *i.e.*, its director of Monetary Affairs, Brian F. Madigan. Citing a decision by a panel of the Ninth Circuit in *Lion Raisins, Inc. v. USDA*, 354 F.3d 1072, 1079 (9th Cir. 2004), the Board suggests that this Court is obliged to defer to the agency's expertise on the core issue of whether a FOIA exemption applies in this case.[10] The Board is wrong.

The consequence of the *de novo* review requirement is that a federal agency's view on the applicability of exemptions is not entitled to the deference that would otherwise attach to agency determinations. *See United States Dep't of Justice v. Reporters Committee For Freedom of Press*, 489 U.S. 749, 755 (1989) (distinguishing de novo review under FOIA from review of other agency action under the Administrative Procedure Act); *see also Natural Resources Defense Council, Inc. v. Defense Nuclear Facilities Safety Bd.*, 969 F.2d 1248, 1250-1251 (D.C. Cir. 1992), *cert. denied*, 508 U.S. 906 (1992) (*Chevron* deference is trumped under FOIA because the statute's purpose of transparency in government "creates tension with the understandable reluctance of government agencies to part with that information"). While federal courts adopt a certain deference under FOIA in very limited areas, *i.e.*, national security, no such deference applies under Exemption 4 or Exemption 5. *See Wolf v. C.I.A.*, 473 F.3d 370, 374

---

[10]     Def. Mem. at 20, n. 5, citing *Lion Raisins*, 354 F.3d at 1079, for the proposition that "Courts can rely solely on government affidavits so long as the affiants are knowledgeable about the information sought and the affidavits are detailed enough to allow the court to make an independent assessment of the government's claims."

(D.C. Cir. 2007) ("in conducting de novo review in the context of national security concerns, courts . . . .accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.")

Moreover, even under the Board's own reasoning, the government is obliged to supply detailed and specific descriptions of each category of information that the agency seeks to withhold and the ways in which each category of information could place the submitter in a competitive disadvantage. *See Lion Raisins*, 354 F.3d at 1080. Government affidavits "will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Cooper Cameron Corp. v. United States Dept. of Labor, Occupational Safety and Health Admin.*, 280 F.3d 539, 543 (5th Cir. 2002). *See also Comstock Int'l (U.S.A.), Inc. v. Export-Import Bank*, 464 F. Supp. 804, 807 (D.D.C. 1979) ("[c]onclusory and generalized allegations are unacceptable as a means of sustaining the burden of nondisclosure under the FOIA").

> a. The Board Identifies No Basis in the Federal Reserve Act or
>    FOIA for Withholding Records on the Basis of a "Stigma," But
>    Relies Entirely Upon Speculation.

Apart from Ms. Thro's declaration, which describes the search itself, the Board has submitted declarations from four FRBNY employees (Anne F. Baum, Christopher R. Burke, Lorie K. Logan and Susan E. McLaughlin), an employee of the FRBB (Jacqueline P. Palladino), and Mr. Madigan, the Director of the Board's Division of Monetary Affairs. Apart from lengthy descriptions of the particular facilities that these employees help to administer, these employees principally confine themselves to a series of conclusory and often speculative assertions to the effect that the release of information regarding Discount Window and other liquidity borrowing will cause competitive harm.

- Anne F. Baum (FRBNY):

  . . . Public disclosure that an institution had utilized the CPFF ***could*** result in a negative perception that would cause a competitive disadvantage and harm the entity's ability to obtain funding in broader markets, possibly risking its longer term viability.

  Additionally, if the names of issuers that have sold commercial paper to the CPFF were to be made public, ***there is a real concern*** that market participants would draw adverse conclusions about the credit worthiness and viability of the issuers based on conjecture and speculation. These rumors would likely cause substantial competitive harm to those issuers who face competition in the market for retail goods and service from other U.S. and foreign issuers of commercial paper. The mere fact that an issuer came to the CPFF to sell its commercial paper ***could*** lead market participants to inaccurately speculate that the issuer was having difficulty securing funding in the regular commercial paper market and that the issuer itself must therefore be in financial trouble. . . . . (Baum Decl. at ¶¶ 15, 16) (Emphasis supplied).

- Christopher R. Burke (FRBNY):

  . . . A primary dealer would suffer a competitive disadvantage if its name, rate, amounts or the relevant collateral it posted were disclosed to the public, as these transactions would provide information to competitors regarding the rates at which it can receive financing, as well as the composition of the primary dealer's portfolio. If the Bank were to disclose or be compelled to disclose the information being sought in the FOIA request, it would severely hamper the primary dealer's ability to compete in the market because it would reveal information about the primary dealer's trading strategies and the size of its book, giving others an opportunity to trade against the primary dealer. It ***may*** also provide a basis for identifying the relationship between (a) publicly observable behavioral patterns of the primary dealers and (b) the (unobservable) composition of the dealer's portfolio that would be valuable for inferring the composition of the dealer's portfolio at a later date. This ***could*** reduce the primary dealer's willingness to participate in these operations in the future. (Burke Decl. at ¶ 25) (Emphasis supplied).

