UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
FOX NEWS NETWORK, LLC,            :   **OPINION AND ORDER**
                                     :   **SUBSTANTIALLY GRANTING**
                 Plaintiff,     :   **DEFENDANT'S MOTION FOR**
                                     :   **SUMMARY JUDGMENT AND**
          -against-       :   **DENYING PLAINTIFF'S**
                                     :   **MOTION FOR SUMMARY**
BOARD OF GOVERNORS OF THE FEDERAL  :   **JUDGMENT**
RESERVE SYSTEM,               :
                                     :   09 Civ. 272 (AKH)
                 Defendant.   :
------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

       In the summer of 2007, responding to a weakening national economy, the

Board of Governors of the Federal Reserve System ("the Board") took steps to provide

much-needed liquidity to American companies in search of funds. One major step was to

authorize the regional Federal Reserve banks to issue loans at terms more favorable than had

been their longstanding practice.

       Typically, the twelve regional Federal Reserve Banks ("FRBs") used their

Discount Window to make overnight loans to eligible depository institutions in their

respective districts, as loans of "last resort."[1] As a temporary measure in August 2007, the

FRBs reduced the rates for money lent through the Discount Window and lengthened the

loan terms from overnight to as long as ninety days. When the Board found that liquidity

still did not sufficiently improve, it authorized the FRBs, in March 2008, to lend to additional

entities, including primary dealers, "to promote effectively the goals of maximum

---

[1] Until 2003, because the rate was lower than the target rate set by the Federal Reserve, borrowers had to show that they had no other available source of borrowed money before being permitted to borrow at the Discount Window. Since then, no such showing has been required because the Discount Window rate is set higher than the target rate. Thus, one might expect that "institutions will use the Discount Window as a backup rather than a regular source of funding," The Federal Reserve Discount Window, http://www.frbdiscountwindow.org /discountwindowbook.cfm, or, more likely, when the liquidity needs of a financial institution cannot be met by its regular sources of funding.

employment, stable prices, and moderate long-term interest rates," 12 U.S.C. § 225a.  The

amount of money lent through the Discount Windows at the twelve regional FRBs increased

dramatically, from an average of approximately $1 million during the week of August 8,

2007, to over $188 billion in the last week of 2008.  Pl. Memo 5.

Plaintiff Fox News Network ("Fox") is owner of Fox Business Network, a

cable news network.  Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552

(2006), Fox seeks disclosure of borrowers' names, loan amounts, and pledged collateral for

the loans made under these new programs.  Fox argues that because taxpayer dollars are

being dispersed to particularly troubled institutions in economically perilous times, via

untested and unprecedented methods, the public deserves transparency and the Federal

Reserve requires increased oversight.

The Board resists disclosure under FOIA, maintaining that it already

voluntarily releases broader, aggregate information regarding these lending facilities and that

releasing transaction-level information would jeopardize the success of the facilities.  The

Board argues that since the public has long regarded the Discount Window as providing

mainly "loans of last resort" (along with routine needs by stable banks for short-term funds)

publicizing this information would deter borrowers from using the Discount Window, and

might induce depositors and investor to make panicky withdrawals from financial institutions

that borrowed from a Federal Reserve bank's Discount Window.  If the court grants

disclosure and those dangers follow, great damage to the national economy would result.

Fox submitted to the Board two requests, pursuant to FOIA.  The Board

conducted a search, compiled and reviewed the responsive materials, and replied that all the

documents that Fox had sought were exempted from required disclosure rules under two

exemptions of the Act, Exemptions 4 and 5.  5 U.S.C. 552(b)(4), (5).  Both parties move for summary judgment.

I rule that one document, which the Board determined is not a record, is indeed, a record.  The Board shall identify this document and either produce it or claim an exemption.  In all other respects, I grant the Board's motion and deny Fox's motion, finding that the Board performed an adequate search and that Exemption 4 permits the Board not to disclose the documents that Fox seeks.

## I.    History of the Federal Reserve

The tension between federal power and states' rights, which so fundamentally shaped our bicameral legislature, the electoral college, the limited jurisdiction of our federal courts, and other aspects of the United States Constitution, also is reflected in the national banking system:  whether to focus national monetary policy and power in one or a few national banks, or to rely on the banking systems of each state.  Alexander Hamilton, the first Secretary of the Treasury, founded the First Bank of the United States in 1791.  The bank was a private company, created to service commercial and private needs, but empowered also to issue a national currency, receive tax payments due to the United States, and monetize and manage the national debt.  The wealth it possessed combined with its ties to the federal government led to the bank's rapid growth in national wealth and power.  However, the bank was opposed by Thomas Jefferson and his Democratic-Republican party who distrusted centralized federal power and favored state banking systems.[2]

Congress let the bank's charter lapse twenty years after it was founded.  A profusion of state-chartered banks arose to succeed to the functions that the national bank had

---

[2] See generally Alan Brinkley, The Unfinished Nation: A Concise History of the American People 161-65 (2d ed., McGraw-Hill 1997); Harry J. Carman & Harold C. Syrett, A History of the American People 229 (Alfred A. Knopf 1952).

performed.  The state banks, with their powers to lend and to issue currency, created a great

spread of wealth, run-away inflation, financial panic, and economic chaos.  In 1816, to return

the nation to solvency and stability, President James Madison signed into law a Second Bank

of the United States with larger capitalization than the First Bank.  Denounced by President

Andrew Jackson and his Democratic party, the Second Bank suffered the same fate as the

first when its charter was allowed to lapse in 1836, and again was succeeded by state banks,

easy money, multiple issues of currency, a spread of wealth, inflation that surpassed bounds,

and financial chaos, which ushered in the Panic of 1837.[3]  Again, the nation rescued itself by

an increased centralization of banking functions and tighter regulations through the National