- Lorie K. Logan (FRBNY):

  Similarly, if the name of a primary dealer that borrowed from the TSLF or the TOP were to be made public, ***there is a real concern*** that market participants would draw adverse conclusions about the primary dealer based on conjecture and speculation. These rumors would likely cause substantial competitive harm to primary dealers borrowing at the TSLF or the TOP because the mere fact that a primary dealer is coming to the TSLF or the TOP would lead market participants to inaccurately speculate that the primary dealer was having difficulty finding

term funding against its collateral in the open market and that the dealer itself must therefore be in financial trouble. (Logan Decl. at ¶ 37) (Emphasis supplied).

- Susan McLaughlin (FRBNY):

A borrower's competitive position ***could*** be severely harmed if the New York Fed or its agents disclosed or were compelled to disclose that the institution obtained funds at the Discount Window.  Institutions borrowing at the Discount Window face competition in the market for retail and commercial banking services from other domestic and international institutions.  If the New York Fed or its agents were to make public or be compelled to make public the name of an institution that borrowed from the Discount Window, ***there is a real concern*** that market participants, including financial analysts, customers, and competitors of the borrowing institution, would draw adverse conclusions about the borrowing depository institution that were based on conjecture and speculation. . . .

In addition to the likelihood of substantial competitive harm to the financial institutions borrowing at the Discount Window, if details regarding collateral posted as security by an individual institution were publicly disclosed there would also be a likelihood of substantial competitive harm to the institutions whose assets had been pledged as collateral (the "issuers") for Discount Window loans. This would occur because public disclosure of the collateral being pledged at the Discount Window and PDCF would fuel speculation regarding the soundness of the issuers.  The market would question the financial condition of the issuers based on the volume of a particular collateral type that was pledged, the value placed on the collateral and the fact that the borrower was unable to readily pledge the issuer's collateral in private financial markets.  While the speculation about an issuer might have no basis in fact, ***there is a very real possibility*** that the rumors alone ***could*** place this institution in a weakened condition vis-à-vis its competitors, particularly in these times of market stress.

. . . A primary dealer would similarly suffer competitive and reputational harm if its name and the collateral it posted were disclosed to the public by the New York Fed.  For the reasons stated in Paragraph 19-24 above, the mere fact that a primary dealer is coming to the PDCF ***could*** lead market participants to inaccurately speculate that the primary dealer was having difficulty obtaining financing in the open market and that the dealer itself must therefore be in financial trouble, or the underlying securities must be difficult to pledge. (McLaughlin Decl. at ¶¶ 21, 23, 26) (Emphasis supplied).

- Jacqueline Palladino (FRBB):

A borrower's competitive position ***could*** be severely harmed if the market became aware of the fact that the institution obtained funds at the Discount Window, including through the AMLF. Institutions borrowing at the Discount Window face competition in the market for retail and commercial banking

services from other domestic and international institutions. If the name of an institution that borrowed from the Discount Window were to be made public by the Boston Fed, ***there is a real concern*** that market participants, including financial analysts, customers, and competitors of the borrowing institution, would draw adverse conclusions about the borrowing institution that were based on conjecture and speculation. In particular, it ***could*** fuel speculation that the institution is experiencing liquidity strains, a shortage of capital, or is less financially sound than publicly reported.

These ***rumors have the potential*** to cause substantial competitive harm to institutions borrowing at the Discount Window because, in reaction to the rumors, customers ***could*** withdraw deposits and private lenders ***could*** accelerate loans or refuse to provide additional funding to the borrowing institution. This in turn would cause capital and liquidity strains, leaving the borrowing institution in a weakened position vis-à-vis its competitors. Such rumors and speculation about the health of institutions ***could*** quickly spiral into market turmoil, as has been apparent in recent months in the financial markets.  (Palladino Decl. at ¶¶ 17, 18) (Emphasis supplied).

The declarations make clear that the Board's proof consists of speculation and conjecture about the *possibility* of rumors, speculation and conjecture.  Even the Madigan Declaration, which is apparently styled as a form of expert opinion, rests upon little more than pure supposition, coupled with stray anecdotal, hearsay references:

As a result of stigma, if institutions perceive any chance that their [Discount Window] or SCLF borrowing might be revealed to the public, they ***may*** avoid borrowing at virtually any cost.  For example, rumors that Citibank might be borrowing at the [Discount Window] in the early 1990s reportedly sparked runs at some of its offices in Asia.[11]  The risks to an institution posed by the possibility of such depositor behavior are likely to cause institutions to be very cautious in borrowing from the [Discount Window]. . . . (Madigan Decl. at ¶ 27) (Emphasis supplied).

Mr. Madigan goes on to layer his opinion with citation to a March 2007 report (published prior to the financial crisis) which, in turn, opines that "discount window facilities should not be

---

[11]      Mr. Madigan's declaration does not disclose or attach any specific facts upon which he formed his opinion. In addition, it is equally possible that the "run on the bank" in 1991 to which Mr. Madigan refers may have been caused less by any particular public awareness of Discount Window borrowing than by some negative remarks by Congressman John D. Dingell during a House committee meeting, as well as the shutdown of the Hong Kong branch of Bank of Credit and Commerce International ("B.C.C.I.").  *Run at Citibank in Hong Kong,* Reuters, Aug. 9, 1991.

considered available in a name-specific event as this could signal to the markets that the firm is

in dire straits and **could** exacerbate the crisis."  (Madigan Decl. at ¶ 27) (Emphasis supplied).