Banking Act of 1863, and its subsequent amendments in 1864 and 1865, which chartered

myriad smaller national banks and created a national currency.  This legislation enabled the

North to fund and equip the armies that won the Civil War.[4]  However, these measures were

insufficient to establish a truly centralized banking system.  Once again, the federal system

declined and was eclipsed by the state-chartered banks, leading again to run-away inflation

and a succession of financial panics culminating in the Panic of 1907.[5]

        The fluctuations and compromises continue until today between a central

national bank, a central bank mediated by partially autonomous regional banks, and

numerous state banks.  The current system owes its origin to the Federal Reserve Act of 1913

("FRA"), which capped the federal reform effort that followed the Panic of 1907.[6]  The FRA,

signed into law by Woodrow Wilson, created a number of substantially autonomous regional

---

[3] See Brinkley, supra note 2, at 210-11, 222-23, 249-52, 256-57, 259; Carman & Syrett, supra note 2, at 352.

[4] See Carman & Syrett, supra note 2, at 627; Roger T. Johnson, Historical Beginnings . . . The Federal Reserve 10-12 (Public and Community Affairs Department, Federal Reserve Bank of Boston 1999).

[5] See Johnson, supra note 4, at 12-15; Robert F. Bruner & Sean D. Carr, The Panic of 1907: Lessons Learned from the Market's Perfect Strom 1-7 (John Wiley & Sons, Inc. 2007).

[6] See Bruner & Carr, supra note 5, at 141-51.

banks and a federal board of governors, in charge of oversight and federal policy.[7]  The FRBs were to be "the monetary and fiscal agents of the United States."  <u>Fasano v. Fed. Reserve Bank of N.Y.</u>, 457 F.3d 274, 277 (3rd Cir. 2006) (quoting <u>First Agric. Nat'l Bank v. State Tax Comm'n</u>, 392 U.S. 339, 356 (1968)).

   The FRA provided that three government officials, the Secretaries of Treasury and Agriculture and the Comptroller of the Currency, would select the number of regional districts, draw the district boundaries, and choose the city within each district in which the bank would be located.  Controversy surrounded the number of regional banks and the size and reach of the New York branch.  Other areas were concerned that a system so firmly rooted in New York City would not be sympathetic or attuned to their local needs, including the financial demands peculiar to the regional manufacturing and agricultural industries. Congress instructed that "the districts shall be apportioned with due regard to the convenience and customary course of business and shall not necessarily be coterminous with any State or States."  FRA § 2(1).  In the end, by selecting a relatively large number of regions (twelve) each with a federal bank, and by intentionally curbing the power of the New York Federal Reserve branch, the three officials insured that institutions throughout the country might have access to federal funds from a receptive regional lender.[8]

   The 1913 House Currency and Banking Committee Report, issued in conjunction with the Federal Reserve Act and expressing congressional intent, comments that the FRBs are "individually organized and individually controlled, each holding the fluid funds of the region in which it is organized and each ordinarily dependent upon no other part

---

[7] <u>See</u> Brinkley, <u>supra</u> note 2, at 621-22, 705; 2 Carman & Syrett, <u>supra</u> note 2, at 385, 524.
[8] <u>See</u> Johnson, <u>supra</u> note 4, at 16-37.

of the country for assistance." H.R. Rep. No. 69 63rd Cong., 1st Sess. 18 (1913). The FRA

requires each FRB, through its individual board of directors, to:

> administer the affairs of said bank fairly and impartially
> and without discrimination in favor of or against any
> member bank or banks and may, subject to the provisions
> of law and the orders of the Board of Governors of the
> Federal Reserve System, extend to each member bank such
> discounts, advancements, and accommodations as may be
> safely and reasonably made with due regard for the claims
> and demands of other member banks, the maintenance of
> sound credit conditions, and the accommodation of
> commerce, industry, and agriculture.

12 U.S.C. § 301. The twelve regional banks are "operating arms of the central banking

system," but at the same time substantially independent and autonomous. The Federal

Reserve System Purposes and Functions, 6 (9th ed., June 2005).[9] They are charged with

carrying out "system functions including operating a nationwide payments system,

distributing the nation's currency and coin, supervising and regulating member banks and

bank holding companies, and serving as banker for the U.S. Treasury." Id. Each bank acts

"as a depository for the banks in its own district," "a lender to eligible institutions . . . , and

a clearing agent for checks." Id. at 6, 11. The FRBs turn all their profits over to the

Department of Treasury, id., and they operate, in part, under independent grants of

Congressional authority. See, e.g., 12 U.S.C. § 341 (providing the power to sue and be

sued, make contracts, appoint officers, hire and fire employees, prescribe by laws).

However, they are managed by their own boards of directors, with two-thirds majorities

elected by the banks in their regions, and enjoy considerable autonomy with regard to their

---

[9] The Federal Reserve System Purposes and Functions is a Board publication upon which courts have relied
to explain the workings of the Federal Reserve. See Fed. Open Mkt. Comm. of Fed. Reserve Sys. v.
Merrill, 443 U.S. 340, 343 n.2 (1979).

lending and deposit policies, as long as they are not inconsistent with the general

propositions of national policy and oversight.

The Board, in contrast to the FRBs, is a government agency composed of

seven members, appointed by the President and confirmed by the Senate, and a staff.  12

U.S.C. § 241.  The Board may examine and report upon the FRBs' activities, suspend or

remove any FRB officer or director, require the FRBs to write off losses, oversee loans

between FRBs, supervise the FRBs, and issue rules and regulations for the FRBs.  12 U.S.C.

§ 248(a)-(r).  The Board "exercises broad responsibility over the nation's payments system . .