But Congress has adopted no such blanket exemption for records of Discount Window

borrowing simply on the ground that it "could" lead to rumors in the marketplace.

      In addition, the Board is very loose with its use of the word "competitive."  To justify

withholding information pursuant to Exemption 4, a federal agency must show that the

"affirmative use of proprietary information *by competitors*," and not merely " . . . any injury to

competitive position."  *Public Citizen Health Research Group v. F.D.A.*, 704 F.2d 1280, 1291

(D.C. Cir. 1983) (emphasis in original).  *See also CNA Financial Corp. v. Donovan*, 830 F.2d

1132, 1154, n. 158 (D.C. Cir. 1987), *cert. denied*, 485 U.S. 977 (1988) (same); *Public Citizen

Health Research Group v. F.D.A.*, 964 F. Supp. 413, 415 & n. 2 (D.D.C. 1997) (alarm in

marketplace not to be equated with competitive harm).  But that is the sum and substance of the

Board's speculative musings about competitive harm, as quoted in the declarations excerpted

above, *i.e.*, a "run on the bank," and the prospect of "adverse conclusions" by "market

participants."

      There is no "fear of stigma" exemption under FOIA.  Congress knew perfectly well how

and when to exempt data regarding financial institutions from disclosure under FOIA if it wanted

to.  For example, Congress *did* enact 5 U.S.C. § 552(b)(8), which exempts from disclosure

information obtained in "examination, operating, or condition reports" prepared in the course of

an agency's supervision of a financial institution.  In fact, the House Report specifically noted

that private financial data, "if indiscriminately disclosed, [could] cause great harm."  H. R. Rep.

No. 1497 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2418, 2428.  But the Federal Reserve does

not claim an exemption under 5 U.S.C. § 552(b) (8) – nor could it on these facts – and no other

FOIA exemption authorizes the Federal Reserve to withhold agency records out of a fear of causing a "run on the bank."

Given Rule 56(c)'s requirement that a motion for summary judgment be supported by evidentiary facts, the foundation for Mr. Madigan's declaration is inadequate to support the agency's claim of entitlement to judgment as a matter of law.[12]  Under the second prong of the *National Parks* test, defendants must present "specific factual or evidentiary material" to justify withholding agency records under Exemption 4 of FOIA, *i.e.*, evidence of competition and some identification of the business submitters who would be harmed by disclosure of the information. *See Pacific Architects and Engineers, Inc. v. Renegotiation Board*, 505 F.2d 383, 385 (D.C. Cir. 1974).  *See also Associated Press v. United States Department of Defense*, 410 F. Supp. 2d 147, 150 (S.D.N.Y. 2006) (FOIA case; agency entitled to summary judgment only if it can show by undisputed facts supported by admissible evidence that it is entitled to judgment as a matter of law); *News Group Boston, Inc. v. National R.R. Passenger Corp.*, 799 F. Supp. 1264, 1269 (D. Mass. 1992) (denying Exemption 4 and holding unsupported statements of opinion by Amtrak representatives insufficient to meet burden of coming forward with specific factual or evidentiary material); *Black Hills Alliance v. U.S. Forest Service*, 603 F.Supp. 117, 121 (D.S.D. 1984) (affidavits of Forest Service officials generally opining as to the possibility of competitive use of drilling information submitted by Union Carbide held insufficient).

Here, the Board has come forward with declarations that are long on speculation but conspicuously short on facts.   Moreover, it is a matter of public record that some of the leading banks in the nation have used the Federal Reserve's emergency facilities during the period of

---

[12]     Fox Business assumes that the FRB declarants are not offered as "experts," as their declarations do not purport to qualify them as such.  Those staff members possess either MBAs or degrees in public administration and are generally operational personnel.

Fox Business's FOIA Requests; Mr. Madigan conspicuously avoids any explanation as to why these institutions are still standing, unstained by the "stigma."

While Mr. Madigan relies upon hearsay from the 1990s in support of his speculation regarding competitive harm to borrowers, Fox Business respectfully submits that the more recent evidence of borrowing from the Federal Reserve's liquidity facilities requires the opposite conclusion. For example, in its annual report on Form 10-K, JPMorgan Chase & Co. reported that it had borrowed $1.1192 billion (as of December 31, 2008) from the AML Facility, which is used to provide liquidity to eligible U.S. money market mutual funds. *See* JPMorgan Chase & Co., Annual Report (Form 10-K), at 190 (Mar. 2, 2009) (An excerpted portion is attached as Exhibit 1 to the accompanying Declaration of Terence W. McCormick ("McCormick Decl.")). JPMorgan Chase also took $30 billion of advances under the Term Auction Facility ("TAF"). *Id.* Similarly, Citigroup, Inc. ("Citigroup") also publicly disclosed its borrowing from the Federal Reserve. *See* Citigroup, Inc., Annual Report (Form 10-K), at 98-99 (Feb. 27, 2009) (McCormick Decl. at Exhibit 2) . Citigroup had funded $13.8 billion under the Primary Dealer Credit Facility ("PDCF"). *Id.* at 98. Citigroup's Form 10-K also shows that on December 31, 2008, Citigroup had $9.0 billion in Commercial Paper and $3.3 billion in Credit Card Asset-Backed Commercial Paper outstanding under the Commercial Paper Funding Facility. *Id.* Citigroup also publicly disclosed that it uses the Term Securities Lending Facility ("TSLF") to "facilitate secured funding transactions for its inventory as well as that of its customers." *Id. See also* Merrill Lynch, Annual Report (Form 10-K), at 43-44 (disclosing Merrill Lynch's use of several facilities during 2008 and 2009, including TSLF, PDCF, and CPFF) (McCormick Decl. at Exhibit 3). One would expect, of course, that if Citibank, JPMorgan Chase or Merrill Lynch had been the subject of a "run on the bank" as a consequence of this publicly disclosed