. and plays a major role in supervision and regulation of the U.S. banking system."  See 12

U.S.C. § 248(j).  However, the degree of supervision and control by the Board is a function

of the personalities at play and any current issues between Congress and local banking

interests.  All this is done in a tension with local powers and practices exercised by the

twelve regional banks and the member banks that they serve.

## II.    Procedural History

On November 10, 2008, Fox's Vice President Bruce Becker submitted a

FOIA request to the Board, pursuant to 5 U.S.C. § 552, seeking "the names of institutions

receiving Federal Reserve lending from programs including but not limited to the following:

Regular [Open Market Operations ("OMO")]; Single-Tranche OMO Program; Discount

Window; Term Discount Window Program; Term Auction Facility; Primary Dealer Credit

Facility; Transactional Credit Extensions; ABCP Money Market [Mutual Fund] Liquidity

Facility; Securities Lending; Term Securities Lending Facility; Term Securities Lending

Facility Options Program; and any other Federal Reserve lending facility not mentioned

above," for the time period of August 8, 2007 through November 17, 2008.

On November 18, 2009, Fox's Executive Vice President Kevin Magee filed a second FOIA request before Fox had received any response from the Board. The second request sought records from September and October 2007 that identify the names of the institutions that had received loans under the programs listed in the first FOIA request, as well as the loan amounts and collateral pledged. The second request included an application for expedited processing, under 5 U.S.C. § 552(a)(6)(E)(v)(II).

In response to the two requests, the Board conducted a search of its records and engaged in discussions with its FRBs. The Board located 6,186 pages of agency records responsive to Fox's requests. The information contained in these pages related to the names and loan amounts of Discount Window borrowers and other programs mentioned in the requests. The Board found little information regarding collateral. After reviewing the responsive material, the Board determined that all the documents contained exempt material and no reasonably segregable non-exempt information. The Board denied the requests under Exemptions 4 and 5, and, on February 19, 2009, filed two indices pursuant to <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973) and supporting declarations. The Board represented that the bulk of the documents Fox sought were records of the FRBs in New York and Boston, and that records of an FRB are not records of the Board, as defined by the Federal Reserve Act, and do not have to be produced by the Board.

On March 27, 2009, the Board moved for summary judgment, arguing that no records have been improperly withheld and that it is entitled to judgment as a matter of law. Fox cross-moved, arguing that (1) the Board conducted an inadequate search, in part because it failed to search FRB records, and (2) no exemptions apply to the records. Alternatively, Fox seeks discovery, asserting that the Board has demonstrated bad faith in conducting the search.

### III.    Discussion

### A.  Relevant Law

Congress enacted FOIA "to establish a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." <u>Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill</u>, 443 U.S. 340, 351-52 (1979) (citing S.Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)).  There are nine exclusive exemptions listed in § 552(b).  "But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act," and each exemption "must be narrowly construed." <u>Dept. of Air Force v. Ross</u>, 425 U.S. 352, 361 (1976).

Summary Judgment is granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986).  On a motion for summary judgment in a FOIA case, "the agency must demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." <u>Nation Magazine v. U.S. Customs Serv.</u>, 71 F.3d 885, 890 (D.C. Cir. 1995) (internal quotations and citations omitted).  The agency also "must demonstrate that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." <u>Ruotolo v. Dep't of Justice, Tax Div.</u>, 53 F.3d 4, 9 (2d Cir. 1995).

The agency will sustain its burden by showing, through "affidavits or declarations, . . . that the agency has conducted a thorough search for responsive documents and has given reasonably detailed explanations why any withheld documents fall within an exemption." <u>Carney v. U.S. Dep't of Justice</u>, 19 F.3d 807, 812 (2d Cir. 1994).  The burden of proof rests with the agency on all material issues related to the search's adequacy and the

merits of exemptions.  5 U.S.C. § 552(a)(4)(B).  Affidavits submitted by an agency are

"accorded a presumption of good faith."  Carney, 19 F.3d at 812.  In a FOIA case, the

government agency is not entitled to the deference generally given under the Administrative

Procedure Act, and the district court should review the agency's decision de novo.  U.S.

Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 755 (1989).

"Discovery relating to [an] agency's search and the exemptions it claims for

withholding records generally is unnecessary if the agency's submissions are adequate on

their face," Carney, 19 F.3d at 812, demonstrating "that the withheld information is clearly

exempt and contains no segregable, nonexempt portions."  Allen v. CIA, 636 F.2d 1287,

1298 (D.C. Cir. 1980), overruled on other grounds by Founding Church of Scientology of

Washington D.C., Inc. v. Smith, 721 F.2d 828 (D.C. Cir. 1983).  "Where the agency fails to

meet that burden, . . . the court may employ a host of procedures that will provide it with

sufficient information to make its de novo determination, including . . . discovery by the

plaintiff."  Id.  If the agency satisfies its burden, the plaintiff must then demonstrate the

agency's bad faith by "impugn[ing] the agency's affidavits or declarations, or provid[ing]

some tangible evidence that an exemption claimed by the agency should not apply or

summary judgment is otherwise inappropriate."  Carney, 19 F.3d at 813 (citation omitted).

Failing that, the court has the discretion to "forgo discovery" to corroborate the agency's

claims and grant summary judgment in favor of the agency.  Id. at 812.

### B.  Adequate Search

A court must determine whether an agency has adequately searched its records

prior to analyzing claims of exemption.  See Carney, 19 F.3d at 812.  "'The factual question . .

. is whether the search was reasonably calculated to discover the requested documents, not

whether it actually uncovered every document extant.'" <u>Grand Cent. P'ship v. Cuomo</u>, 166

F.3d 473, 489 (2d Cir. 1999) (quoting <u>Safeguard Servs., Inc. v. SEC</u>, 926 F.2d 1197, 1201

(D.C. Cir. 1991)).  However, "if the sufficiency of the agency's identification or retrieval

procedure is genuinely in issue, summary judgment is not in order."  <u>Founding Church of</u>

<u>Scientology of Wash., D.C., Inc. v. NSA</u>, 610 F.2d 824, 837 (D.C. Cir. 1979).