borrowing from the FRBs, Mr. Madigan would have pointed that fact out in his declaration. The foregoing reports are a matter of public record and may be accessed through the website of the United States Securities and Exchange Commission ("SEC") at http://www.sec.gov. This Court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).[13]

In addition, the list of financial institutions that have received funding under the Troubled Assets Relief Program ("TARP") is also a matter of public record and has been disclosed by the Treasury Department. *See* McCormick Decl., at Exhibit 4. Accordingly, the only logical view of the record is that the market has already absorbed the information regarding the state of our financial industry, and disclosure regarding Discount Window lending, SCLFs and OMOs would have no discernable impact on either the borrowing institutions or the Federal Reserve System.

      b.   No Institutional Borrower Has Objected to the Release of Information in Response to Fox Business's FOIA Requests or Filed a "Reverse-FOIA" Suit.

Moreover, if there were a serious concern about the "stigma" associated with borrowing at the Discount Window and the various SCLFs, one might have expected that the affected institutions would have *objected* to public disclosure of the documents sought by Fox Business. As of the present, the Board has not notified Fox Business that any such institutions have been notified of the FOIA Requests or have objected to disclosure (*see* 12 C.F.R. §§ 261.15, 261.16); nor have any "reverse-FOIA" suits been commenced in connection with the FOIA Requests. As this Court pointed out in *New York Public Interest Research Group ("NYPIRG") v. United States Environmental Protection Agency*, 249 F. Supp. 2d 327 (S.D.N.Y. 2003) (Hellerstein, J.),

---

[13]    The Board might be on stronger ground in advancing this argument if the market conditions prevailing before August 2007 were still in existence. It is undisputed that Discount Window borrowing was a miniscule fraction of what it is today. (*See* Fox Rule 56.1 Stmt. at ¶ 15, Board's Answer at ¶ 14). In normal conditions, the release of information regarding borrowing by a much smaller universe of member banks might more plausibly have been useful to competitors. However, given the spike in institutional borrowing from the Federal Reserve System's emergency facilities, the record permits only one inference, namely, that the market has already absorbed the news that banks have borrowed from the Federal Reserve System's emergency liquidity facilities (in the past).

a business submitter's silence in the face of possible disclosure under FOIA is a factor militating

*against* Exemption 4:

> . . . While the confidentiality agreement between GE and the EPA and the "privileged and confidential" marking placed on some of the documents evince GE's intent that the analyses be treated as confidential, defendants have not established GE's "custom" with respect to this information. GE has not come forward to invoke Exemption 4's protection, and the government's allegations of confidential treatment are not based on personal knowledge.

*NYPIRG*, 249 F. Supp. 2d at 337. *See also Black Hills Alliance*, 603 F. Supp. at 121 ("[i]t is

significant that Union Carbide itself has not submitted an affidavit addressing these matters");

*Wiley Rein & Fielding v. United States Dep't of Commerce*, 782 F. Supp. 675, 676 (D.D.C.

1992) (rejecting competitive harm claim under Exemption 4 because "no evidence" was

submitted to suggest that the companies themselves object to disclosure); *Newry Ltd. v. U.S.

Customs and Border Protection Bureau*, No. Civ.A. 04-02110 (HHK), 2005 WL 3273975, at *4

(D.D.C. July 29, 2005) (denying Exemption 4, and noting that "[c]ourts have repeatedly rejected

competitive harm claims when they are advanced solely by the defendant agencies").[14]

> ### c. The Board Does Not Adduce Evidence That Responsive Records Are Subject to any Confidentiality Agreements.

There is no evidence that the FRBs are contractually bound to treat as confidential the

fact of a borrower's use of its facilities, the amount borrowed or the collateral required. The

FRBNY declarants vaguely state that "[i]t is not market practice to disclose this information,"

(Baum Decl. at ¶ 15 (CPFF facility); Burke Decl. at ¶ 25 (Open Market Operations), and/or that

there is an "implicit understanding" amongst the parties that information regarding such

borrowing will not be disclosed. (*See id.*; *see also* Logan Decl. at ¶ 32 (Securities Lending

---

[14]    In *Inner City Press*, by contrast, the Board submitted a declaration from a senior vice president of Wachovia Corporation, averring that Wachovia "would not have provided the Board with the actual names of its subprime lending clients" if it believed the information would later be disclosed under FOIA.  463 F.3d at 247, n. 9.