   The Board has successfully carried its burden of showing that it performed an

adequate search.  Alison M. Thro, an attorney for the Board, was responsible for processing

Fox's two FOIA requests.  She has ten years of experience processing FOIA requests for the

Board, five of those years as its attorney in charge of such processing requests.  Ms. Thro

submitted a declaration detailing the Board's general procedure for handling FOIA requests

and outlining her processing of Fox's requests.

   Not long prior to receiving Fox's requests, the Board had received and

processed nineteen different FOIA requests regarding substantially overlapping information

about Discount Window lending and Special Credit and Liquidity Facilities transactions, and

it relied on this work in processing Fox's requests.  In processing the first nineteen requests,

Thro had "contacted staff members in the two divisions of the Board most likely to have

responsive records."  Thro Decl. ¶ 10.  These two divisions, the Division of Monetary Affairs

and the Division of Reserve Bank Operations and Payment Systems, are the only

departments charged with overseeing the Reserve Banks' lending under the relevant facilities

and supplying "data and statistics to the Board . . . relating to" those facilities.  Thro Decl. ¶

22.  Thro and her staff contacted numerous senior and other staff members at each division

and discussed previous FOIA requests in an effort to compile responsive documents.  In total,

thirteen staff members cooperated with the legal team.  Based on discussions with the staff

members, Thro concluded that it was not reasonably likely that responsive documents were

kept in any other divisions of the Board.  Thro and her staff then had follow-up discussions

with six of the staff members to confirm that all appropriate documents had been searched.

In response to Fox's FOIA requests, the Board's legal staff reviewed

documents it had compiled while processing the many earlier requests, locating 6,008 pages

of responsive documents.  Thro made further inquiries, including to the same two

departments, speaking with several staff members, seeking any remaining responsive

information.  These conversations led Thro to 178 additional pages of responsive documents.

In all, Thro found 6,186 responsive pages of documents, all of which the Board believed to

be exempt from disclosure under Exemptions 4 and 5.

Fox argues that the Board's submissions reveal "positive indications of

overlooked materials," precluding a finding of summary judgment in the Board's favor,

Founding Church of Scientology of Wash., D.C., Inc. v. NSA, 610 F.2d at 837, and entitling

Fox to summary judgment because of the inadequate search, Judicial Watch, Inc. v. U.S.

Dep't of Commerce, 34 F. Supp. 2d 28, 46 (D.D.C. 1998).  Alternatively, Fox asks for

discovery to test the competency of the Board's search.  Carney, 19 F.3d at 812.

I hold that Thro's methodology was reasonably calculated to identify all

responsive documents.

### 1.  Federal Reserve Bank Records

Fox argues that the Board failed adequately to search its records because it did

not search records of the New York Federal Reserve Bank ("FRBNY") and the Boston

Federal Reserve Bank ("FRBB"), the instrumentalities that made the Discount Window

loans.  The Board responds that it is not required to search files maintained by the FRBs, for

the FRBs' records are not the Board's records and, thus, the Board is under no obligation to search them. Jones-Edwards v. NSA, 196 Fed. App'x 36, 38 (2d Cir. 2006) ("An agency is not obliged to conduct a search of records outside its possession or control." (citing Grand Cent. P'ship, 166 F.3d at 479)); see Dept. of Justice v. Tax Analysts, 492 U.S. 136, 144-45 (1989) (finding agency records are those (1) created or obtained by the agency and (2) under the agency's control "at the time of the FOIA request").

The Board maintains that it has consistently interpreted its regulations to require search only of records generated by the Board, or by other entities performing a function on behalf of the Board. One regulation provides:

> Records of the Board include . . . all information coming into the possession and under the control of the Board, any Board member, any Federal Reserve Bank, or any officer, employee or agent of the Board or any Federal Reserve Bank, in the performance of functions for or on behalf of the Board that constitutes part of the Board's official files.

12 C.F.R. § 261.2(i)(1)(i). The Board interprets the words "for or on behalf of the Board" to mean "under delegated authority from the Board." Thro Supp. Decl. ¶ 3. This "longstanding practice of the Board," in interpreting its own regulations, id., "'becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Bruh v. Bessemer Venture Partners III L.P., 464 F.3d 202, 207 (2d Cir. 2006) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14 (1945)).

The FRA, which established the FRBs, grants independent authority to the FRBs to lend at the Discount Window and determine required collateral. 12 U.S.C. § 347b(a) ("Any Federal Reserve bank, under rules and regulations prescribed by the Board . . . , may make advances to any member bank on its time or demand notes having maturities of not more than four months and which are secured to the satisfaction of such Federal Reserve

bank."). The Board promulgates general rules and regulations, but lacks the statutory

authority to lend. Thus, it cannot delegate lending authority to the FRBs. Because the FRBs

lend money pursuant to their own mandate, records of their lending are not Board records.

Indeed, the five required forms that a borrower completes when applying for a loan at an

FRB Discount Window indicate that the loan is from the FRB and not the Board. These

forms make no mention of the Board, only of the relevant FRB.[10]

The history and structure of the Federal Reserve, the Board, and the FRBs,

bolster the Board's statutory interpretation. In the FRA, Congress divided the powers of the

Federal Reserve System between the Board, which is a federal agency, and the FRBs, which

were established as regional banks. Premised on this division, the Board interprets the

statutory definition of its records.