Program, TSLF and TOP).[15]  Nor would such an "understanding," whether implicit or explicit,

be dispositive under Exemption 4.  *See Petkas v. Staats*, 501 F.2d 887, 889-90 (D.C. Cir. 1974);

*National Parks*, 498 F.2d at 767.  Quite the contrary: federal agencies are not authorized to carve

out exceptions to FOIA merely by assuring that they will treat documents confidentially.  *See*

*Teich v. F.D.A.*, 751 F. Supp. 243, 247 (D.D.C. 1990) ("[w]hile certainly the agency can deny

access to records that the FOIA itself protects, [an undertaking in advance to treat documents as

nonpublic] cannot be used to forge a Northwest passage around the FOIA").  Put another way,

the Court, and not the agency, is the last word on FOIA as to any documents that come within

the agency's possession.  *See id*.

       In sum the Board points to: (i) nothing in the Federal Reserve Act or FOIA that requires

(or authorizes) withholding documents otherwise subject to FOIA on the basis of a "stigma"; (ii)

no objection by a single institutional borrower, and no reverse-FOIA litigation in response to Fox

Business's FOIA Requests; and (iii) no confidentiality agreements.  Nor has the Board even

identified a *single* institutional borrower that would be competitively harmed.  All that the Board

has to offer are vague "understandings" and educated speculation regarding imaginary

competitive harm on the part of its staffers – which is fatally undermined by the widespread

public reporting by the banks themselves of their own borrowing from the Federal Reserve

System.

       2.   The So-Called "Third Prong" of *National Parks* Does Not Afford a
            Valid Basis Upon Which to Find that the Requested Information
            Be Withheld Under Exemption 4 of FOIA

       The Board alternatively relies upon a so-called "third prong" of the *National Parks* test,

which examines whether release of the subject information would impair a federal agency's

---

[15]      With regard to the PDCF facility, Ms. McLaughlin upgrades the "implicit understanding" to an "explicit understanding" (McLaughlin Decl. at ¶ 19), without specifying the form of that "understanding."

ability to carry out its statutory mission, in this case, the Federal Reserve System's role of addressing strains in financial markets. (Def. Mem. at 26-33). But no such "third prong" has been recognized by the Second Circuit. In fact, the *National Parks* court itself did not expand Exemption 4 to allow withholding of documents on the ground of an agency's "program effectiveness" but left the question for another day. *National Parks*, 498 F.2d at 770 & n. 17. The Second Circuit has had occasion to address the "program effectiveness" variant of Exemption 4, but has expressly declined to adopt it. In fact, in 1996 the *Nadler* court consciously avoided the issue of whether administrative efficiency would constitute a category under Exemption 4, even though the district court in that case had done so. *Nadler*, 92 F.3d at 96.[16] Five years after *National Parks*, moreover, the Supreme Court squarely rejected "administrative effectiveness" as a justification for withholding documents under Exemption 5. *Federal Open Market Committee v. Merrill ("FOMC")*, 443 U.S. 340, 353-354 (1979) (noting legislative history and finding that reliance upon agency's "efficiency" interest would broadly empower agency to undermine FOIA's purpose of prompt disclosure). There is no reason to believe that the Supreme Court would be any more likely to endorse an "agency effectiveness" expansion of Exemption 4.

The cases which invoked this rationale to exempt information generated in the transactional process (as opposed to information obtained from a nongovernmental entity), *Comstock Int'l (U.S.A.), Inc. v. Export-Import Bank*, 464 F. Supp. 804 (D.D.C. 1979), and

---

[16]    *But see 9 to 5 Org. for Women Office Workers v. Board of Governors*, 721 F.2d 1, 10 (1st Cir. 1983). The Board also relies upon dicta in *Critical Mass Energy Project v. Nuclear Regulatory Commissions*, 975 F.2d 871, 879 (D.C. Cir. 1992) (en banc), *cert. denied*, 507 U.S. 984 (1993). However, while the *Critical Mass* court viewed the two-prong test of *National Parks* as non-exclusive, the "program effectiveness" consideration was not the determinative factor in that case. Rather, the *Critical Mass* decision turned on the private interest in confidentiality, and created an exception to *National Parks* in cases where the business submitter had provided the information voluntarily in the first instance. This Court rejected the *Critical Mass* test in *NYPIRG*, 249 F. Supp. at 335-36, and the Second Circuit expressly refused to adopt it in *Inner City Press*, 463 F.3d at 245, n. 6.

*Clarke v. United States Department of the Treasury*, No. 84-1873, 1986 WL 1234 (E.D. Pa. Jan. 28. 1986), involved government agencies that had competitors for their lending or bond-selling activities and, thus, stood to lose clientele if they could not assure their customers' confidentiality.  As the court reasoned in *Buffalo Evening News,* 666 F. Supp. at 471, such holdings – to the extent they even comport with the required narrow construction of Exemption 4 – have no persuasive force where, as here, the Federal Reserve's liquidity programs are lenders of last resort for the institutional borrowers that the programs target.