The Federal Reserve is structured to empower local institutions to lend, while

permitting federal oversight. The Board has the authority to promulgate the rules and

regulations to which the FRBs must adhere. But, this authority does not suggest that loans

made by an FRB, acting under its own authority and discretion, are done on the Board's

behalf. "It is evident from the legislative history of the Federal Reserve Act that Congress

did not intend to give the federal government direction over the daily operation of the

Reserve Banks." Lewis v. U.S., 680 F.2d 1239, 1241 (9th Cir. 1982) ("[T]he reserve-bank

plan retains to the Government power over the exercise of the broader banking functions,

while it leaves to individuals and privately owned institutions the actual direction of routine."

(citing H.R. Report No. 69, 63 Cong. 1st Sess. 18-19 (1913))).

Fox argues that the FRBs act on the Board's behalf when they implement the

monetary policy that the Board's regulations permit, and that records generated by the FRB

---

[10] Forms available at: http://www.frbdiscountwindow.org/required.cfm.

in connection with the facilities are Board records. However, to read the statute as defining all FRB records as Board records goes against the fundamental importance of an FRB's autonomy, autonomy which was the cornerstone of the Federal Reserve System's success.

The Board interprets other relevant regulations consistently with this reading. The record-keeping regulation for the Board provides: "Records of the Board include . . . [records] maintained for administrative reasons in the regular course of business in official files in any division or office of the Board or any Federal Reserve Bank in connection with the transaction of any official business." 12 C.F.R. § 261.2(i)(1)(ii). It provides that the Board may store its records off-site in the FRBs only "for administrative reasons." Id. Thus, not all records kept by the FRBs are records of the Board; only those reflecting delegated functions or those held at an FRB for the Board's "administrative reasons."

Section 261.3(a) provides that the Secretary of the Board is the custodian of its records, whether maintained at the Board or in an FRB. This regulation provides: "The Secretary of the Board . . . is the official custodian of all Board records, including records that are in the possession or control of the Board, any Federal Reserve Bank, or any Board or Reserve Bank employee." Plaintiff argues that this establishes that the Board's Secretary, and therefore the Board, has custody or control over all records kept by all FRBs. However, as the Board maintains, this provision does not extend the functions or powers of the Board's Secretary beyond the limits of § 261.2(i)(1)(i).

Congress established the Board and the regional FRBs as separate entities, reflecting the tension between a centralized federal bank and generally independent state and local banks. The Board establishes national policy, but that policy is implemented by each FRB, which maintains its own banking relationship with the member banks of its region.

15

The Board's interpretation of which records belong to the Board and which belong to the FRBs is consistent with the overall Federal Reserve System structure established by statute.

Although the Board has the power "[t]o examine at its discretion the accounts, books, and affairs of each Federal reserve bank and of each member bank and to require such statements and reports as it may deem necessary," 12 U.S.C. 248(a), that oversight power does not change the balance of the record-keeping functions described above. In any event, for purposes of FOIA, what an agency has an ability to obtain, but has not obtained, is irrelevant. Forsham v. Harris, 445 U.S. 169, 182, 185, 186 (1980) ("FOIA applies to records which have been in fact obtained, and not to records which merely could have been obtained"); Ciba-Geigy Corp. v. Mathews, 428 F. Supp. 523, 531 (S.D.N.Y. 1977) (holding that agency "should not be compelled to acquire data it neither referred to directly nor relied upon in making decisions").

It may be, as Fox argues, that no FRB has a FOIA office to which FOIA requests may be submitted, that the only FOIA office for the Federal Reserve System is in the Board, and if Fox cannot obtain documents from the Board, it will be deprived of obtaining any meaningful documents enabling a public accounting of the Board's Discount Window loan program. Whether or not this is so, it does not alter the fact that Fox served its requests only upon the Board and that the definition of a Board record is limited by statute.

I hold that the Board's interpretations of its own regulations are reasonable and consistent. I reject Fox's argument that the interpretations are unreasonably narrow and attenuated.

## 2. Additional Arguments for Inadequate Search

Fox argues that additional aspects of the Board's search cause it to be inadequate. Fox argues that the Board failed to account for records obtained from the FRBNY and the FRBB in the "daily data feed" from which the Board generates its own reports; that the Board did not search deleted files for responsive material; and that the Board chose not to search an attachment to a received e-mail that the recipient of the e-mail had not and need not have opened.

The daily data feeds are daily reports sent electronically by the individual FRBs to the Division of Monetary Affairs containing aggregate data pertaining to FRB transactions. The Board generates three different weekly reports from the data, and searched its weekly reports to respond to Fox's FOIA request. Fox charges that the daily data feeds may have contained information that was not incorporated into the Board's weekly reports and that the Board never searched the unincorporated information.

Fox has no proof that any data was left out of the Board's three weekly reports. The good-faith presumption accorded to agency affidavits "cannot be rebutted by 'purely speculative claims about the [possible] existence . . . of other documents.'" Grand Cent. P'ship, 166 F.3d at 489 (quoting Safeguard Servs., Inc., 926 F.2d at 1200); Carney, 19 F.3d at 813 ("something more than [movant's] bare allegations" of agency's concealment of records is required). The daily reports themselves are dynamic, the data changing with each day's business, and the Board does not retain hard copies of each generation. To require the Board to reconstruct the daily data feeds as of particular dates would be unduly burdensome. Grand Cent. P'ship, 166 F.3d at 489 ("an agency's search need not be perfect, but rather need only be reasonable"); Schrecker v. Dept. of Justice, 349 F.3d 657, 663 (D.C. Cir. 2003) (The

"adequacy of an agency's search is measured by a standard of reasonableness, and is dependent upon the circumstances of the case."); see Judicial Watch, Inc. v. Export-Import Bank, 108 F. Supp. 2d 19, 27 (D.D.C. 2000) ("[I]t is the requester's responsibility to frame requests with sufficient particularity to ensure that searches are not unreasonably burdensome . . . . The rationale for this rule is that FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters.") (quotation and citation omitted).