### III

### THE FOIA EXEMPTION FOR INTER- AND INTRA-AGENCY MEMORANDA DOES NOT APPLY TO THE INFORMATION FOX BUSINESS IS SEEKING

A.    The Board Has Not Established That Any of the Withheld Documents Are Pre-Decisional, Deliberative Materials.

The Board alternatively relies upon Exemption 5 of FOIA, which permits a federal agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To begin with, the Board's invocation of Exemption 5, which applies only to *intra- and inter-agency* material is untenable, since the Board acknowledges that the material in question is passed back and forth between itself and the FRBs and, at least according to the Board, the FRBs are private entities rather than governmental agencies.  Even without this insurmountable obstacle, however, it is apparent that Exemption 5 is not applicable to the factual information Fox Business is seeking.

The Board concedes that Exemption 5 will operate "to exempt those documents, and only those documents that are normally privileged in the civil discovery context."  *NLRB v. Sears,*

34

*Roebuck & Co.*, 421 U.S. 132, 149 (1975).  In this regard, the Board does not rely upon the attorney-client privilege or "executive" privilege for pre-decisional deliberations.  *See id.*

The Board does argue that the records at issue, *e.g.*, the Remaining Term Report, Origination Report and Emergency Credit Report, were "prepared by Board staff using data supplied by the Federal Reserve Banks and distributed to Board staff (with copies to the FRBNY) for use in formulating monetary policy and for Reserve Bank supervision purposes" (Def. Mem. at 34), but does ***not*** assert the deliberative process privilege.  Nor could it; as Fox Business established in its motion for summary judgment, to qualify as "deliberative executive" material, the document in question must be "predecisional" and "deliberative."  *Tigue v. United States Department of Justice,* 312 F.3d 70, 76 (2d Cir. 2002), *cert. denied,* 538 U.S. 1056 (2003).  This privilege does not, as a general matter, cover "purely factual" material.  *Grand Central Partnership v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999); *Hopkins v. United States Dep't of Housing and Urban Development*, 929 F.2d 81, 85 (2d Cir. 1991).  There is no evidence in the record that such documents fall within this description.  Moreover, "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery."  *Environmental Protection Agency v. Mink,* 410 U.S. 73, 87-88 (1973).

> B.    The Exemption for Confidential Business Commercial Information Under *FOMC v. Merrill* Does Not Apply.

The Board grounds its entitlement to an exemption entirely upon an exception recognized by the Supreme Court for the ***temporary*** withholding of the ***government's*** confidential commercial information.  (Def. Mem. at 34-37, citing *FOMC v. Merrill*, 443 U.S. 340 (1979)).  But *FOMC* is of no help to the Board.

The Supreme Court in *FOMC* recognized a *qualified, temporary* privilege within Exemption 5 "for confidential commercial information, at least to the extent that this information is generated by the Government itself *in the process leading up to awarding a contract*." 443 U.S. at 360 (emphasis added). As Fox Business pointed out in its separate motion for summary judgment, *FOMC* unmistakably confined the scope of that privilege to instances where "the Government will be placed at a competitive disadvantage or . . . the consummation of [a government] contract may be endangered." *Id.* at 360. Critically, the *FOMC* Court held that "the rationale for [the *FOMC* privilege] expires as soon as the contract is awarded or the offer withdrawn." *Id.*

As the Board recognizes, the rationale for the *FOMC* decision was that "if the Domestic Policy Directives contain *sensitive information not otherwise available*, and if immediate release of the Directives would significantly harm the Government's monetary functions or commercial interests, then a slight delay in publication of the Directives such as that authorized by 12 C.F.R. § 271.5 would be permitted under Exemption 5." *Id*. at 363 (emphasis added). But the Board fails to substantiate that any information regarding the terms of the lending at issue are "sensitive" or "not otherwise available." Instead, the Board shoehorns generalized concerns regarding the supposed impact of disclosure upon the effectiveness of its "monetary functions." (Def. Mem. at 37, citing Madigan Decl. at ¶ 32).

The problem with the Board's position is that the records Fox Business has requested concern loans *that have already been made*, and in some cases months ago, and in some instances almost two years ago. The Board simply cannot advance a serious argument that disclosure could conceivably place the Federal Reserve System "at a competitive disadvantage" or could "endanger the consummation" of the particular loans. *See Government Land Bank v.*

36

*General Services Admin.*, 671 F.2d 663, 665 (1st Cir. 1982) (appraisal reports for property listed by General Services Agency protected from disclosure under Exemption 5, *but only until property is sold*).

Moreover, to qualify for an exemption under *FOMC*, the agency must show not only that immediate disclosure "would significantly harm the Government's monetary functions or commercial interests," but also that any delay in disclosure would be "slight." *FOMC, supra,* 443 U.S. at 361. Manifestly, a delay of more than four months (and up to nineteen months) does not meet that criterion.