   As to deleted material, the issue arises with regard to two Board members and one staff member who had received weekly reports via e-mail containing transaction-level loan information. None of these three individuals had used the reports to perform Board duties and had routinely destroyed all copies prior to Fox's FOIA request. Id. The Board's failure to use computer experts to search for these files does not render the search inadequate. Baker & Hostetler LLP v. U.S. Dep't of Commerce, 473 F.3d 312, 318 (D.C. Cir. 2006) (agency's FOIA response sufficient when its explanation as to why it was unable to recover deleted emails was adequate and unrebutted). The personnel routinely deleted such emails shortly after receiving them because they did not need this information to perform Board duties. See Wilbur v. CIA, 355 F.3d 675, 678 (D.C. Cir. 2004) ("the fact that responsive documents once existed does not mean that they remain in the [agency's] custody today or that the [agency] had a duty under FOIA to retain the records"); Yeager v. DEA, 678 F.2d 315, 321 (D.C. Cir. 1982) ("A requester is entitled only to records that an agency has in fact chosen to create and retain.").

### 3. The Unopened Attachment

   In one instance, the Board did not search an attachment to an e-mail received by a number of Board staff and Board members within the relevant time period. The

recipients had opened the e-mail which contained responsive aggregate information from the FRBNY regarding a relevant lending facility. None of the recipients opened the attachment until Thro asked them to do so as part of the search. Thro determined that because the attachment had not been opened, forwarded, used, reviewed, or relied upon in the course of the recipients' duties for the Board, it was not a Board record. I disagree.

The attachment was both obtained by the agency and within the agency's control "at the time of the FOIA request." Dept. of Justice, 492 U.S. at 144-45. It was kept and not deleted. Yeager, 678 F.2d at 321. That no staff or Board member thought to open the attachment does not negate its status as a record. Documents, and their attachments, are records whether or not an employee's eye passed over every section or page.

I hold that the attachment is an agency record and should be included in the search. Thro's decision, however flawed, was forthrightly presented in her declaration and is not evidence of "bad faith." Allen, 636 F.2d 1298. Fox's submissions are "adequate on their face," Carney, 19 F.3d at 812, regardless, and provide sufficient information on which to make a de novo determination. See id. at 813. The Board shall conduct the additional search, turn over all responsive and non-exempt information, and submit an additional Vaughn index, if necessary.

In spite of this deficiency, the search conducted by the Board was thorough and reasonable. The Board searched the two divisions reasonably likely to have responsive documents (based on its nineteen prior similar FOIA requests). The Board contacted thirteen staff members and had follow-up discussions with six. The Board's FOIA attorney personally reviewed the information. This process yielded 6,008 pages of exempt information listed on the Feb. 19, 2009 Vaughn indicies. A later, additional search yielded

178 more pages listed on supplemental Vaughn index. I find that the search was adequate, no additional search (other than that indicated above) is required, and no discovery by Fox of the Board's review process is warranted.

### C. FOIA Exemptions

The Board argues that Exemptions 4 and 5 exempt the responsive documents recovered in the search. Exemption 4 applies to an agency's commercial, financial, or trade secret information that is obtained from a person and is privileged or confidential. 5 U.S.C. 552(b)(4). Exemption 5 applies to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. 552(b)(5). I hold that Exemption 4 applies and, thus, do not discuss whether Exemption 5 applies.

Under Exemption 4, an agency must demonstrate that the information sought is: (1) a "trade secret" or "commercial or financial" in character, (2) "obtained from a person," and (3) "privileged or confidential." 5 U.S.C. 552(b)(4); Inner City Press/Cmty. on the Move v. Bd. of Governors, 463 F.3d 239, 244 (2d Cir. 2006). The parties agree that the loan information sought is "commercial or financial," but dispute the other two elements.

### 1. Obtained from a Person

Documents within the scope of Exemption 4 must be "obtained from a person." 5 U.S.C. § 552(b)(4). For the purposes of FOIA, a "'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2). An "agency" includes, inter alia, a "Government corporation [or] Government controlled corporation." 5 U.S.C. § 552(f)(1). Fox wants the Board to disclose documents containing the borrowers' names, loan amounts, and pledged collateral

for all the loans made through the Discount Window and related facilities.  The Board

contends that the information that Fox seeks originated with and was obtained by an FRB,

from a borrower, and therefore was "obtained from a person."  Fox argues that the

information is obtained by the Board from the FRBs, and that the loan information is

generated by the federal government, and does not implicate raw information received

directly from the borrower.  See Nadler v. FDIC, 899 F. Supp. 158, 164 (S.D.N.Y. 1995)

("The thrust of the FOIA is to create a right of access to official information.  Information

generally acquires an 'official' character either when it is generated by the agency itself or is

acquired from private parties whose activities are substantively germane to the agency's

'official' mission.").

Exemption 4 aims squarely at protecting the rights of individuals over their

privileged or confidential commercial information against FOIA's broad sweep.  In

recognizing this, courts look past formalities to ensure that even indirect disclosure does not

jeopardize a person's privacy.  One court exempted a "ratio calculated [by an agency] from

individual components all of which are obtained from" individuals.  OSHA Data/CIH, Inc. v.

U.S. Dept. of Labor, 220 F.3d 153, 162 (3rd Cir. 2000); see Judicial Watch, Inc. v. Export-

Import Bank, 108 F. Supp. 2d 19 (D.D.C. 2000) (exempting information that the "Bank

obtained . . . from the insurance applicants themselves"); Clarke v. U.S. Dep't of Treasury,

1986 U.S. Dist. LEXIS 29989 (E.D. Pa. Jan. 28, 1986) (holding names and addresses of

holders of a certain type of bond are obtained from persons).  Another held that agency

summaries and reformulations of a "person's" raw data are "obtained from a person."