## IV.

### RESPONSIVE DOCUMENTS AT THE FRBNY AND FRBB ARE AGENCY RECORDS

The records sought by Fox Business's FOIA Requests may be divided into two categories: (1) those in the immediate possession, custody and control of the Board itself and (2) records located at the FRBs. As to the first category, the uncontested facts in the record establish that, despite earlier assertions to the contrary, the Board had obtained from the FRBs loan origination and collateral records in various forms, on a daily and a weekly basis. *See* Thro Decl. at ¶¶ 15-19, 26, 28. Thus, the Board possesses documents revealing the identity of the borrowers, the amounts borrowed and the collateral pledged. However, in its motion for summary judgment, the Board asserts that the second category of documents are not "records of the Board" because they were originated in the first instance and maintained by the FRBs. The Board is wrong.

    A.    For Purposes of FOIA, The Board and The FRBs Are in Actuality One Unitary Agency of the United States.

In its strained effort to argue that the Federal Reserve System is a combination of "public and private interests," of which it asserts the FRBs are private corporations, the Board

unwittingly concedes that, for the purposes of FOIA, the Board and the FRBs are in actuality a single whole.  For example, the Board concedes that the Board and FRBs "work hand in hand as components of our nation's central banking system," (Def. Mem. at 41) and that the FRBs are the "operational arm of the nation's central banking system . . . created in 1913 as the 'monetary and fiscal agents of the United States,'" operating under a grant of authority by Congress. (Def. Mem. at 42, 44) (citations omitted).[17]  As explained more fully in Part II.A.1, *supra*, each FRB has three directors who are designated by the Board, and conducts the nation's central banking function in conjunction with the Board, both pursuant to its own statutory authority and powers delegated by the Board.  This entanglement of the Board and the FRBs fatally undermines the Board's position that records located at the FRBs are somehow distinct from those of the Board for purposes of FOIA.

The Supreme Court had very little trouble finding that the Federal Open Market Committee was an agency of the federal government, noting that it was composed of seven members of the Board *and five representatives of the FRBs*.  *FOMC*, 443 U.S. at 344 & n.4, 352 ("FOMC is clearly an 'agency' as that term is defined in the Administrative Procedure Act"). Similarly, in *Federal Reserve Bank of Boston v. Commissioner of Corporations and Taxation of Com. of Massachusetts*, 499 F.2d 60 (1st Cir. 1974), the First Circuit held that the Federal Reserve Bank of Boston was entitled to maintain suit in federal court for a declaratory judgment to claim exemption from tax on the ground that it was an agency or instrumentality of the United States government, and that the Attorney General of the United States did not have to join in the action as a plaintiff to secure that right in the name of the United States.  The First Circuit

---

[17]    Tellingly, most of the evidence adduced by the Board in support of its motion for summary judgment was provided by declarants from the *FRBs*.

pointedly rejected a comparison of the Federal Reserve Banks to "private corporations," like

savings and loan associations:

> While savings and loan associations may in many ways be analogized to private corporations, federal reserve banks, by contrast, are plainly and predominantly *fiscal arms of the federal government. Their interests seem indistinguishable from those of the sovereign* and there are good reasons to relieve them of any symbolic requirement of joinder with and by the United States.  There are twelve such banks in the nation, of which the plaintiff is one. They were created and are operated in furtherance of the national fiscal policy.  They are not operated for the profit of shareholders, and do not provide ordinary commercial banking services; their stockholders, the member banks, lack the powers and rights customarily vested in shareholders of a private corporation. Federal reserve banks act as depositories for money held in the United States Treasury and as fiscal and monetary agents of the United States.  12 U.S.C. § 391.[18]  They hold the legal reserves of member banks, issue currency, facilitate check clearance and collection, and have supervisory duties as to member banks.  They also provide important services for the Treasury with respect to the public debt and the issuance, handling and redemption of government securities.

499 F.2d at 62-63 (emphasis added).

**B.    Board Regulations Make Clear that Documents at the FRBs
       Are Records of the Board for Purposes of FOIA.**

As Fox Business pointed out in its motion for summary judgment, 12 C.F.R. §

261.2(i)(1)(i) identifies the records of the FRBs as Board records.  In response, the Board urges

that the regulation only encompasses "documents in the performance of functions for or on

behalf of the Board."  (Def. Mem. at 45; Thro Decl. at ¶ 32).  Relying on a strained interpretation

of this language, the Board has invoked another provision, 12 C.F.R. § 265.11, which delineates

the specific delegations of authority formally assigned to the FRBs.  (Def. Mem. at 46, n. 21).

Since this provision does not explicitly provide for "delegation" of the functions of making loans

and taking collateral, the Board argues that records maintained by the FRBs in connection with

---

[18]    Some of the funding for the FRB's lending comes from the TALF, a program of the United States Department of the Treasury, thereby adding yet another layer of agency entanglement and fatally undermining the Board's characterization of the FRBs as "private corporations."

39

those functions are not "records of the Board" under 12 C.F.R. § 261.2(i)(1)(i).  The Board's argument is not sustainable for several reasons.