Philadelphia Newspapers, Inc. v. HHS, 69 F. Supp. 2d 63, 67 (D.D.C. 1999).  Because the

borrower's name, the amount it must borrow, and the property it volunteers to provide as

collateral is information that originated with the borrower and is reflected in the data Fox

seeks, I hold that it was "obtained from" the borrower.

One court found that a borrower's loan information was not "obtained from"

the individual borrower, but "generated by" the lending agency, and that, therefore,

Exemption 4 did not apply.  Buffalo Evening News v. Small Bus. Admin., 666 F. Supp. 467,

469 (W.D.N.Y. 1987).  The court in Buffalo Evening News addressed a request by plaintiff

newspaper that the SBA disclose information pertaining to SBA loans made in the wakes of a

powerful ice storm and a blizzard that damaged a host of small businesses in the region.  The

SBA responded to an initial request by disclosing a complete list of borrowers' names, cities,

and states.  Unsatisfied, the plaintiff requested more detailed information, pursuant to FOIA.

The SBA made further disclosures, but refused to reveal individual loan amounts or

dispositions, claiming that the information was obtained from individuals and covered by

Exemption 4.

The court in Buffalo Evening News ruled "that 'in no way do these records

implicate any financial information provided to the government by the borrower.'"  Id. at 468

(citing Miami Herald Publ'g Co. v. Small Bus. Admin., 670 F.2d 610 (5th Cir. 1982)).  The

plaintiff asserted:

> [T]he only connection between the information sought here
> and the information obtained from the borrower is that a
> loan was granted by the SBA presumably on the basis of
> the financial records submitted by the borrower and that
> nothing more or less is established by the release of the
> requested records, much less the contents of the records
> submitted by the borrowers.

Id. at 468-69 (quotation omitted).  The court held "that all of the information sought by

plaintiff here has been generated by the defendant SBA in the course of its involvement with

its borrowers." <u>Id.</u> at 469.  The court reiterated, "this information in no way implicates any of the financial information provided by the borrowers to the government." <u>Id.</u>

  The facts at issue here are markedly different from those in <u>Buffalo Evening News</u>.  In <u>Buffalo Evening News</u>, the identities of the SBA borrowers were already public, whereas the identities of the Discount Window borrowers are not.  The SBA loans in <u>Buffalo Evening News</u> were generally available to promote recovery in areas ravaged by storms or other dramatic adverse conditions; the Discount Window loans were focused on particular companies in financial distress.  There was no quality of opprobrium in <u>Buffalo Evening News</u>; that is in the case before me.

  The discount window loans "implicate" potentially "personal" and sensitive financial information, unlike the loans in <u>Buffalo Evening News</u>.  The Board has legitimate concern that disclosure of information about Discount Window loans can damage them and do incalculable harm to the national economy.  As the Board's economist attests,

> Some of these reasons, such as an unexpectedly large loan request from a customer or a runoff in liabilities as a major depositor makes payments to third parties, may result from routine developments and may not indicate an underlying capital or liquidity problem.  However, the fact that an institution borrowed from the [Discount Window] may suggest to customers, creditors, analysts, or the news media that its liquidity shortage stems from a financial problem at the institution that is not known by the public at large.

McLaughlin Decl. ¶ 23.  The SBA borrowers, on the other hand, clearly needed the loans because of damage sustained in the storms.  The SBA loans carried no further implications.  Indeed, the court in <u>Buffalo Evening News</u> made sure to clarify that its holding was based in part on the fact that "this information in no way implicates any of the financial information provided by the borrowers to the government." <u>Buffalo Evening News</u>, 666 F. Supp. at 469.

Because disclosure by the Board implicates the borrower's financial information, and the parties agree that the individual borrowing institutions are "persons," as defined by FOIA, it is not relevant whether FRBs ought to be classified as "persons" or "agencies." 5 U.S.C. § 551(2). Any responsive document qualifies as exempt because it contains information obtained from the borrower: names, amounts, and collateral.

### 2. Privileged or Confidential

The other element of Exemption 4 is whether the info sought is privileged or confidential. Information is "privileged or confidential" if it is not ordinarily released to the public and "its disclosure would have the effect either (1) of impairing the government's ability to obtain . . . necessary information in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained." Continental Stock Transfer, 566 F.2d 373, 375 (2d Cir. 1977). The agency has the burden of showing that the information is privileged or confidential and "must identify specific dangers that disclosure will pose." Nadler v. FDIC, 899 F. Supp. 158, 162 (S.D.N.Y. 1995). "Actual competition and the likelihood of substantial competitive injury is all that need be shown," Gulf & W. Indus., Inc. v. U.S., 615 F.2d 527, 530 (D.C. Cir. 1980), by proffering "evidence demonstrating the existence of potential economic harm," Inner City Press, 380 F. Supp. 2d at 219. In addition, many courts have recognized a third ground on which information may be found privileged or confidential: if disclosure would undermine the agency's "effective execution of its statutory responsibilities." 9 to 5 Org. for Women Office Workers v. Bd. of Governors, 721 F.2d 1, 10 (1st Cir. 1983); Critical Mass Energy v. NRC, 975 F.2d 871, 880 (D.C. Cir. 1992) (en banc).