1.  <u>12 C.F.R. § 261.2(i)(1)(i)</u>

First, 12 C.F.R. § 261.2(i)(1)(i) does not provide any indication that the "functions" referred to in that rule are limited to those that have explicitly been delegated under 12 C.F.R. § 265.11.  Instead, 12 C.F.R. § 261.2(i)(1)(i) refers, without any further qualification, to records acquired by the FRBs "in the performance of functions for or on behalf of the Board"— a broad formulation that does not require that the "function" in question be among those formally delegated pursuant to 12 C.F.R. § 265.11 or any other formal delegation source.

Second, it cannot seriously be argued that an FRB's administration and implementation of the Federal Reserve System's lending programs for improving liquidity in the financial sector are not functions performed "for or on behalf of the Board," especially the emergency programs that were put into motion by the Board in 2007 and 2008.  Indeed, the Board's own website states that the "tools" of the Federal Reserve System include "the provision of liquidity directly to borrowers and investors in key credit markets [through t]he Commercial Paper Funding Facility, the Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility, and the Money Market Investor Funding Facility . . . [, as well as the soon-to-be-implemented] Term Asset-Backed Securities Loan Facility."[19]  Thus, the Board's attempt artificially to narrow the scope of 12 C.F.R. § 261.2(i)(1)(i) should be rejected.

2.  <u>12 C.F.R. § 261.2(i)(1)(ii)</u>

Whatever relevance 12 C.F.R. § 265.11 may have to the application of 12 C.F.R. § 261.2(i)(1)(i), the same cannot be said for 12 C.F.R. § 261.2(i)(1)(ii).  That regulation states that

---

[19]    http://www.federalreserve.gov/monetarypolicy/bst_crisisresponse.htm.

40

"Records of the Board include . . . [records t]hat are maintained for administrative reasons in the regular course of business in official files in any division or office of the Board *or any Federal Reserve Bank* in connection with the transaction of any official business" (emphasis added). This provision is plainly broader than 12 C.F.R. § 261.2(i)(1)(i) and, more critically, *does not* include any reference to "functions" performed "for or on behalf of" the Board. Thus, the "delegated functions" argument advanced by the Board has no force under this regulation.

Since there can be no doubt that loans made by FRBs – and their acceptance of the collateral associated with such loans – constitute the transaction of the FRBs' "official business," *see, e.g.*, 12 U.S.C. § 347b(a)(authorizing FRBs to make secured short-term loans to member banks under the Board's supervision), the loan and collateral records maintained by the FRBs are squarely within the class of records described as "records of the Board" under 12 C.F.R. § 261.2(i)(1)(ii). Hence, the Board is obligated to search such records for the documents Fox Business has requested.

       3.      <u>12 C.F.R. § 261.3(a)</u>

Finally, 12 C.F.R. § 261.3(a) makes the Board's Secretary the "official custodian of all Board records, *including records that are in the possession or control of . . . any Federal Reserve Bank*." This provision effectively refutes the Board's assertion (Def. Mem. at 38-40, quoting *Kissinger* and *Tax Analysts*), that it has neither "obtained" nor continues to have "control" of the FRBs' collateral records.

Even if the FRBs were deemed private entities, the records in their possession would still be Board records subject to disclosure under FOIA. Where a government contractor performs a function on behalf of a federal agency, the records are deemed subject to the control of the agency and become "agency records. *See, e.g., Burka v. United States Dep't of Health and*

*Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (setting forth test for whether documents are under "control" of agency); *In Defense of Animals v. National Institutes of Health*, 543 F. Supp. 2d 70, 77 (D.D.C. 2008) ("records need not be generated by an agency, or in the actual possession of an agency, for the records to be considered 'owned or obtained' by an agency"). Here, the conceded and regular transmission of loan records among the Board and the twelve FRBs makes abundantly clear that the records at issue are not only obtained but controlled by the Board.

Perhaps anticipating that the Court will conclude that information created by the FRBs is subject to FOIA, the Board requests (in a footnote) "that the FRBNY and FRBB be given an opportunity to intervene and assert their interest, and the Board reserves its right, if necessary, to submit additional evidence and argument regarding the application of exemptions 4 and 5 to responsive FRBNY and FRBB documents." (Def. Mem. at 38, n. 16). Fox Business respectfully submits that the Court should decline the Board's invitation to add another layer of delay into this process; deny the Board's motion for summary judgment; grant the motion by Fox Business; and direct the Board to produce the requested documents forthwith.

* * * * *

## CONCLUSION

The Board's stated rationale for withholding the records sought by Fox Business rests upon speculation, not evidence.  It also relies upon an intellectual shell game under which the Federal Reserve Banks become agencies for the purpose of one exemption under FOIA and then cease to be for purposes of another, as long as that will serve the Board's purpose of withholding records from public scrutiny.  The Board has not carried its burden of establishing a proper search for records or any valid exemptions under FOIA.

For all the foregoing reasons, Fox Business respectfully submits that the Board's motion for summary judgment must be denied.

Dated:        New York, New York
              April 17, 2009

**MINTZ & GOLD LLP**

/s/  Steven G. Mintz
Steven G. Mintz
Terence W. McCormick
Paul Ostensen
470 Park Avenue South
10th Floor North
New York, N.Y. 10016-6819
Tel:  (212) 696-4848
Fax:  (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
ostensen@mintzandgold.com
*Attorneys for Plaintiff*
*Fox News Network, LLC*