The Board has shown specific and substantial harms to borrowers if the information about Discount Window loans were disclosed. The Federal Reserve Bank of Boston's website reads, in part: "There will not be any public disclosure of the individual borrowers participating in [the Discount Window] or the amounts of individual advances made to the borrowers."[11] The institutions borrowing at the Discount Window, the Term Auction Facility, and the Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility compete for retail and commercial banking services in the marketplace. "A primary dealer would suffer competitive and reputational harm if its name and the relevant collateral it posted were disclosed to the public," for the public is likely to draw inferences of its relative financial strength and viability. Logan Decl. ¶ 34. "Anonymity is crucial to primary dealers." Id. ¶ 35.

The Board's concerns, that rumors are likely to begin and runs on banks are likely to develop, cannot be dismissed. Similarly, the Board's concern is real that disclosure would reveal proprietary trading information of borrowers, their trading strategies and the size and nature of their portfolios of assets. The national economy is not so out of danger, and the frailty of banks so different now then when their Discount Window borrowing began, as to make the Board's concern academic.

I rule, for all these reasons, that The Board's argument of exemption based on confidentiality is meritorious.

### 3.  Governmental Effectiveness

Courts have recognized a third ground on which information may be found privileged and confidential: that disclosure would undermine the agency's "effective execution of its statutory responsibilities." 9 to 5 Org. for Women Office Workers v. Bd. of

---

[11] http://www.frbdiscountwindow.org/mmmf.cfm.

Governors, 721 F.2d 1, 10 (1st Cir. 1983); Critical Mass Energy v. NRC, 975 F.2d 871, 880 (D.C. Cir. 1992) (en banc).  Exemption 4 "also protects a governmental interest in administrative efficiency and effectiveness."  Critical Mass Energy, 975 F.2d at 879; see Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 n.17 (D.C. Cir. 1974) (indicating Exemption 4 may protect governmental interests).  The Second Circuit has not affirmatively accepted this approach, nor explicitly rejected it.  Nadler v. FDIC, 92 F.3d 93, 96 (2d Cir. 1996) ("[W]e do not reach the issue whether the district court properly afforded relief to the FDIC on the basis of the "program effectiveness" exemption derived from footnote seventeen of National Parks.").  Nevertheless, judges in this and other district have adopted the analysis.  Africa Fund v. Mosbacher, 1993 U.S. Dist. LEXIS 7044 at *21 (S.D.N.Y. May 26, 1993) (holding confidential export information exempt from disclosure by the Department of Commerce because the information is "invaluable in making policy and maintaining effective export controls"); Clarke v. U.S. Dep't of Treasury, 1986 U.S. Dist. LEXIS 29989 at *2 (E.D. Pa. Jan. 28, 1986).

In Clarke, plaintiff sought the names of all owners of a particular type of United States Treasury bond, as well as the bonds' value and maturity dates.  The agency declined to release the documents for fear "investors would be less likely to purchase government bonds in the future if they knew the details of their purchases would be subject to public disclosure."  Id. at *5 (citing defendant's unopposed affidavit).  The court found that Exemption 4 applied because disclosure would "violate the purchasers' expectations of confidentiality and harm the Treasury Department's ability to issue bonds in the future."  Id. at *2.  The court relied on uncontradicted affidavit evidence that "[a]ny market participant with access to data concerning the positions of other participants would have a significant

competitive advantage." Id. at *7. Similarly, those institutions that borrow at the Discount

Window, as well as the other facilities mentioned in Fox's FOIA requests, do so with the

understanding that the loan is confidential. As in Clarke, the Board asserts that borrowers

would be less likely to use their facilities, if the transactions were not confidential. Id.

       In another similar case, Comstock Int'l (U.S.A.), Inc. v. Export-Import Bank,

464 F. Supp. 804 (D.D.C. 1979), the agency, "a banking corporation that seeks to facilitate

and finance exports and imports between the United States and other countries," offers

"loans, guarantees, and other forms of financial assistance." Id. at 805. The agency withheld

a loan agreement in which it was a party, "maintain[ing] that disclosure would significantly

impair its ability to promote United States exports." Id. at 808. The agency argued that it

might lose applicants to foreign financial institutions that do not disclose, and "that

disclosure would . . . impair its effectiveness by making it more difficult to negotiate loan

agreements." Id. It was concerned as well that disclosure "would discourage commercial

bank participation with Eximbank on joint loan agreements, thus impairing Eximbank's

ability to control overall financing of transactions." Id. The court explained, "borrowers

would be less inclined to make concessions that could be disclosed to a future lender." Id.

       Disclosing details of the facilities Fox identifies would compromise the

Board's effective execution of its statutory responsibilities. The Board is charged with: (1)

promoting goals of maximum employment, stable prices, and moderate long-term interest

rates, 12 U.S.C. § 225a; (2) utilizing its authority to permit lending by FRBs so as to address

unusual and exigent circumstances in the domestic economy, 12 U.S.C. § 343; and (3)

employing certain lending practices by FRBs as a safety valve in relieving liquidity strains

for individual depository institutions and the banking system, and to complement open

market operations in achieving the target federal funds rate, 12 U.S.C. § 347b(b). In essence, borrowers would view taking such last-resort, publicly disclosed loans as unwise because it would stigmatize the company and lead to a, perhaps false, belief that the company is in financial trouble. This would undermine the Board's mandate to provide stability to markets, especially during a financial crisis. Under this rationale, withholding information regarding even loans paid months ago is mandated by Exemption 4.

### Conclusion

For the reasons stated above, I hold that Exemption 4 exempts disclosure of the responsive documents that the Board located in its search. Accordingly, I grant the Board's motion for summary judgment and deny Fox's motion, except that the Board must conduct an additional search of the unopened attachment and make appropriate disclosures.

The Clerk shall mark motions Nos. 8 & 13 as terminated and close the case, subject to reopening within sixty days for matters relating to the remaining search.

SO ORDERED.

Dated:  New York, New York
        July 30 2009

ALVIN K. HELLERSTEIN
United States District Judge